UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

DETENTION WATCH NETWORK
and CENTER FOR CONSTITUTIONAL
RIGHTS,

ECF CASE
14-cv-583 (LGS) (RE)

*Plaintiffs*,

v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

*Defendants*.
------------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION COMPELLING DEFENDANTS TO PRODUCE
RECORDS RESPONSIVE TO PLAINTIFFS' FOIA REQUESTS**

GHITA SCHWARZ
SUNITA PATEL
Center For Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6445
Fax: (212) 614-6499
gschwarz@ccrjustice.org
spatel@ccrjustice.org

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ........................................................................................................ 10

    I.      PLAINTIFFS WILL SUFFER IRREPARABLE
           INJURY ABSENT A PRELIMINARY INJUNCTION ..................... 11

    II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE
           MERITS, BECAUSE THE RECORDS THEY SEEK
           GO TO THE HEART OF THE PUBLIC'S
           RIGHTS UNDER FOIA ..................................................................... 15

           A.  Plaintiffs Were Plainly Entitled to Expedited Processing .............. 16

           B.  Defendants Improperly and Untimely Denied Plaintiffs'
               Request as Overbroad, and Plaintiffs Specifically
               Identified the Information Sought ................................................... 17

               1.  Defendant ICE Never Denied Plaintiffs' Request ............. 19

               2.  Defendant ICE's Arbitrary 10-Day Deadline
                    Was Not a Legitimate Grounds for Denial of
                    Plaintiffs' Request ............................................................. 20

               3.  Since Plaintiffs' Request Was Never Denied,
                    Plaintiffs' December 19 Letter
                    Was Not an Appeal ............................................................ 21

                4.  Plaintiffs' Requests Reasonably
                    Described the Records Sought .......................................... 21

    III.    THE BALANCE FO HARDSHIPS FAVORS PLAINTIFFS ............ 23

    IV.   THE PUBLIC HAS A STRONG INTEREST IN THE
           IMMEDIATE DISCLOSURE OF THE
           REQUESTED DOCUMENTS ......................................................... 24

CONCLUSION .................................................................................................... 25

**CASES**

*Al-Fayed v. C.I.A.*, 254 F.3d 300 (D.C. Cir. 2001) ................................................17

*ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24 (D.D.C. 2004) ........... 12, 15-16

*ACLU v. Dep't of Defense,* 339 F. Supp. 2d 501 (S.D.N.Y. 2004) ........... 10-11, 16

*ACLU v. Dep't of Defense,* 357 F. Supp. 2d 501 (S.D.N.Y. 2005) .......................24

*ACLU v. U.S. Dep't of Homeland Security,* No. 11 Civ. 3786 (RMB),
2013 U.S. Dist. LEXIS 130610, *26-27 (S.D.N.Y. Sept. 9, 2013) ......................25

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*,
542 F. Supp. 2d 1181 (N.D. Cal. 2008) ...............................................12, 13, 14, 16

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*,
No. C 07-5278 SI, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007) ........ 12-14

*Elec. Privacy Info. Ctr. v. Dep't of Justice*,
416 F.Supp.2d 30 (D.D.C. 2006) ...............................................................12, 15, 25

*Gerstein v. C.I.A.*, No. C-06-4643 MMC, 2006 WL 3462659,
at *4 (N.D. Cal. Nov. 29, 2006)...............................................................................12

*Halpern v. F.B.I.*, 181 F.3d 279 (2d Cir. 1999) ...............................................11, 21

*Hudgins v. IRS*, 620 F.Supp. 19 (D.D.C. 1985)...............................................19, 21

*Judicial Watch v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ................................22

*King v. U.S. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987)...............................23

*Kowalczyk v. Department of Justice*, 73 F.3d 386 (D.C.Cir.1996)................. 20-21

*Leadership Conference on Civil Rights v. Gonzales*,
404 F. Supp. 2d 246 (D.D.C. 2005) ...........................................................12, 13, 14

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010)......................................................................................11

*New York Times Co. v. U.S. Dep't of Homeland Security*,
No. 1, Civ. 8100 (SAS), 2013 U.S. Dist. LEXIS 83894
(S.D.N.Y.  June 6, 2013).........................................................................................25

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..........................................13

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ......................12

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1979) ..........................................................................................24

*Nat'l Day Laborer Organizing Network et al. v. ICE et al.,*
877 F. Supp. 2d 87, 93 (S.D.N.Y. 2012) .................................................. 18, 24- 25

*Nurse v. Sec'y of Air Force*, 231 F. Supp. 2d 323 (D.D.C. 2002)..................18, 22

*Payne Enters., Inc. v. United States*, 837 F.2d 486 (C.A.D.C. 1988).............11, 12

*Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011)................11, 23, 24

*Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4 (2d Cir. 1995) ...........................19

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989)............................................................................................16

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ...............................................2, 25

## STATUTES

5 U.S.C. § 522.................................................................................................1, 20
5 U.S.C. § 552 (2009) ................................................................................ *passim*
5 U.S.C. § 552 (2013) .........................................................................................17
6 C.F.R. § 5.3 .........................................................................................19, 20, 23
6 C.F.R. § 5.9 ...............................................................................................20, 21

## CONGRESSIONAL RECORD

H. Rep. 93–876, 93 Cong.2d Sess. 6 (1974)..................................................17, 21

# PRELIMINARY STATEMENT

Plaintiffs, Detention Watch Network ("DWN") and Center for Constitutional Rights ("CCR") (collectively "Plaintiffs"), seek an injunction compelling U.S. Immigration and Customs Enforcement ("ICE") and the U.S. Department of Homeland Security ("DHS") (collectively "Defendants") to promptly process and produce the information sought in Plaintiffs' request for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522 ("the Request"), filed on November 25, 2013.

The records sought in the Request deal with policy, practice, and communications surrounding the Detention Bed Quota, a mechanism included in Congressional appropriations bills that conditions over $5.39 billion in funding for ICE on the maintenance of 34,000 detention beds per day. These detention beds exist for the sole purpose of civil detention of immigrants pending the outcome of their immigration cases, not incarceration for individuals serving sentences for criminal convictions or awaiting trial on criminal charges. The Detention Bed Quota is a matter of widespread controversy and increasing public and press concern.

Denied expedited processing and erroneously informed that their case would be closed, Plaintiffs filed suit on January 30, 2014 to compel Defendants to comply with the law and produce the requested documents, which are time-sensitive in nature: imminent Congressional debate on appropriations is expected to begin in March, 2014, and the expected attempts to renew the Detention Bed Quota render the Plaintiffs' Request a matter of urgency.

Plaintiffs easily meet the standard for obtaining a preliminary injunction. First, Plaintiffs will suffer irreparable harm if the injunction is denied, because Congressional debates on the Fiscal Year 2015 budget, including all-but-certain attempts to renew the Detention Bed Quota, are expected to begin in or before March 4, 2014, when the Obama Administration is expected to

submit its proposed budget. Without the information sought, Plaintiffs' efforts to educate the public and engage communities in the debate will be irreparably harmed. Second, Plaintiffs are likely to succeed on the merits of their Request for crucial documents and expedited processing. Plaintiffs' Request, which specifically identified information about government activity that has become a matter of enormous public concern, goes to the heart of the purpose of FOIA, and because Congressional debate on the renewal of the Detention Bed Quota is imminent, there is an urgent need to inform the public of agency decision-making regarding the Quota. Third, the balance of hardships tips in the Plaintiffs' favor, as Defendants are required to comply with FOIA and cannot identify any burden that would override their obligation to follow federal law, while Plaintiffs, who seek to engage the public in debate of a controversial policy that has devastating effects on immigrant families and communities, will suffer tangible hardship if the lack of information impedes their efforts to fight for reform.

Therefore, Plaintiffs respectfully request that this Court order Defendants to produce the records sought in Plaintiffs' FOIA Request within ten days of the Court's order and order Defendants to provide Plaintiffs with declarations, as specified in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) within ten days thereafter.

## STATEMENT OF FACTS

### Plaintiffs' FOIA Request

Plaintiffs DWN and CCR are non-profit advocacy organizations engaged in extensive work informing the public and engaging in debate regarding immigration detention policy and practice. Plaintiff DWN, a network of advocacy groups fighting for reform of immigration detention practices, is the primary organization focused on campaigning to end the Detention Bed Quota. Plaintiff CCR, a legal organization with a history of engaging the public in debates

regarding policing and imprisonment, spearheaded litigation on behalf of organizations seeking information regarding ICE's Secure Communities program. *See NDLON et al. v. ICE et al.*, 10 CV 3488 (SAS). Both are primarily engaged in disseminating information to the public. *See* Declaration of Ghita Schwarz ("Schwarz Decl.") (Ex. A) (Plaintiffs' Request).

On November 25, 2013, Plaintiffs submitted FOIA requests to ICE and DHS seeking information regarding ICE's controversial interpretation and implementation of Detention Bed Quota. (Schwarz Decl. Ex. A). Plaintiffs sought a limited number of specific records related to contractual agreements regarding detention beds with private prison corporations and local, state, and city governments; statistical reports on detention and financial payouts to private prison corporations; communications regarding news articles about the Detention Bed Quota; reports and memoranda regarding the Detention Bed Quota to and from the Secretary of DHS, the Director of ICE, Members of Congress and the White House, and leadership at DHS and ICE; records dealing release of thousands of detainees as a result of budget constraints; communications between ICE, DHS and local, state and Congressional officials regarding detention costs and the need to fill detention beds as a result of contractual obligations; and records related to the relationship between ICE and private prison corporations.  (Ex. A at 3-5.)

Plaintiffs requested expedited processing, citing "an urgent need to inform the public about the policies and decision-making regarding the detention bed quotas or detention bed mandate." As evidence of the urgency of the request, Plaintiffs cited ongoing news reports about the controversy surrounding the Quota and pointed to the imminent Congressional debates on its renewal, stating that "it is paramount that the public have the requested information in order to meaningfully engage in the public debate surrounding the cost of detention; decisions regarding

the number of beds ICE is required to occupy; and incentives by local governments to arrest and fill ICE detention beds." (Schwarz Decl. Ex. A at 7).

**Defendants' Responses**

Plaintiffs confirmed delivery of their request on November 26, 2013 by Federal Express to DHS, ICE, and numerous component offices. With the exception of one small component of DHS, which stated that it could not locate or identify responsive records, defendant DHS has never responded to Plaintiffs' Request.

ICE acknowledged receiving Plaintiffs' Request in two inconsistent letters dated November 27, 2013 but postmarked on December 4, 2013. In the first, ICE acknowledged receipt of the letter and invoked a 10-day extension. (Schwarz Decl. Ex. B). In the second, ICE declared the request too broad, asked for further specificity, and stated that the request would be administratively closed within ten days if no response from Plaintiffs was received within ten days of the date of the letter. ICE did so without citing any authority for this administrative closure process and despite the fact that the letter was postmarked nine days later than it was dated, giving Plaintiffs only one day to meet ICE's arbitrary deadline. (Schwarz Decl. Ex. B). On December 10, 2013, Ian Head of Plaintiff CCR communicated by telephone and e-mail with the ICE FOIA office to request clarification and to advocate against administrative closure, but heard no response. On December 13, 2013, CCR Attorney Sunita Patel called the ICE FOIA office and was told that a supervisor would call back to facilitate the request, but no one ever did. (Schwarz Decl. ¶4).

Plaintiffs responded with a letter to ICE on December 19 (Schwarz Decl. Ex. C), stating that Plaintiffs had "reasonably described" the records sought as per 5 U.S.C. 552 (a)(3). ICE responded in a letter dated December 27, 2013, construing Plaintiffs' December 19 letter as an

"appeal" of an "adverse determination," even though ICE had never made such a determination. (Schwarz Decl. Ex. D). On January 30, 2014, after filing the complaint in the instant case, Plaintiff CCR received a response from ICE stating that it had affirmed its position that the request was too broad and that the request would be "remanded" for further discussions with Plaintiffs. Even if Plaintiffs December 19 letter had been an appeal of an adverse determination, ICE's response, postmarked January 27, 2014 (Schwarz Decl. Ex. E), was sent after the passage of the deadline for ICE to respond to an appeal. While the letter claimed that it had also been sent by email, Plaintiffs have no record of any email copy of this letter. Two and a half months after receiving Plaintiffs' Request, ICE has not made any substantive response.

**Background on the Detention Bed Quota**

Up for renewal in Fiscal Year 2015, the Detention Bed Quota is language included in Congressional appropriations bills – most recently in the Fiscal Year 2014 Omnibus Appropriations Bill – that currently conditions over $5.39 billion in funding for ICE on the maintenance of 34,000 detention beds per day. *See* February 10, 2014 Declaration of Silky Shah, attached as Schwarz Decl. Ex. F ("Shah Decl.") ¶¶ 8-9. These detention beds exist for the sole purpose of civil detention of immigrants pending the outcome of their immigration cases, not incarceration for individuals who are serving sentences for criminal convictions or awaiting trial on criminal charges. (Shah Decl. ¶ 8). While the majority of detained immigrants according to ICE are subject to "mandatory detention" under the law because of past criminal convictions, more than a third are detained on a discretionary basis: asylum-seekers, non-violent, low-level offenders, and civil immigration violators. (*Id*. at ¶ 15).

First introduced as an unfunded Congressional policy in 2006, the Detention Bed Quota has been part of appropriations bills in every year since 2009 and was most recently renewed in

the omnibus spending bill for Fiscal Year 2014, passed in January of 2014  *See* Ed O'Keefe, *The winners and losers of the new spending bill*, Washington Post (January 14, 2014), attached as Schwarz Decl. Ex. H. The Detention Bed Quota appears to have been interpreted by ICE to require that 34,000 detention beds be filled each day. (Shah Decl. ¶10). This interpretation of the Congressional language mandates the incarceration of a specified number of immigrants and is contested by some members of Congress, including some who initially supported the policy.  *See* William Selway and Margaret Newkirk, *Congress Mandates Jail Beds for 34,000 Immigrants as Private Prisons Profit*, Bloomberg (Sept. 24, 2013), attached as Schwarz Decl. Ex. I; September 25, 2013 Letter Opposing the Detention Bed Quota from 65 Members of Congress to President Barack Obama, attached as Schwarz Decl. Ex. J.  Indeed, in the summer of 2013, after DWN and its members called attention to a $147 million increase in the detention budget during the House appropriations debate, DWN mobilized its members to support Congressional Representatives Theodore Deutch (D-FL) and Bill Foster (D-IL) in introducing an amendment in the House that would have struck the Detention Bed Quota from the fiscal year 2014 appropriations bill, HR 2217. (Shah Decl. ¶ 18). The bill failed by a vote of 232 to 190, but garnered significant media attention and public awareness of the issue. (*Id*).

ICE depends heavily on contracts with private prison corporations and state and local jails to operate immigration detention facilities, and press reports have documented the millions of dollars spent by private prison corporations to lobby members of Congress in support of the Detention Bed Mandate. *See, e.g.,* Schwarz Decl. Ex. I. The financial rewards are immense:  just one private prison contractor, Corrections Corporation of America, is reported to have earned $752 million in federal contracts in 2012 alone. (*Id).* At the same time, on several occasions, budget constraints have caused ICE and DHS to release thousands of detainees.. For example, in

February 2013, ICE released over 2000 detainees as a result of the sequestration of the budget. *See* Alicia Caldwell, *Undocumented Immigrant Releases Acknowledged by John Morton of Homeland Security Department*, Associated Press (March 14, 2013), attached as Schwarz Decl. Ex. K. The release of detainees as a result of budget limitations led to public questions regarding why such individuals had been detained, often in abhorrent conditions, in the first place. (Shah Decl. ¶ 17). For example, during a House Judiciary Committee hearing weeks later, U.S. Rep. Spencer Bachus, R-Ala., pointedly questioned Immigration and Customs Enforcement Director John Morton about "an overuse of detention." *See* Transcript Excerpt of March 19, 2013 House Judiciary Committee Hearing, attached as Schwarz Decl. Ex. L.

Despite the increasing public critique of the Quota, the Detention Bed Quota was renewed in the omnibus spending bill passed by Congress in January 2014. (Shah Decl. ¶ 20). The Obama Administration has announced that it will release its budget on March 4, 2014. (Shah Decl. ¶ 24.) It is all but certain that the Detention Bed Quota will be part of the Administration's requested budget and therefore a topic of Congressional debate.

**Increasing Public Interest in the Detention Bed Quota Controversy**

The press, advocates, prominent officials, and the public have demonstrated a strong interest in the purpose and costs of the Quota and its impact on immigrant communities and agency enforcement decisions. DWN has launched an active campaign to fight the renewal of the Detention Bed Quota, calling attention to the enormous human cost of the detention system and the unprecedented nature of a quota demanding a certain number of detention bed be filled. (Shah Decl. ¶¶ 13-19). Community organizing groups such as Grassroots Leadership, a non-profit based in the Southern United States that exposes injustice within detention and prison facilities and advocates ending the privatization of detention, has published several reports that

document abuses within specific private immigration detention facilities and draw explicit connections to the Detention Bed Quota. *See* February 10, 2014 Declaration of Bob Libal at ¶ 6 ("Libal Decl."), attached as Schwarz Decl. Ex G (citing immigration detention reports published in June 2012, September 2013, and December 2013).

The controversy over the Quota extends to high-level officials within Congress and the Obama Administration. In April 2013, while still in office, then-Secretary of DHS Janet Napolitano criticized the quota aspect of the Detention Bed Mandate as "arbitrary" and "artificial," a statement that gained widespread coverage. (*See, e.g.*, Schwarz Decl. Ex. I). Legislators have taken an active role in questioning the use of immigration detention, particularly privately-operated facilities, rather than lower-cost alternatives and in asking whether enforcement decisions are being improperly influenced by the existence of the Quota. *See* September 25, 2013 Letter Opposing the Detention Bed Quota from 65 Members of Congress to President Barack Obama, attached as Schwarz Decl. Ex. J.

Since June 2013, when HR 2217, the amendment to eliminate the Detention Bed Quota, failed, the Detention Bed Quota and its impact has been covered by National Public Radio, the Wall Street Journal, the New York Times, Bloomberg, and a variety of other outlets. As a nationally-recognized resource on detention issues, DWN was contacted frequently by local and national media to comment on the Quota. For example, in October 2013, DWN's Interim Executive Director, Silky Shah, was a featured guest on Melissa Harris-Perry's nationally syndicated television program on MSNBC, discussing the Detention Bed Quota as an obstacle to meaningful reforms of the immigration detention system.  (Shah Decl. ¶ 19).

As the budget debate for FY 2015 approaches, and in the wake of the recent renewal of the Quota in 2014, these concerns, and public attention, have only grown. In the first few weeks

of 2014, opinion pieces written by well-known officials or by newspaper editorial boards have denounced the Detention Bed Quota as an unprecedented law enforcement technique that causes enormous suffering and raises serious questions about the legitimacy of ICE's enforcement decisions. For example, former Manhattan District Attorney Robert Morgenthau, writing in the New York Daily News on January 19, 2014, denounced the Quota as a "cruel," "unprecedented and unique" policy that has "a corrupting influence on the entire process" of immigration enforcement and removal. *See* Robert M. Morgenthau, *Immigrants Jailed Just to Hit a Number: A Cruel Homeland Security Quota*, N.Y. Daily News (Jan. 19, 2014), attached as Schwarz Decl. Ex. M. The following day, the editorial board of the New York Times criticizing the Quota – and its attendant $2.8 billion cost – as "mindless" and "irrational" given that "more pressing government obligations are being starved." *See* Editorial, *Detention Must Be Paid*, N.Y. Times (Jan. 20, 2014), attached as Schwarz Decl. Ex. N. The Times took particular note of the excessive costs of "keeping prison beds warm" when compared with "low-cost alternatives to detention that don't involve fattening the bottom lines of for-profit prison corporations." *Id.*

Similarly, in preparing for the FY 2015 debate on the funding for immigration enforcement and detention, advocates have alerted elected officials to the questionable utility and human costs of the Detention Bed Quota. A January 24, 2014 letter from 131 civil and human rights organizations urged the Obama Administration and legislators to "reject the principle of a mandated detention level" and to seek flexibility in using detention funds for lower-cost alternatives to detention, citing "common sense fiscal responsibility, best law enforcement practices, and basic due process principles." *See* Letters Re: Immigration detention bed mandate in FY 2015 DHS Appropriations (January 24, 2014), attached as Schwarz Decl. Ex. O.

**<u>Insufficient Information for the American Public, Advocates and Congressional
Representatives to Participate in the Policy Debate Surrounding the Detention Bed Quota</u>**

Advocates, legislators, the press and the public plainly lack crucial information that would help inform the upcoming Congressional debate. Information regarding, among other topics, internal agency debate over interpretation and implementation of the Quota, the relationship of the Quota to enforcement and detention policy decisions, and the astonishing sums paid to private prison corporations during a time of budget austerity is crucial for the public to engage in meaningful debate over the renewal of the Quota.

Without such information, Plaintiffs and other advocates are at a serious disadvantage in efforts to report on the effects of the Detention Bed Quota and engage the public in advocacy. For example, advocates do not have a clear picture of when and why ICE decided to interpret the Detention Bed Quota as a requirement to *fill* 34,000 beds when the appropriations language of the appears to only indicate that Congress intends merely to *fund* 34,000. (Shah Decl. ¶ 21). Similarly, internal agency communications regarding the release of detainees due to budget constraints is essential to understanding whether ICE is detaining thousands of immigrants – at an exorbitant human and financial cost – based on the Quota. (Shah Decl. ¶ 22). Contracts, budgeting information, and communications with private prison contractors form a crucial piece of the puzzle for advocates fighting on a local level to expose brutal conditions at local immigration detention centers and to use such information to engage with Congressional representatives. (Shah Decl. ¶ 23; Libal Decl. ¶¶ 7-11). In sum, Plaintiffs, the American public and its elected representatives lack the information needed to participate in a meaningful public debate about whether the Detention Bed Quota should be renewed.

## ARGUMENT

"Congress enacted FOIA to illuminate government activities. The law was intended to provide a means of accountability, to allow Americans to know what their government is doing."

*ACLU v. Dep't of Defense*, 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004), citing *Halpern v. FBI*, 181 F.3d 279, 284-85 (2d Cir. 1999). This Court has jurisdiction to vindicate the public's right to know by ordering the production of "agency records improperly withheld from the complainant." *See* 5 U.S.C. § 552(a)(4)(B) (2009); 5 U.S.C. § 552(a)(6)(E)(iii) (2009); *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (C.A.D.C. 1988).

In order to prevail on a motion for a preliminary injunction, Plaintiffs must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011), citing *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). Plaintiffs plainly meet this standard.

## I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Plaintiffs will suffer irreparable harm absent an injunction requiring Defendants to turn over the requested records, which are crucial for engaging the public in imminent Congressional appropriations debates about the Detention Bed Quota. For Plaintiff DWN, records relevant to Defendants' actions at the local level are also critical for its membership to educate the electorate and hold local officials accountable for enforcement actions linked to the Detention Bed Quota.

Congress provided for expedited processing in appropriate FOIA cases, in "recognition of the value in hastening release of certain information. . . . [T]he loss of that 'value' constitutes a cognizable harm." *Elec. Private Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006). Irreparable harm can result from delayed disclosure of information requested under FOIA, because public awareness of the government's actions is a "'structural necessity in a real

democracy.'" *Elec. Private Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d at 40, quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). Moreover, "*timely* public awareness" is a parallel necessity because "stale information is of little value." *EPIC*, 416 F. Supp. 2d at 40 (citing *Payne Enters.*, 837 F.2d at 494) (emphasis added).

As a result, courts have found irreparable harm where disclosure of requested materials regarding issues of national controversy is delayed. *See, e.g.*, *Gerstein v. C.I.A.*, No. C-06-4643 MMC, 2006 WL 3462659, at *4 (N.D. Cal. Nov. 29, 2006) (expediting disclosure of documents regarding high-profile leaks since "the ongoing debate about how to respond to classified leaks and how aggressively to investigate them cannot be restarted or wound back"). Delay of disclosure is particularly harmful where, as here, the information sought pursuant to FOIA is the subject of impending debate over legislation. *See Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 542 F. Supp. 2d 1181, 1186 (N.D. Cal. 2008) (finding "irreparable harm exists where Congress is considering legislation that would amend the FISA and the records may enable the public to participate meaningfully in the debate over such pending legislation"); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, No. C 07-5278 SI, 2007 WL 4208311, at *7 (N.D. Cal. Nov. 27, 2007) (rejecting defendants' argument that theory of harm was "speculati[ve]" when plaintiffs sought release of records related to FISA amendments at the heart of a concurrent policy debate); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (finding irreparable harm in delayed disclosure of information relevant to the imminent expiration of, and efforts to re-authorize, the Voting Rights Act); *ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004) (finding an urgent need for disclosure of information regarding implementation of measures of the Patriot Act in light of "ongoing debate regarding the renewal and/or amendment of the . . . Act.").

In cases of imminent legislation, preliminary injunctive relief is necessary to advance FOIA's goals of allowing "plaintiff[s], Congress, and the public [to] participate in the debate over the pending legislation on an informed basis," *EFF*, 2007 WL 4208311, at *7, and protecting "the public's interest in the uninhibited, robust, and wide-open debate about matters of public importance that secures an informed citizenry." *Id.* at *6 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)) (internal quotations omitted). Information would be "rendered useless in the effort to educate the American public about the issues pertinent to the legislation if . . .produced after Congress [passes the legislation]." *EFF*, 542 F. Supp. 2d at 1186.

The facts of the instant case are remarkably similar to those of the *Gonzales* and *EFF* cases. In *Gonzales*, the court held that requested documents – Department of Justice communications regarding voter intimidation efforts and the observations of election monitors – were essential to informed public debate of the continued validity of the Voting Rights Act, which was set to expire and which Congress was posed to re-authorize. *Gonzales*, 404 F. Supp. 2d at 250-51. The Detention Bed Quota is an appropriations provision that expires with each appropriations bill and must be annually re-authorized. Appropriations for Fiscal Year 2015 are set to officially begin after the President submits his budget proposal on March 4, 2014, and re-authorization of the Quota has been an issue of media scrutiny and Congressional controversy, with 190 Congress representatives – without the benefit of intense media and public scrutiny that has ensued in the last 8 months – voting to remove it last year. (Shah Decl. ¶ 18). This year, in light of the increasing attention on the Detention Bed Quota, Members of Congress, particularly those who could cast crucial votes in the upcoming appropriations debate, are asking Plaintiff DWN and its members to provide more information about the Quota. Without the records requested, Plaintiffs will enter the Fiscal Year 2015 debate without the information necessary to

properly inform legislators and the public about the Detention Bed Quota. As in *Gonzales*, Plaintiffs' requests "could have a vital impact on development of the substantive record [regarding whether to] re-authoriz[e]" the legislation at issue. *Gonzales*, 404 F. Supp. 2d at 260.

*EFF* also dealt with a statute that was set to expire: the Protect America Act, which extended immunity to telecommunications companies for participation in government surveillance programs. *EFF*, 542 F. Supp. 2d at 1183. The court held that requested information regarding the relationship between agencies and private telecom companies, during public debates as to whether immunity should be extended or retroactively applied, was essential to informed public debate. *Id.* at 1186. Similarly, Plaintiffs request information about the relationship between agencies and private companies that have significant stakes in an imminent piece of legislation of national importance. *See* Compl. ¶¶ 42-44; Schwarz Decl. Ex A at 3.

Defendants' failure to produce the records requested severely harms Plaintiffs' ability to engage the public in a meaningful debate regarding the Detention Bed Quota and undermines Congress' intention in enacting FOIA. As a nationally-recognized resource on detention issues, DWN is frequently contacted by local and national media to comment on the Quota, (Shah Decl. ¶ 19) and its members engage legislators on the impact of detention policies in local communities (*See, e.g.*, Libal Decl. ¶¶ 2, 4, 7). To educate the public and Congressional representatives effectively, Plaintiffs must be able to access information sought in their Request.

For example, for the public to understand why ICE has interpreted the Congressional appropriations bill to require filling 34,000 beds at all times, an interpretation disputed by advocates and some legislators (Shah Decl. ¶ 21), information regarding agency interpretation of the Quota as well as internal disagreement is essential to effectively inform the public. . Similarly, information regarding the release of thousands of detainees in 2013 as a result of

federal budget sequestration (Shah Decl. ¶ 22) will shed light on whether ICE, as a practice, is typically holding immigrants in detention as a result of the detention bed quota when alternatives to detention may be more humane and more cost-effective alternatives. Such information is highly relevant to the public understanding of the necessity of the Detention Bed Quota and whether decision-making on depriving individuals of liberty are being driven by funding concerns, an issue likely to have serious impact on political debate. Similarly, records regarding contracting decisions and financial payouts to private prison corporations are crucial for advocates seeking to educate legislators regarding the costs, both human and financial, in brutal detention centers in representatives' home districts. (Shah Decl. ¶ 23; Libal Decl. ¶ 7).

Deprived of such information and the ability to share it with the public, Plaintiffs are stymied in their ability to engage in and to galvanize others to engage in meaningful public debate. Plaintiffs cannot wait until after debate has begun to obtain documents; they must be able to review, analyze and share the information in order to advocate effectively. Accordingly, "[a]s time is necessarily of the essence in cases like this, such harm will likely be irreparable." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 416 F.Supp.2d 30, 40-41 (D.D.C. 2006).

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS, BECAUSE THE RECORDS THEY SEEK GO TO THE HEART OF THE PUBLIC'S RIGHTS UNDER FOIA

Every portion of Plaintiffs' Request seeks information of crucial public concern regarding federal government activity, the very heart of FOIA. "A democracy requires accountability, and accountability requires transparency." Memorandum for the Heads of Executive Departments and Agencies, 74 Fed. Reg. 4683 (Jan. 21, 2009). FOIA is recognized as an essential tool to inform current policy decisions. *See Leadership Conference on Civil Rights v. Gonzales*, 404 F.Supp.2d 246, 260 (D.D.C. 2005); *ACLU v. U.S. Dep't of Justice*, 321 F.

Supp.2d 24, 30 (D.D.C. 2004); *Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, No. C 07-5278 SI, 2007 WL 4208311 (N.D.Cal. Nov. 27, 2007). Because Plaintiffs filed the Request in order to inform the ongoing public policy debate about the Detention Bed Quota, their Request exemplifies the reasons FOIA was enacted.

In FOIA matters, the Court must review the agencies' decisions *de novo*, 5 U.S.C. § 552(a)(4)(B) (2009), and the agencies bear the burden of justifying their actions. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (stating, "FOIA expressly places the burden on the agency to sustain its action and directs the district courts to 'determine the matter *de novo*.'" (quoting 5 U.S.C. § 552(a)(4)(B)).

Defendants cannot meet this burden, because they have improperly denied Plaintiffs' request for expedited processing, and ICE has failed to comply with its statutory obligations by stating, without any factual justification, that Plaintiffs did not specifically identify information they sought. Because Plaintiffs seek timely processing of a FOIA Request that specifically identifies the information sought and identifies components of the agencies that might possess such documents, there is no doubt Plaintiffs will succeed on the merits of their claim.

### (A) Plaintiffs Were Plainly Entitled to Expedited Processing

FOIA entitles all requesters to prompt processing. 5 U.S.C. § 552 (2009) ("Each agency, upon any request for records . . . shall determine within 20 days . . . after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefore. . . ."). Congress has recognized that delay in complying with FOIA requests may be "tantamount to denial." *ACLU v. Dep't of Def.*, 339 F.Supp.2d 501, 504 (S.D.N.Y. 2004 (citing H. Rep. No. 876, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News, 6267, 6271). Thus, the FOIA statute allows

for expedited processing "in cases in which the person requesting the records demonstrates a compelling need." 5 U.S.C. § 552(a)(6)(E)(i)(I) (2012).

Plaintiffs clearly demonstrated a compelling need for the documents requested, and Defendants were obligated to grant expedited processing of Plaintiffs' request. Expedited processing requires a demonstration that there is an "urgency to inform the public regarding actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(i)(I); 6 C.F.R. § 552(a)(6)(E)(v) (2013). Determination of an "urgent need" turns on "at least" these three factors: "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Al-Fayed v. C.I.A.*, 254 F.3d 300, 310 (D.C. Cir. 2001) (citing H.R. Rep. No. 104-795, at 26 (1996)).

Plaintiffs clearly meet this test. First, as current and growing press, legislative, and community concern demonstrates, the Request is a matter of "exigency" to the American public, whose legislators are preparing to enter into debate over renewal of the Quota. Second, as demonstrated in Part I supra, the consequences of delayed response will not only "compromise a significant recognized interest," but also stymie Plaintiffs from having the full range of information they are entitled to in order to engage the public in meaningful debate over the mass detention of immigrants for civil immigration violations. Third, it is self-evident that the Request covers federal government activity. Indeed, the Request covers some of the most important and controversial functions that the federal government undertakes: the deprivation of a large class of people of liberty, and the large sums of taxpayer dollars that flow to private prison corporations in the name of immigration enforcement.

### (B) Defendants Improperly and Untimely Denied Plaintiffs' Request, and Plaintiffs Reasonably Described the Information Sought

Plaintiffs have exhausted their administrative remedies because Defendants have failed to either comply with or deny Plaintiffs' Request within the statutory timeframe, in violation of both FOIA and Defendants' own regulations. With the exception of one small DHS component, DHS has failed to provide *any* response within 20 days, in violation of 5 U.S.C. § 552 (a)(6)(A)(i). Defendant DHS has therefore constructively denied Plaintiffs' request.

Defendant ICE has similarly failed to provide any responsive documents or formally deny the request within 20 days, failed to give Plaintiffs an "opportunity to discuss [the] request so that [they] may modify it to meet [regulatory] requirements," 6 C.F.R. § 5.3(b), erroneously classified a letter seeking clarification from Plaintiffs as an appeal despite the fact that ICE never denied the Request nor advised Plaintiffs of their ability to appeal. (Schwarz Decl ¶4). Even if Plaintiffs' response to ICE's contradictory communications had in fact been appeals, ICE failed to respond within the statutorily required 20 days, even after erroneously classifying Plaintiffs' letter as an appeal. Plaintiffs' attempts to seek assistance with their request have gone unheeded. (Schwarz Decl. ¶4). ICE's tactics in responding to Plaintiffs' Request appear designed to avoid giving any substantive response within a reasonable time frame, and fly in the face of FOIA's core goals to "engender[] a more informed public and a more accountable government." *Nat'l Day Laborer Organizing Network et al. v. ICE et al.*, 877 F. Supp. 2d 87, 93 (S.D.N.Y. 2012).

Because Plaintiffs have done "all that [they] could do to obtain a final administrative decision on [their] request," they have constructively exhausted their administrative remedies. *See Nurse v. Sec'y of Air Force*, 231 F. Supp. 2d 323, 328-29 (D.D.C. 2002).

### (1) Defendant ICE Never Denied Plaintiffs' Request

Defendant ICE's second November 27 letter ("Letter 2") cannot be construed as a denial of Plaintiffs' Request not only because it explicitly stated "this action is not a denial of your

request," (Schwarz Decl. Ex. B) but because DHS's own regulations require the agency to first communicate any potential reasons for denial to requestors and assist them in modifying their request if necessary. *See* 6 C.F.R. § 5.3(b) ("If a component determines that your request does not reasonably describe records, it shall tell you either what additional information is needed or why your request is otherwise insufficient. The component also shall give you an opportunity to discuss your request so that you may modify it to meet the requirements of this section."); *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 10 (2d Cir. 1995) (noting, in applying identical regulatory language, that it was the "duty of the [agency] to assist the [requestors] in reformulating their request if it was thought that the request needed to be narrowed."). FOIA requires that any denial of a request be immediately communicated to requestors as well as the reasons for denial "and of the right of such person to appeal to the head of the agency any adverse determination." 5 U.S.C. § 522(a)(6)(A)(i). No such denial or notice of right to appeal was ever communicated to Plaintiffs. *See Hudgins v. IRS*, 620 F.Supp. 19, 21 (D.D.C. 1985) (holding that exhaustion requirement was satisfied by the fact that requestor was never informed of his right to appeal the denial of his request).

### (2) *Defendant ICE's Arbitrary 10-Day Deadline Was Not a Legitimate Grounds for Denial of Plaintiffs' Request*

Although Defendant ICE claimed that Plaintiffs' Request would be administratively closed in ten days if Plaintiffs did not respond (Schwarz Decl. Ex. B). Plaintiffs contacted Defendant ICE by phone and email during this time period, and in a December 19 letter to assure the agency they did not want the request closed. (Schwarz Decl. Ex. C) In addition, Plaintiffs contend that Defendant ICE did not have the authority to set an arbitrary 10-day deadline for closure of the request, nor did it cite any. Denials of FOIA requests based on noncompliance with agency procedures must be based on the agency's "published rules." *See* 5 U.S.C. §

552(a)(3)(A)(ii). DHS's published rules allow the agency to set deadlines for the receipt of fees, 6 C.F.R. § 5.3(c), but the regulation addressing the specificity of requests does not contain any such authority to set deadlines; in fact, it only says that overly broad requests may be "delayed," not that they may be denied. *See* 6 C.F.R. § 5.3(b). Further, a 10-day deadline is unreasonably short considering the deadline to appeal an adverse determination is 60 days. *See id.* § 5.9(a)(1).

In any event, Defendant ICE never stated that Plaintiffs' Requests were being denied for failure to respond within this 10-day deadline nor for any other reason.

### (3) *Because Plaintiffs' Request Was Never Denied, Plaintiffs' December 19 Letter Was Not an Appeal*

Because Defendant ICE never formally denied Plaintiffs' Request, Plaintiffs' December 19 letter was not an appeal. Appeals are made subsequent to "adverse determinations" made in a "letter denying [the] request," which Plaintiffs have never received. *See* 6 C.F.R. § 5.9(a)(1). Appeals are also made to the "Associate General Counsel (General Law), Department of Homeland Security," not to FOIA officers. *See id.*

Even if the December 19 letter were construed as an appeal, Defendant ICE did not respond within 20 days as required by 5 U.S.C. § 552(a)(6)(A)(ii). Because Defendant ICE has neither complied with Plaintiffs' Request nor made a formal denial within 20 days of the original request, *see* 5 U.S.C. § 552(a)(6)(A)(i), Plaintiffs have exhausted administrative remedies.

### (4) *Plaintiffs' Requests Reasonably Described the Records Sought*

In any case, even if Defendants had proceeded properly – which they did not – their claim of that the records sought were too broad in scope or not specifically identified is meritless. Under FOIA, "an agency is obliged to make 'promptly available' records that are 'reasonably describe[d]' in a written request therefor and are not exempt from disclosure." *Kowalczyk v. Department of Justice,* 73 F.3d 386, 388 (D.C.Cir.1996) (citing 5 U.S.C. §§ 552(a)(3)(A),

552(b)). Congress required that the description of the material being sought be "sufficiently detailed so that a professional employee of the agency, familiar with the general subject area, could reasonably be expected to find the desired documents." *Hudgins,* 620 F.Supp. at 21 (quoting H. Rep. 93–876, 93 Cong.2d Sess. 6 (1974)). When the request demands all agency records on a given subject, the agency must pursue any "clear and certain" lead it cannot in good faith ignore. *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999) (internal citations omitted).

Plaintiffs' Request sought records within a limited number of topics related to the Detention Bed Quota, and the Request was not just "sufficiently" but remarkably detailed. Plaintiffs sought specific forms of contractual agreements, cost information, and communications with private prison corporations; communications and talking points regarding media articles; information regarding the practices of a limited number of ICE Field Offices; and records, reports and communications about the release of detainees due to budget constraints. (Ex. A at 3-5). Plaintiffs clearly described each of these items, typically by citing references that would allow Defendants to find the requested records. For example, Plaintiffs sought records and communications related to the testimony of then-Director of ICE John Morton regarding specific events, i.e. the release of thousands of detainees in February 2013 as a result of budget sequestration and communications "about John Morton's decisions on or about December 2009 and Spring 2010 to release detainees." (Ex. A at 4-5). Plaintiffs provided Defendants with citations to the testimony described and the Congressional record in which these events were discussed. Given this level of detail, Defendants clearly had "clear and certain" leads to search for and produce the requested information. *Halpern*, 181 F.3d at 288. Indeed, it is hard to "imagine what else… could have been said to satisfy the government's appetite for specificity."

*Judicial Watch v. Rossotti*, 326 F.3d 1309, 1313 (D.C. Cir. 2003) (discussing the requirement of "reasonable" specificity in the context of a fee waiver under FOIA).

Defendant ICE's letter requesting further specificity did not provide any real guidance regarding how to modify Plaintiffs' Request. (Schwarz Decl. Ex. B (repeating the requirements of 6 C.F.R. § 5.3(b)). It merely recited statutory and regulatory standards which had already been satisfied by Plaintiffs' Request, and asked Plaintiffs to send their request to the agency component they "believe created and/or controls the record," which Plaintiffs had already done. This is all that is required by DHS's regulations, which explicitly allow for requests even when requestors have no idea which component contains the records. *See* 6 C.F.R. § 5.3(a) ("If you cannot determine where within the Department to send your request, you may send it to the Departmental Disclosure Officer . . . [which] will forward your request to the component(s) it believes most likely to have the records that you want.").

In the context of assessing the legitimacy of a denial of a request, courts have recognized that merely reciting statutory standards is unhelpful and insufficient. *See King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987) (agency "affidavits [justifying denials] cannot support summary judgment if they are 'conclusory, merely reciting statutory standards, or if they are too vague or sweeping.'"). Plaintiffs contend that this is also true of requests for further specificity, as the agency neither gives "additional information" nor explains why a "request is otherwise insufficient," 6 C.F.R. § 5.3(b), when it merely recites a series of its own regulations about what a request "should" generally contain.

Because Plaintiffs' actions have "fully complied with the applicable administrative scheme," they have exhausted or constructively exhausted their remedies. *See Nurse v. Sec'y of Air Force*, 231 F. Supp. 2d 323, 327 (D.D.C. 2002).

In sum, both on the issue of expedited processing and on the substance of the Request itself, Plaintiffs have a likelihood of success on the merits.

## III.    THE BALANCE OF HARDSHIPS FAVORS PLAINTIFFS

In the alternative, "a serious question go[es] to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff[s]' favor." *Red Earth LLC v. United States*, 657 F.3d at 143. Where agency records shed light on controversial government practices, delays in releasing requested records frustrate the public interests served by the FOIA statute. Defendants' refusal to process Plaintiffs' Request causes Plaintiffs, advocates, legislators, the press, and the public significant hardships. In light of the significant interest set forth by Plaintiffs and the corresponding lack of equities in Defendants' failure to disclose the records requested – or even to comply with their own administrative regulations – this Court should issue a preliminary injunction and grant Plaintiffs the requested relief.

The hardship to the Government to process and produce the requested records, if any, is negligible. First, Plaintiffs received the Request in November of 2013 and have failed to do the minimum required under FOIA and its implementing regulations. Plaintiffs simply ask requesting that Defendants fulfill the obligations under the statute.  Second, the requested records, described with great specificity, should not be difficult to locate, not only because Plaintiffs have named several agency components that could possess the records, but also because the increasing public spotlight on the Detention Bed Quota strongly suggests that ICE and DHS officials would be sharply aware of related communications, contracts and statistics.

The minimal burden placed on Defendants is outweighed by the Plaintiffs' – and the public's (see Part IV *infra*) – interest in disclosure.  Indeed, FOIA's intent is "to ensure an

informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co*., 437 U.S. 214. 242 (1979). Where, as here, Plaintiffs have committed to an education and organizing campaign to address the Detention Bed Quota in advance of the passage of the Fiscal Year 2015 budget, denial of Plaintiffs' motion would cause serious hardship to Plaintiffs' efforts, hardships that far outweigh any burden to Defendants. Ensuring that the public is informed and engaged enough to hold the government accountable is the central goal of FOIA. Defendants' efforts to frustrate that goal here, where the policy at issue has had an enormous and devastating human impact, must not be rewarded.

## IV. THE PUBLIC HAS A STRONG INTEREST IN THE IMMEDIATE DISCLOSURE OF THE REQUESTED DOCUMENTS

Given the imminence of debate on the renewal of the Detention Bed Quota and the clear and increasing public interest and attention to the issue, the public's interest weighs heavily in favor of granting an injunction. *Red Earth*, 657 F.3d at 143.

Courts have recognized an "overriding public interest ... in the general importance of an agency's faithful adherence to its statutory mandate." *EPIC*, 416 F. Supp. 2d at 42. The public's interest weighs in favor of granting an injunction, because FOIA recognizes not only that the public interest is served by disclosure to government records, but also that there is an interest in prompt disclosure. *ACLU v. Dep't of Defense*, 357 F.Supp. 2d 708, 712 (S.D.N.Y. 2005). While Defendants' failure to adhere to the statute, standing alone, militates in favor of granting the injunction, the public's interest here goes far beyond the interest in having government defendants comply with their own regulations. FOIA "is intended to facilitate transparency about the government's policies even – or perhaps especially – when members of the public are disturbed by those policies and are fighting to end them." *Nat'l Day Laborer*

*Organizing Network*, 877 F. Supp. 2d at 93. Thus, it requires "government employees to diligently and honestly respond to requests even from people with whom they disagree." *Id.*

Indeed, several courts have found that FOIA cases involving immigration detention are of particular importance to the public. *See, e.g., ACLU v. U.S. Dep't of Homeland Security*, No. 11 Civ. 3786 (RMB), 2013 U.S. Dist. LEXIS 130610, *26-27 (S.D.N.Y. Sept. 9, 2013) (holding that "the public interest in disclosure is particularly compelling here because the ACLU seeks to highlight ICE's historically troublesome practices of 'prolonged immigration detention'") (internal citations omitted); *New York Times Co. v. U.S. Dep't of Homeland Security*, No. 1, Civ. 8100 (SAS), 2013 U.S. Dist. LEXIS 83894 (S.D.N.Y. June 6, 2013) at *11 (stating that the "public has an interest in knowing how ICE handles aliens . . . who are required to be released").

As in these cases, in the instant case legislators, advocates, and the press have a strong interest in understand the practices and justifications underlying the Detention Bed Quota and its effects on immigrant communities as well as the typical taxpayer. Plaintiffs are actively engaged in working with affected communities, advocacy networks, and legislators to ensure that the public sufficiently informed to engage in meaningful debate over the Quota's renewal. The public interest in an informed citizenry – the central goal of FOIA – is thus vividly apparent here, where a controversial government policy that deprives tens of thousands of individuals of liberty every day is once again subject to imminent debate.

## CONCLUSION

Plaintiffs respectfully request that this Court enjoin Defendants from withholding the records sought in Plaintiffs' Request and order Defendants to produce those records within ten days of the Court's Order, and order Defendants to provide Plaintiffs with declarations, as specified in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) within ten days thereafter.

Dated: February 11, 2014

Respectfully submitted,

GHITA SCHWARZ
SUNITA PATEL
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, New York 10012
Tel: 212-614-6445
Fax: 212-614-6499
gschwarz@ccrjustice.org

*Attorneys for Plaintiffs*