# EXHIBIT A

 

November 25, 2013

Freedom of Information Act Request
U.S. Immigration and Customs Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
Attn: Catrina Pavlik-Keenan, FOIA Director

Freedom of Information Act Request
U.S. Department of Homeland Security
245 Murray Drive SW
STOP-0655
Washington, D.C. 20528-0655

**Re: Freedom of Information Act Request**

To Whom It May Concern:

This is a request under the Freedom of Information Act, 5 U.S.C. Sec. 552 ("FOIA"), on behalf of the Center for Constitutional Rights ("CCR") and the Detention Watch Network ("DWN") (collectively "the Requesters") for information regarding U.S. Immigration and Customs Enforcement agency ("ICE") and Department of Homeland Security ("DHS") Detention Bed Mandate, also known as the Immigration Detention Quota or the Detention Mandate. We ask that you please direct this request to all appropriate offices and components and/or departments within ICE and DHS, including, but not limited to the following offices or components within DHS: Office of Operations Coordination and Planning; Office of Policy; Office of Legislative Affairs; Office of Intergovernmental Affairs; and Office of General Counsel; and the following offices within ICE: Office of the Director and Deputy Director; Office of Detention Policy and Planning; State and Local Coordination; Office of Detention Oversight; Congressional Relations; Office of Acquisition Management; Enforcement and Removal Operations; Office of Detention Management, Enforcement and Removal Operations; and Office of the Principal Legal Advisor.

### A. Purpose of Request

The purpose of this request is to obtain information for the Requestors and the public on the Detention Bed Mandate, Bed Mandate and/or Detention Quota, decision-making surrounding the mandate, and its impact on detention policy and detention contracting decisions nation-wide from June

1

2006 to the present. This information will enable the public to engage in an important on-going policy debate[1] and the upcoming Congressional appropriations debate (likely to begin as early as February 2014).

The use of local jails and correctional facilities, as well as private correctional facilities, to detain non-citizens in civil immigration detention is a matter of concern to the Requestors and the general public. The suggestion in recent news articles that the mandate is not welcomed by high-level Department of Homeland Security ("DHS") officials such as former DHS Secretary Janet Napolitano,[2] but is the result of private prison corporations lobbying certain members of the Senate and House DHS appropriations subcommittees, raises questions regarding fiscal responsibility and appropriations priorities.[3] The public has a right to understand the motives of government officials and agencies on this important policy issue, especially in light of the upcoming appropriations and continued Comprehensive Immigration Reform debate.

Further, the Requesters and the public have an interest in understanding how the Detention Bed Mandate impacts enforcement operations, including the Quota and/or Mandate's relationship with how Immigrations Customs Enforcement ("ICE") determines how many and whom to detain. The extent to which decisions regarding lucrative intergovernmental service agreements ("IGSAs") with ICE and DHS are determined on the basis of local law enforcement cooperation with ICE enforcement programs such as 287(g), the Criminal Alien Program or Secure Communities is unknown to the public at this time. In addition, the Requesters and the public have an interest in understanding the costs of the Detention Bed Mandate as well as the decision-making to use detention in lieu of cost-effective alternatives.

## B. Definitions

1) **Record(s).** In this request the term "Record(s)" includes, but is not limited to, all Records or communications preserved in electronic (including metadata) or written form, such as correspondences, emails, documents, data, videotapes, audio tapes, faxes, files, guidance,

---

[1] *See e.g.,* Stephen Dinan, *Obama's Budget a Blow to Immigrant Enforcers; Funding Cut for Detentions, States*, Washington Times (Apr. 11, 2013), http://www.washingtontimes.com/news/2013/apr/11/obamas-budget-a-blow-to-immigrant-enforcers/?page=all; Editorial, *The Madness of U.S. Immigration Policy, Continued*, Bloomberg View (Sept 26, 2013), http://www.bloomberg.com/news/2013-09-26/the-madness-of-u-s-immigration-policy-continued.html; Human Rights First, Growing Bipartisan Support in Congress on Eliminating Detention Bed Mandate (June 5, 2013), http://www.humanrightsfirst.org/2013/06/05/growing-bipartisan-support-in-congress-on-eliminating-immigration-detention-bed-mandate-2/.

[2] William Selway & Margaret Newkirk, *Congress Mandates Jail Beds for 34,000 Immigrants as Private Prisons Profit*, Bloomberg (Sept. 24, 2013), http://www.bloomberg.com/news/2013-09-24/congress-fuels-private-jails-detaining-34-000-immigrants.html ("At an April hearing, then-Homeland Security Secretary Janet Napolitano, whose department includes ICE, called the mandate 'artificial' and said reducing the required number of detainees would let the agency free low-risk offenders who could be on supervised release.")

[3] *Id.*

2

guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, technical manuals, technical specifications, training manuals, studies, or any other Record of any kind.
2) **Agreements.** In this request the term "Agreement(s)" refers to any agreement, written or otherwise; communications; contracts and/or supplements, modifications or addendums to contracts or agreements.
3) **Detention and/or Detain.** In this request the term "Detention" or "Detain" refers to the placement in custody of a non-citizen or individual suspected to be a non-citizen, based on purported violations of the Immigration and Nationality Act, into a local or state jail or prison, not limited to Intergovernmental Service Agreement facilities. The term further refers to private contractual facilities, run or managed by private prison companies or corporations.
4) **Bed Mandate and/or Detention Bed Mandate and/or Detention Quota:** In this request the terms "Bed Mandate", "Detention Bed Mandate" and/or "Detention Quota" refer to the concept and practice, since 2007, that the Immigration and Customs Enforcement agency, including its regional and field offices and various local law enforcement agency partners and private contractors, to maintain a certain numerical level of detention.
5) **Communication(s).** In this request the term "communication" means the transmittal of information (in the forms of facts, ideas, inquiries or otherwise).
6) **Local Governments.** In this request the term "local" government includes state/local government, municipal corporations, tribal governments, tribal business entities, and Alaska Native Corporations.

## C. Request for Information

a. Most Recent Copies of Executed Agreements Related to Detention Facilities or Detention Beds
   i. Executed Agreements between Private Prison Corporations (such as Corrections Corporation of America and the Geo Group) and ICE, DHS and/or the Federal Bureau of Prisons;
   ii. Executed Agreements between DHS/ICE and local, state, city or municipal governments, including all Intergovernmental Service Agreements.
   iii. Executed contract renewal, supplemental agreements, addendums, riders, etc. of the agreements in (i) and (ii).

b. Communications regarding contract renewal, supplemental agreements, addendums, riders, etc. of the aforementioned agreements listed in Part C(a).

c. Agreements (formal and informal) regarding detention space, financing of detention beds, and the allocation of beds limited to the following ICE jurisdictions: the Atlanta Field Office; the Dallas, El Paso, Houston and San Antonio Field Offices; the New Jersey Field Office and the Philadelphia Field Office.

d. Data and Statistics from 2007 to present:
   i. Copies of all regularly generated statistical reports on detention; enforcement prioritization and detained population; detention occupancy by geographic location (i.e. ICE field office, state or county).

    ii. Copies of any cumulative data or information on numerical payouts to private prison corporations by ICE or DHS.
    iii. Financial records of actual payments to private prison companies or contractors, including the "guaranteed minimums," "guaranteed minimum" prices and "variable" prices under contracts with private prison corporations.[4]

e. Records Related to the Creation or Revision (including drafts, memoranda, correspondence and communications) of Specific Media-Related and Public Relations Documents such as Press Releases, Talking Points, emails with press quotes, etc.:
    i. William Selway & Margaret Newkirk, *Congress Mandates Jail Beds for 34,000 Immigrants as Private Prisons Profit*, Bloomberg (Sept. 24, 2013), http://www.bloomberg.com/news/2013-09-24/congress-fuels-private-jails-detaining-34-000-immigrants.html;
    ii. Stephen Dinan, *Obama's Budget a Blow to Immigrant Enforcers; Funding Cut for Detentions, States*, Washington Times (Apr. 11, 2013), http://www.washingtontimes.com/news/2013/apr/11/obamas-budget-a-blow-to-immigrant-enforcers/?page=all; and
    iii. Spencer S. Hsu and Andrew Becker, *ICE officials set quotas to Deport More Illegal Immigrants*, Washington Post (Mar. 27, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/03/26/AR2010032604891.html.

f. All Reports and Memoranda Reporting on the Detention Bed Mandate and Detention-related Appropriations Decisions to/from the Secretary of Homeland Security, Assistant Secretary of Homeland Security in Charge of Immigration and Customs Enforcement, Members of Congress and/or the White House.

g. Records, including communications, about releases from detention due to budget constraints or loss of funding, including but not limited to the following:
    i. Effects of the 2013 Budget Sequestration and the government shutdown in the fall of 2013;[5] and
    ii. Testimony of John Morton before the Judiciary Committee of the U.S. House of Representatives in March 19, 2013.[6]

---

[4] *E.g.*, Department of Homeland Security, Contract ACD-3-C-0015, at 3 (Oct. 1, 2003), *available at* http://www.ice.gov/doclib/foia/contracts/ccaacd3c0015asofp00023.pdf.

[5] *E.g. Release of Criminal Detainees by U.S. Immigration and Customs Enforcement: Policy or Politics? Before the H. Comm. on the Judiciary*, 113th Cong. (Mar. 19, 2013); *See* 159 Cong. Rec. 1973 (2013) ("My amendment would hold the Obama administration accountable for its recent decision to release more than 2,000 undocumented immigrants from detention centers across the country in the past month.") (Grassley, Mar. 20, 2013).

[6] Testimony of John Morton, Director of ICE, "The Release of Criminal Detainees by U.S. Immigration and Customs Enforcement: Policy or Politics," March 19, 2013,

iii. Communications with or about John Morton's decisions on or about December 2009 and Spring 2010 to release ICE detainees from detention.[7]

h. Records of ICE or DHS communications with local, state or Congressional officials or law enforcement agencies related to costs, reimbursements, profits, or monetary agreements for detention; monetary or contractual incentives related to immigration detention or detention contracting; or the need for additional detainees or possible sources of additional detainees to fulfill contractual obligations with ICE.

i. Records related to the relationship between ICE and private prison corporations including email communications, letters, memoranda, policy memos for contract bidding processes or Requests for Proposals.

## D. Format of Production

Please search for responsive records regardless of format, medium, or physical characteristics, and including electronic records. Please provide the requested documents in the following format:

- Saved on a CD, CD-ROM or DVD;
- In PDF or TIF format wherever possible;
- Electronically searchable wherever possible;
- Each paper record in a separately saved file;
- "Parent-child" relationships maintained, meaning that the requester must be able to identify the attachments with emails;
- Any data records in native format (i.e. Excel spreadsheets in Excel);
- Emails should include BCC and any other hidden fields;
- With any other metadata preserved.

## E. The Requesters

***The Center for Constitutional Rights ("CCR")*** is a non-profit, public interest, legal, and public education organization that engages in litigation, public advocacy, and the production of publications in the fields of civil and international human rights. CCR's diverse dockets include litigation and advocacy around immigration detention, post-9/11 immigration enforcement policies, policing, and racial and ethnic profiling. CCR is a member of immigrant rights networks nationally and provides legal support to immigrant rights movements. One of CCR's primary activities is the publication of newsletters, know-you-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These are other materials are available through CCR's

---

*http://www.dhs.gov/news/2013/03/19/written-testimony-us-immigration-and-customs-enforcement-director-john-morton-house*

[7] *See* 159 Cong. Rec. 1973 (2013) ("My amendment would hold the Obama administration accountable for its recent decision to release more than 2,000 undocumented immigrants from detention centers across the country in the past month.") (Grassley, Mar. 20, 2013).

Development, Communications, and Education & Outreach Departments. CCR operates a website, www.ccrjustice.org, which addresses the issues on which the Center works. The website includes material on topical civil and immigrant rights issues and material concerning CCR's work. All of this material is freely available to the public. In addition, CCR regularly issues press releases and operates a listserv of over 50,000 members and issues "action alerts" that notify supporters and the general public about developments and operations pertaining to CCR's work. CCR staff members often serve as sources for journalist and media outlets, including on immigrant rights.

***Detention Watch Network*** is a national coalition of organizations and individuals working to expose and challenge the injustices of the U.S. immigration detention and deportation system and advocate for profound change that promotes the rights and dignity of all persons. DWN was founded in 1997 in response to the explosive growth of the immigration detention and deportation system in the United States. Today, DWN is the only national network that focuses exclusively on immigration detention and deportation issues. The Network is recognized as the "go-to" resource on detention issues by media and policymakers and known as a critical national advocate for just policies that promote an eventual end to immigration detention. As a member-led network, we unite diverse constituencies to advance the civil and human rights of those impacted by the immigration detention and deportation system through collective advocacy, public education, communications, and field-and-network-building. DWN has a well-known website featuring the latest news, information and developments on detention policy.

## F. Fee Waiver

The Requesters are entitled to a fee waiver pursuant to 5 U.S.C.(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k) on the grounds that "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester[s]." 5 U.S.C. § 552(a)(4)(A)(iii); *see also* 6 C.F.R. § 5.11(k) (records furnished without charge if the information is in the public interest, and disclosure is not in the commercial interest of institution). *See, e.g., McClellan Ecological v. Carlucci*, 835 F.2d 1282, 1285 (9th Cir. 1987). Requesters meet the requirements of 6 C.F.R. § 5.11(k) because the subject of the request concerns the operations or activities of the government; the disclosure of the information is likely to contribute to a significant public understanding of government operations or activities due to the requesters' expertise in the subject area and ability to convey the information; the Requesters' primary interest is in disclosure; and they have no commercial interest in the information. In addition, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), the Requesters qualify as a "representatives of the news media," defined as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii).

As described in Part D above, the Requesters are non-profit organizations dedicated to civil rights, human rights, and immigrant rights, and have a proven track-record of compiling and disseminating information and reports to the public about government functions and activities, including the government's record and position on immigrants' rights, detention and policy matters. The Requesters have undertaken this work in the public interest and not for any private commercial interest. Similarly, the primary purpose of this FOIA request is to obtain information to further the public's understanding of federal immigration enforcement actions and policies. Access to this information is

crucial for the Requesters and the communities they serve to evaluate immigration enforcement actions and their potential detrimental efforts.

As stated above, the Requesters have no commercial interest in this matter. The Requesters will make any information that they receive as a result of this FOIA request available to the public, including the press, at no cost. Disclosure in this case therefore meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers of noncommercial requesters.'").

In the alternative, we request a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II). ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media."). See also 6 C.F.R. § 5.11(d). If no fee waiver is granted and the fees exceed $250.00, please contact the Requesters' undersigned counsel to obtain consent to incur additional fees.

### G. Expedited Processing

The Requesters are entitled to expedited processing of this request because there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need" is established when there exists an "urgency to inform the public concerning actual or alleged Federal Government activity," when the requester is a "person primarily engaged in disseminating information," 6 C.F.R. § 5.5(d)(ii).

There is an urgent need to inform the public of the policies and decision-making regarding the ICE detention bed quotas or detention bed mandate. The appropriations debate will begin in a matter of months and it is paramount that the public have the requested information to meaningfully engage in the public debate surrounding the cost of detention; decisions regarding the number of beds ICE is required to occupy; and incentives by local governments to arrest and fill ICE detention beds. Politicians on both sides of the aisle have also called attention to excessive use of immigration detention, which is directly tied to the mandate. For example, during a March 2013, House Judiciary Committee Hearing, Representative Spencer Bachus (R-Ala.) warned of an "overuse of detention by this administration," and was among 190 House members who voted for the amendment to eliminate the detention bed mandate.[8]

Given the bipartisan critique of the Detention Bed Mandate, the public has an urgent need to know why it is still in place. Congress debates the appropriations for the Department of Homeland Security as early as February of each calendar year.[9] It is necessary for the requested information to be made available in advance of Congressional discussions of the appropriations debate, so that the public can engage meaningfully with the political issues surrounding the Detention Bed Mandate.

---

[8] Jude Joffe-Block, *Ice Head Answers More Questions on Detainee Release*, KPBS, March 19, 2013, http://www.kpbs.org/news/2013/mar/19/ice-head-answers-more-questions-detainee-release/.

[9] *See* Senate Appropriations, Homeland Security Subcommittee Hearing Dates, http://www.appropriations.senate.gov/ht-homeland-security.cfm?method=hearings.default&subcommitteeId=7a93b400-6178-4c04-9711-094f5d87a0c4 (indicating DHS budget was brought before Senate in February or March for Fiscal Years 2010-2014).

7

## H. Certification & Conclusion

The Requesters certify that the above information is true and correct to the best of the Requesters' knowledge. *See* 6 C.F.R. § 5.5(d)(3). If this Request is denied in whole or in part, the Requesters ask that the Department of Homeland Security and ICE justify all deletions by reference to specific exemptions of FOIA. The Requester expects DHS and ICE to release all segregable portions of otherwise exempt material, and reserves the right to appeal a decision to withhold any records or to deny the within application for expedited processing and waiver of fees.

Please furnish all applicable Records in electronic format as specified above to: Sunita Patel, Center for Constitutional Rights, 666 Broadway, 7th Floor, New York, NY 10012.

If you have any questions regarding the processing of this request, please contact Sunita Patel at (212) 614-6439, or Ian Head at (212) 614-6470. Thank you for your consideration.

Sincerely,

Sunita Patel, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
spatel@ccrjustice.org

On Behalf of the Requesters