# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
DETENTION WATCH NETWORK
and CENTER FOR CONSTITUTIONAL
RIGHTS,

                                        *Plaintiffs*,                      **DECLARATION OF**
                                                                     **SILKY SHAH**

     v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT AGENCY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

                                        *Defendants*.
------------------------------------------------------------X

      I, SILKY SHAH, declare pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, that the following is true and correct:

      1.     I am the Interim Executive Director of Detention Watch Network ("DWN"), a Plaintiff, along with the Center for Constitutional Rights ("CCR") in the above-captioned matter. I make this statement in support of Plaintiffs' Motion for a Preliminary Injunction, seeking that Defendants release information regarding the implementation and effects of the Detention Bed Quota, a policy enacted by Congress and ostensibly interpreted by Defendants to require the incarceration of 34,000 immigrants every day.

      2.     DWN and CCR filed a Freedom of Information Act ("FOIA") request with ICE and DHS in November 2013 asking for specific documents and information about the Quota, as well as expedited processing because of the imminent congressional appropriations debates for Fiscal Year 2015.

3. As of the date of this Declaration, DWN and CCR have not received any documents pursuant to our request.

4. Release of the records Plaintiffs requested is a matter of urgency. The records requested are crucial for our work in alerting the public to the effects of the Detention Bed Quota as Congress prepares to consider the President's budget proposal for Fiscal Year 2015, scheduled to be submitted to Congress on March 4, 2014.

*Detention Watch Network*

5. DWN is a national coalition of 200 organizations and individuals working to reform the U.S. immigration detention and deportation system. We are the only national network focused exclusively on immigration detention reform. Many of our members have been detained themselves or work with families and communities that have been subject to detention. Our organizational membership is diverse both geographically and by issue. National legal and policy groups include the American Immigration Lawyers Association, Human Rights First, the National Immigration Law Center, National Latina Institute for Reproductive Health, Women's Refugee Commission, and the American Civil Liberties Union (and many of their state affiliates). DWN members also include numerous faith-based groups, including Lutheran Immigration and Refugee Service, Catholic Legal Immigration Network, Jesuit Refugee Service/USA, United Methodist Women, and Unitarian Universalist Service Committee. Our members are also state and regional coalitions and organizations, such as Puente (Arizona), Families for Freedom (New York), Texans United For Families, Georgia Detention Watch, Florida Immigrant Coalition, Colorado Immigrant Rights Coalition, and Illinois Coalition for Immigrant and Refugee Rights. Members also include legal services providers and law schools, such as the Florence Immigrant and Refugee Rights Project (Arizona), ProBAR (Texas), Public

Counsel (California), Northwest Immigrant Rights Project (Washington), Immigrant Defense Project (New York), University of Houston Law Center, Legal Aid Clinic (Texas), Stanford Law, Immigrants' Rights Clinic (California), and University of Miami School of Law Immigration Project (Florida).. Such a broad membership base makes us a clearinghouse of information for advocates, elected officials, affected community members and the public of detention-related material.

6. In my position at DWN, I am responsible for overseeing the advocacy campaigns and priorities established by our membership, and tailor our communications and media strategy with those goals in mind. For the past year, addressing the impact of the "Detention Bed Quota" (also known as the "immigration detention bed mandate", "bed mandate", "lock up quota" and "bed quota") has been identified by our membership as a current organizational priority due to its inextricable link to the mass incarceration of immigrants, racial profiling and raids in immigrant communities, and the rapid rate of deportations. I, along with our staff and our members meet with and educate elected officials and their staff members about the detention bed quota and the need for reforms to the immigration detention system, engage and support our local and regional policy reform efforts, and conduct outreach to media and community groups to alert the public of the effects of the detention bed quota.

7. DWN's expertise in researching and reporting to the public on immigration detention-related issues, specifically regarding human rights abuses and U.S. governmental policy, is a reflection of our membership, who work with, have constituents, or are themselves detained or members of communities directly affected by these agencies' immigration enforcement policies. The immediate release of the requested information concerning the "Detention Bed Quota" or "bed mandate" by Immigration and Customs Enforcement ("ICE")

and Department of Homeland Security ("DHS") is central to educating both our members and the general public on the effects of the Quota on detention and immigration enforcement policies and practices.

*The Detention Bed Quota*

8. The Detention Bed Quota is a Congressional policy that currently conditions over $5.39 billion in funding for ICE on the maintenance of 34,000 detention beds per day. These detention beds exist for the sole purpose of civil detention of immigrants pending the outcome of their immigration cases, not incarceration for individuals who are serving sentences for criminal convictions or awaiting trial on criminal charges.

9. The Detention Bed Quota was formally included in appropriations bills starting in Fiscal Year 2009 with a mandate of 33,400 beds, later increased to 34,000 in 2012. The Detention Bed Quota has been included by Congress in every appropriations bill since Fiscal Year 2009, including most recently in the omnibus spending bill for Fiscal Year 2014. There is currently a significant and growing debate among members of Congress and the Obama Administration regarding future quota levels and whether it should be eliminated completely. For example, Representative Jared Polis (D-CO), who supported the Detention Bed Quota in 2009, now opposes it, calling it "an outrage to our values as Americans, and frankly…an outrage to taxpayers." *See* 159 Cong. Rec. 3144 (2013).

10. The Detention Bed Quota appears to have been interpreted by ICE to require that 34,000 detention beds be filled each day. This interpretation of the Congressional language mandates the incarceration of a specified number of immigrants – a practice that is unprecedented in the law enforcement context. DWN and its members believe that ICE's

interpretation of the Congressional language as a quota that must be filled has led to an enormous increase in immigration arrests, detentions, and deportations.

11. The Obama Administration has deported a record-breaking number of immigrants since 2009, and is approaching 2 million. In addition, the number of immigrant detainees has more than doubled in little more than a decade. The total number of individuals who have spent time in immigration detention within a given year has increased from 204,459 in 2001 to 478,000 in 2012. It is also notable that the number of immigrants held in detention daily has more than quadrupled between 7,475 in Fiscal Year 1995 to 33,330 in Fiscal Year 2011 (a few years after the implementation of a detention bed quota).

12. The size and scope of the immigration detention system is particularly significant when compared with the Bureau of Prisons (BOP) custody for the federal prison system. In Fiscal Year 2001, 204,459 immigrants were detained – roughly three times the number of individuals held by BOP. By 2010, the total number of immigrants detained by ICE rose to 363,604 – more than five times the number of individuals in custody for federal criminal offenses.

*DWN's Advocacy Campaigns to Reform Immigration Detention*

13. DWN has been actively engaged in documenting and reporting to the public on the cruel and appalling conditions of immigration detention facilities nationwide. In November 2013, DWN issued the report *Expose and Close: One Year Later*, which examines the continuing lack of accountability for the ongoing human rights crisis caused by mandatory detention of immigrants in the U.S. The report is a follow-up to several DWN member-driven reports on detention facilities DWN published in 2012.

14. As the number of immigrants detained and deported has skyrocketed during President Obama's administration, DWN has called on Congress and the President for broad reforms to the immigration detention system. We have issued public statements and published educational materials and reports demanding greater transparency in ICE and DHS enforcement and detention practices and policies, including the Detention Bed Quota.

15. For example, DWN has highlighted the fact that over 30 percent of immigrant detainees are detained not because the law requires their incarceration, but because ICE has used its discretion to detain asylum-seekers, working people, and low-level, non-violent offenders.

16. In early 2013, DWN engaged our network to support advocates and several members of Congress as they pushed for greater public exposure of the Detention Bed Quota as well as demanding immediate reforms.

17. In February 2013 over 2,000 individuals were released from detention centers across the country citing sequestration cuts as the primary cause. Many questioned why individuals who were easily released due to budget cuts were subject to detention in the first place. During a House Judiciary Committee hearing weeks later, U.S. Rep. Spencer Bachus, R-Ala., pointedly questioned Immigration and Customs Enforcement Director John Morton about "an overuse of detention," asking, "Is it possible that you are detaining more people than you need to?" Immediately after initial reports of the releases, DWN moved quickly and proactively to call attention to the issue, resulting in a CNN.com opinion piece authored by former Executive Director, Andrea Black and coverage from National Public Radio.

18. In May 2013 during the House appropriations debate, DWN called attention to the increase of $147 million in the detention budget. In the summer of 2013, DWN mobilized its members to support Congressional Representatives Theodore Deutch (D-FL) and Bill Foster (D-

IL) introduction of an amendment in the House that would have struck the Detention Bed Quota from the fiscal year 2014 appropriations bill, HR 2217. While the amendment lost by a vote of 232 to 190, it energized advocates nationwide and garnered significant media attention.

19. Since then, and over the course of the past seven months, the Detention Bed Quota and its impact has been covered by National Public Radio, the Wall Street Journal, the New York Times, Bloomberg, the New York Daily News, and a variety of other outlets. As a nationally-recognized resource on detention issues, DWN is frequently contacted by local and national media to comment on the Quota. For example, in October 2013, I was a featured guest on Melissa Harris-Perry's nationally syndicated television program on MSNBC, where I emphasized that even if Congress addresses immigration in the upcoming year, the Detention Bed Quota still stands as a significant obstacle to meaningful reforms of the immigration detention system.

20. Following the government shutdown in the Fall of 2013 over the Fiscal Year 2014 budget, DWN conducted meetings with our members and allied organizations to influence ongoing budget negotiations in Congress. Despite our efforts, the 2014 omnibus spending bill passed in January 2014 and renewed funding for 34,000 detention beds.

21. Without the information sought in our FOIA request, we are at a disadvantage in our efforts to report on the effects of the Detention Bed Quota and engage the public in advocacy. For example, it is still unclear to us when and why ICE decided to interpret the Detention Bed Quota as a requirement to *fill* 34,000 beds when the language appears to only indicate that Congress intends merely to *fund* 34,000. Indeed, then-Secretary of Homeland Security Janet Napolitano testified before the House Appropriations Committee that the detention bed mandate was "artificial" and "arbitrary," suggesting that there is disagreement

within the agency regarding whether the Quota is appropriate. Because information about agency interpretation of the Quota as well as internal disagreement is essential to our campaign, our Request sought "[a]ll Reports and Memoranda reporting on the Detention Bed Mandate and Detention-related Appropriations decisions to/from the Secretary of Homeland Security, the Assistant Secretary for ICE, Members of Congress, and/or the White House." *See* Plaintiffs' Request at C(f). attached as Schwarz Decl. Ex. A.

22. Similarly, the widely reported release of thousands of detainees in times of budget constraint – most recently in February 2013, as a result of budget sequestration – suggests that decisions about detention of immigrants are being driven by funding, not by the need or requirement to detain specific individuals. Legislators like Representative Spencer Bachus (R-AL) have noted that this sort of decision-making suggests the "overuse" of detention. *See Committee Hearings is Release of Criminal Detainees by U.S. Immigration and Customs Enforcement: Policy or Politics? Hearing Before the H. Comm. On the Judiciary*, 113th Cong. 50 (2013) (statement of Rep. Spencer Bachus, Alabama). As a result, we sought "Records, including communications, about releases from detention due to budget constraints or loss of funding," naming three specific examples of the types of records sought. *See* Plaintiffs' Request at C(g), attached as Schwarz Decl. Ex. A.

23. In addition, information about the flow of funding to private prison corporations is of high interest to our members, legislators and the public, and indeed has been mentioned as a serious problem in numerous news, opinion and advocacy pieces discussing the Detention Bed Quota. Because this information is likely to be of great relevance to public debate, we sought a number of documents related to "executed agreements with private prison corporations," "[a]greements (both formal and informal) regarding detention bed space" and "financing of

detention beds" within specific jurisdictions, and "financial records of actual payments to private prison corporations. See Plaintiffs' Request at C(a)(i), (c), and (d)(iii), attached as Schwarz Decl. Ex. A.

*Imminent Congressional Appropriations Debate*

24. The debate on the budget for Fiscal Year 2015 formally commences when the President submits his budget proposal to Congress. The Obama administration has announced that it will present its appropriations budget to Congress on March 4, 2014, at which time discussion and debate on the bill will officially begin. In the past, Congressional appropriations committee members have even started to consider the budget prior to the President's submission. It is vital that DWN and its members receive information about the Quota before these debates ensue, so that we can analyze records and use the information to educate the public about this crucial issue.

25. With the debates around the FY2015 appropriations bill imminent, there is an immediate and urgent need for ICE and DHS to release the requested information. It is paramount that DWN gain access to ICE and DHS policies regarding the Detention Bed Quota so that we can disseminate this information and inform our members and the public and meaningfully engage in the upcoming political debates. It is critical that the public and their representatives in Congress understand the connections between decisions to increase immigration enforcement and a mandatory detention quota. Without the records requested, advocates and the public are deprived of an important tool to evaluate the Obama Administration's policies and hold elected officials accountable for reforming them.

Executed on: February 10, 2014

                                                                                                             Silky Shah