**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DETENTION WATCH NETWORK, CENTER FOR
CONSTITUTIONAL RIGHTS,

                          *Plaintiffs*,

    v.

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT, DEPARTMENT OF HOMELAND
SECURITY,

                          *Defendants*.

DOCKET NO.:  14-CV-583 (LGS)

**Document Electronically Filed**

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**CENTER FOR CONSTITUTIONAL
RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6445
Fax: (212) 614-6499

Ghita Schwarz
gschwarz@ccrjustice.org

**CENTER FOR SOCIAL JUSTICE
SETON HALL LAW SCHOOL**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700;
Jenny-Brooke.Condon@shu.edu

Jennifer B. Condon
Anastasia A. Stylianou (Student Attorney)
John P. Burns (Student Attorney)

**Table of Contents**

TABLE OF AUTHORITIES ............................................................................................. iii

PRELMINARY STATEMENT ...................................................................................... 1

FACTS AND PROCEDURAL HISTORY ..................................................................... 2

ARGUMENT .................................................................................................................. 7

I.      THE GOVERNMENT CANNOT WITHHOLD FINANCIAL
INFORMAITON IN IMMIGRATION DETENTION CONTRACTS
UNDER FOIA EXPEMPTION 4 BECAUSE SUCH CONTRACT
TERMS ARE NEITHER "OBTAINED FROM A
PERSON" NOR "CONFIDENTIAL" ............................................................. 7

      A.  UNIT PRICES, BED-DAY RATES AND STAFFING PLANS
IN GOVERNMENT CONTRACTS ARE NOT PROPRIETARY
INFORMATION "OBTAINED FROM A PERSON." ............................... 8

            1.   Prices and Terms the Government Agrees to in
Awarded Contracts Are Executive Decisions That
Must Be Disclosed ........................................................................ 8

            2.   What the Government Pays Per Day and Unit to
Detain Immigrants Cannot Be Privileged as a
Corporate Secret ........................................................................... 11

      B.  TERMS OF IMMIGRATION DETENTION CONTRACTS
ARE NOT "CONFIDENTIAL" UNDER EXEMPTION 4
BECAUSE THEIR DISCLOSURE WILL NEITHER IMPAIR
THE GOVERNMENT'S ABILITY TO OBTAIN SUCH
INFORMATION IN THE FUTURE NOR CAUSE SUBSTANTIAL
HARM TO THE COMPETETITIVE POSITION OF THE
PRIVATE CONTRACTORS ................................................................. 13

            1.   Disclosure Will Not Impair ICE's Future Ability to
Contract with Private Entities Because Pricing is
Required in Bids for Government Contracts ................................. 14

            2.   Disclosure Will Not Cause Substantial Competitive
Harm to Contractors Because Immigration Detention
Is Not a Competitive Market ........................................................ 15

i

3. Disclosure of Unit Prices and Staffing Plans in Government Contracts Will Not Cause Substantial Competitive Injury to Private Contractors ...................................18

II.  THE USE OF EXEMPTION 4 TO HIDE THE TERMS OF GOVERNMENT DETENTION CONTRACTS UNDERMINES THE PURPOSE OF FOIA ...................................................22

CONCLUSION .................................................................................................................23

# Table of Authorities

**CASES**

*Arizona v. United States*, 132 S.Ct. 2492 (2012) ............................................................16

*Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
601 F.3d 143 (2d Cir. 2010)............................................................ 8-9, 10, 11, 13, 19

*Buffalo Evening News, Inc. v. Small Bus. Admin.*,
666 F.Supp. 467 (W.D.N.Y. 1987) .....................................................................10

*Carney v. Dep't of Justice*, 19 F.3d 807 (2d Cir. 1994).......................................................7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................7

*Ctr. For Pub. Integrity*, 191 F. Supp. 2d 194 (D.D.C. 2002) ...........................................20

*Citizen Health Research Grp. V. FDA*, 704 F. 2d 1280 (D.C. Cir. 1983) ........................16

*Consumers Union of U.S. v. Veterans Admin.*,
301 F.Supp. 796 (S.D.N.Y. 1969) .......................................................................9

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
975 F.2d 871 (D.C. Cir. 1992) ...........................................................................14

*FBI v. Abramson*, 456 U.S. 615 (1982) ........................................................................8

*Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*,
443 U.S. 340 (1979)........................................................................................9

*Fisher v. Renegotiation Bd.*, 355 F.Supp. 1171 (D.D.C. 1974)............................ 10, 11-12

*Fox News Network, LLC v. Dep't of the Treasury*,
739 F.Supp.2d 515 (S.D.N.Y. 2010)...............................................................10, 11

*Hercules, Inc. v. Marsh*, 659 F.Supp. 849 (W.D. Va. 1987) ...........................................18

*In Defense of Animals v. Nat'l Insts. of Health*,
543 F.Supp. 2d 83 (D.D.C. 2008) .....................................................................11

*Inner City Press/Cmty on the Move v. Bd. of Governors of the
Fed. Reserve Sys.*, 380 F.Supp.2d 211 (S.D.N.Y. 2005) .......................................15, 16, 19

*Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*,
463 F.3d 239 (2d Cir. 2006)........................................................................ 8, 14-15

*Lee v. FDIC*, 923 F. Supp. 451 (S.D.N.Y. 1996)..............................................20

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
375 F.3d 1182 (D.C. Cir. 2004) ........................................................................24

*N.Y. Pub. Interest Research Grp. v. EPA*,
249 F.Supp. 2d 327 (S.D.N.Y. 2003).................................................................24

*N.Y. Times v. Dep't of Def.*, 499 F.Supp. 2d 501 (S.D.N.Y. 2007) ...................13

*Nadler v. Fed Deposit Ins. Corp.*, 92 F.3d 93 (2d Cir. 1996)...................... 8, 13-14

*Nat'l Day Laborer Org. Network v. ICE*,
877 F.Supp. 2d 87 (S.D.N.Y. 2012)...................................................................22

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978)............................................................................................12

*National Parks & Conservation Asso. v. Morton,* 498 F.2d 765 ................... 13-14

*Natural Res. Def. Council, v. Dep't of Interior*,
36 F.Supp. 3d 384 (S.D.N.Y. 2014)..................................................................9, 15

*New York Times Co. v. Dep't of Labor*,
340 F.Supp. 2d 394 (S.D.N.Y. 2004)................................................................8, 20

*Niagara Mohawk Power Corp. v. Dep't of Energy*,
169 F.3d 16 (D.C. Cir. 1999) ............................................................................18

*Pac. Architects & Eng'rs, Inc. v. Dep't of State*,
906 F.2d 1345 (9th Cir. 1990) ..........................................................................20

*Philadelphia Newspapers, Inc. v. Dep't of Health & Human Servs.*,
69 F.Supp. 2d 63 (D.D.C. 1999) .................................................................. 10-11

*Prison Legal News v. Dep't of Homeland Sec.*, ---F.Supp.3d ----,
*11, 2015 WL 3796318 (W.D. Wash. 2015)......................................................20

*Pub. Citizen Health Research Grp. v. FDA*,
704 F.2d 1280 (D.C. Cir. 1983)); ..................................................................15, 19

*Racal-Milgo Gov't Sys., Inc. v. Small Business Admin.*,
559 F.Supp. 4 (D.D.C. 1981) ............................................................................21

iv

*Raher v. Bureau of Prisons*, No. CV-09-526-ST,
2011 WL 2014875 (D. Or. May 24, 2011) ....................................17

*Raher v. Fed. Bureau of Prisons*,
749 F.Supp.2d 1148 (D. Or. 2010) ....................................14-15, 16, 17, 18, 19-20, 21, 23

*S. Alliance for Clean Energy v. Dep't. of Energy*,
853 F.Supp. 2d 60 (D.D.C. 2012) ....................................10

*Washington Post Co. v. U.S. Dep't of Health and Human Servs.*,
865 F.2d 320 (D.C. Cir. 1989) ....................................22

## STATUTES

5 U.S.C. § 551 ....................................9

5 U.S.C. § 552 .................................... *passim*

10 U.S.C. § 2304 ....................................6

6 C.F.R. § 5.8 ....................................3

48 C.F.R. § 15.304 ....................................14, 21

## FEDERAL RULES

Fed. R. Civ. P. 56 ....................................8

## OTHER AUTHORITIES

Wendy Netter Epstein, *Contract Theory and the Failures of
Public-Private Contracting*, 34 Cardozo L. Rev. 2211 (2013) ....................................16

Gregory H. McClure, *The Treatment of Contract Prices under the
Trade Secrets Act and Freedom of Information Act Exemption 4:
Are Contract Prices Really Trade Secrets?* 31 Pub. Cont. L.J. 185 (2002) ..................9, 11

Edward Rubin, *The Possibilities and Limitations of Privatization*,
123 Harv. L. Rev. 890 (2012) ....................................16

## PRELIMINARY STATEMENT

This action, arising under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, addresses whether the Government can shield its immigration detention contracts with private companies from public scrutiny by claiming that the contract's terms are corporate secrets exempt from disclosure under FOIA.  At stake is the public's right to know the prices the Government has paid to private prison companies to detain immigrants and to understand and debate contractors' influence over immigration detention policy.

Plaintiffs, Detention Watch Network ("DWN") and Center for Constitutional Rights ("CCR") (collectively "Plaintiffs"), file this Motion for Partial Summary Judgment to compel U.S. Immigration and Customs Enforcement ("ICE") and the Department of Homeland Security ("DHS") (collectively "the Government") to release the terms of government contracts with private prison contractors withheld pursuant to 5 U.S.C. §552 (b)(4) ("Exemption 4"). Plaintiffs are entitled to summary judgment because Exemption 4, which protects "trade secrets and commercial or financial information obtained from a person" that is "privileged or confidential," does not justify the withholding of unit pricing, bed-day rates, and staffing plans in government detention contracts.

First, prices agreed to by the Government are not information "obtained from a person" under Exemption 4 because such terms exists only once the Government decides to award a contract. Second, the Government cannot establish that the unit prices, bed-day rates, and related information are "confidential" under Exemption 4 because: (1) there is no competitive market for immigration detention services; and (2) disclosure will not cause imminent substantial harm to the competitive position of the contractors.

Moreover, disclosing the terms of ICE's private detention contracts is vital to informed public debate about the Detention Bed Quota, the Congressional appropriations provision that

conditions over $5.39 billion in funding for ICE on the maintenance of 34,000 detention beds per day. Controversy about the Detention Bed Quota has increasingly focused on the influence and profits of private prison companies, whose contracts often require "guaranteed minimum" payments regardless of whether detention beds are filled. The nature of private prison contracts are of such great public concern that Congressional representatives have recently introduced legislation to eliminate them. A clear understanding of the pricing schemes supporting guaranteed minimums are essential for public debate about ICE's commercial arrangements with private contractors, the financial incentives underlying the Detention Bed Quota, and private contractors' influence on immigration detention policy.

For all of these reasons, Plaintiffs are entitled to judgment as a matter of law and release of the redacted information.

**FACTS AND PROCEDURAL HISTORY**

**Plaintiffs' FOIA Request and The Government's Productions**

On November 25, 2013, Plaintiffs DWN and CCR submitted a FOIA request to Defendants seeking information regarding ICE's controversial interpretation and implementation of the Detention Bed Quota. Compl. ¶ 2, (ECF No. 1). Plaintiffs sought, *inter alia,* records related to ICE's contracts with both private prison corporations and local governments. *Id.* ¶¶ 2, 57. On January 30, 2014, Plaintiffs filed a Complaint to compel DHS and ICE to search for and produce documents, Compl. ¶¶ 73-74, followed by a Motion for Preliminary Injunction on February 2, 2014, Mot. Prelim. Inj., (ECF No. 6). On July 3, 2014, this Court issued an Order directing ICE to produce a minimum of 1,200 pages of responsive documents per month, and directing DHS to either review 4000 pages or produce 1200 pages per month.  (ECF No. 48).

ICE began producing documents to Plaintiffs on a monthly basis, including its detention

contracts with both local governments and private contractors. Critical terms of these contracts, including unit prices, bed-day rates and staffing plans, were withheld pursuant to Exemption 4. 56.1 Statement ¶ 8. In February 2015, Plaintiffs advised the Government of their position that the information was improperly redacted. *Id*. ¶ 24. The Government conceded that unit pricing had been erroneously redacted in detention contracts with public entities such as local and county governments, and re-produced public contracts with unredacted terms. *Id*. ¶ 25.

In contrast to its position on ICE contracts with public entities, however, the Government stated that prior to disclosing redacted information from its contracts with private contractors, it would seek their input pursuant to 6 C.F.R. §5.8, which requires ICE to provide "prompt written notice" to "any person or entity from whom the Department obtains business information," that a FOIA requester seeks such information. 6 C.F.R. §5.8(d). Private entities then have the opportunity to "object to disclosure." 6 C.F.R. §5.8(d), (f). In June 2015, ICE represented that it had contacted the relevant contractors and would continue to invoke Exemption 4 to protect unit prices and related information from disclosure. On June 30, 2015, Plaintiffs submitted a FOIA Request seeking communications with contractors about the process pursuant to 6 C.F.R. §5.8. 56.1 Statement ¶ 29. Plaintiffs received 49 pages of communications between ICE and some contractors on August 13, 2015, all of which stated that release of such information would cause them substantial competitive harm. *Id*. ¶¶ 30-31. Because this response did not include any communications between ICE and the two largest contractors, Corrections Corporation of America ("CCA") and The Geo Group ("GEO"), Plaintiffs submitted an administrative appeal to ICE on October 9, 2015. *Id*. ¶¶ 32, 35. On November 10, 2015, ICE responded with a determination that new or modified searches "could be made," and that the request would be remanded to "ICE FOIA" for "further action. *Id*. ¶ 36.

**The Contracts and Withholdings at Issue**

The amount that the Government pays contractors for guaranteed minimums is reflected in the redacted bed-day rates and unit prices, including those that vary with detainee population (sometimes referred to as "tiered pricing"). Staffing plans reflect the number of detention staff the contractor will employ to carry out its obligations as a conditions of the contract with the government. The parties agreed to use six representative contracts for the purpose of briefing.[1] *See* Joint Pre-Mot. Req. Partial Summ. J., Oct. 30, 2015 (ECF No. 66). The Government subsequently electronically filed the six ICE contracts, and a *Vaughn* Index, which describes those contracts and explains the Government's position regarding the application of Exemption 4. (ECF No. 69). Those six ICE contracts include the following:

- <u>Contract 1</u>: September 28, 2011 contract modification for detention bed-days at the Broward Transitional Center in Pompano Beach, Florida operated by GEO (ECF No. 69-1);
- <u>Contract 2</u>: November 4, 2011 contract modification for detention bed-days at the Farmville Detention Center in Farmville, Virginia, owned by Farmville, but operated by Immigration Centers of America ("ICA") (ECF No. 69-2);
- <u>Contract 3</u>: June 30, 2011 contract modification for the Otay Mesa Detention Facility in San Diego, California, operated by CCA (ECF No. 69-3);
- <u>Contract 4</u>: June 20, 2012 contract modification to update pricing at Otay Mesa Detention Facility in San Diego, California, operated by CCA (ECF No. 69-4);
- <u>Contract 5</u>: March 11, 2011 contract modification for the Buffalo Federal Detention Facility in Batavia, New York, operated by DHS with Valley Metro-Barbosa Group JV ("Valley Metro") providing detention services (ECF No. 69-5); and
- <u>Contract 6</u>: June 1, 2009 contract modification for the Florence Detention Center in Phoenix, Arizona, operated by ICE, with Asset Protection Security Services LP ("Asset Protection") providing detention services (ECF No. Doc.69-6).

According to the Government, five of these contracts redact "the specific per-detainee bed-day rate" the Government agreed to pay under the contracts. *See Vaughn Index* (noting that these rates are redacted from Contracts 1, 3, 4, 5, and 6). CCA's contract modification with ICE

---

[1] The parties also agreed to have the Court's decision apply to similar redactions in the contracts or other documents containing similar information that ICE has produced or will produce.

for the Farmville detention facility, however, does not include a specific "bed-day rate." *See Vaughn Index*, at 2; Contract 2. In that contract, however, ICE redacted "the number of detainee bed spaces, the number of units, and unit price information" that ICE agreed to pay under the contract. *See Vaughn Index* at 2. In addition to the bed-day rates, units and quantity are also redacted from several of the other contracts that contain it. *See Vaughn Index*; Contracts 1, 3, 4. The Government states that because ICE "has disclosed the total amount to be paid under the contract, the disclosure of the number of beds, quantity or unit price fields could be used to determine the specific bed-day rate." *See Vaughn Index*, at 2. The government also justifies the redaction of the "staffing plan" from CCA's contract for the Otay Mesa Detention Facility, which it describes as "the specific number of employees and staff that the contractor proposes using to fulfill or carry out its obligations under the contract" and one of the "terms and conditions of [the company's] contract with the government." *See Vaughn Index*, Contract 4.

The Government justifies each of these withholdings under Exemption 4 by claiming that its release "is likely to cause substantial harm to the company's competitive position by, *inter alia*, allowing the company's competitors to identify the company's terms and conditions of its contract with the government." *See Vaughn Index*, Contract 1. Specifically, ICE claims that such contracts "are subject to intense competition among private contractors" and that contractors "compete on these contracts largely based upon price." *Id.* ICE therefore claims that disclosure of such information could "enable competitors to utilize the contractor's information in the future in underbidding the current contract." *Id.*

**The Private Immigration Detention Market**

Each year, in appropriations bills authorizing $5.93 billion in funding for DHS, Congress requires ICE to make available 34,000 detention beds per day. 56.1 Statement ¶ 1. ICE manages

a system of immigration detention facilities operated by private contractors, local governmental authorities, and the federal government itself. Many government-owned facilities subcontract with private prison corporations to provide detention-related services. *Id*. ¶¶ 1, 11, 15. Private contractors currently account for 62% of all immigration detention beds. *Id*. ¶ 16. The two largest private immigration detention contractors, CCA and GEO, together operate 72% of the private immigration detention beds. *Id*. ¶ 17. CCA and GEO expanded their share of the total ICE immigrant detention system from 37 percent in 2010 to 45 percent in 2014. *Id*. ¶ 18.

In 2014, the U.S. Government Accountability Office issued a report noting that private contractors do not meaningfully compete for immigration detention contracts and attributing the high cost of contracts with private detention companies to "the lack of competition that drives up prices." *Id*. ¶ 15. Lack of effective competition is particularly apparent in the contract renewal process. As reflected in reporting by the non-partisan think tank Migration Policy Institute, of the private contracts for the largest detention facilities (those holding more than 500 immigrants), *not one* changed hands form one private contractor to another between 2009 and 2012. *Id*. ¶ 19. In some instances, ICE has rebid contracts without full and open competition as required by 10 U.S.C. § 2304, stating, for example, that "[n]o other parties expressed interest in competing" for a contract in Broward County, Florida, and noting that two potential contractors lacked detention facilities within 50 miles of a Field Office and were unable to provide detention services. *Id*. ¶¶ 20, 21. Local governments delegated with detention authority similarly receive few bids. For example, in 2011, Essex County, New Jersey, received only one bid for a contract to run a 450-bed immigrant detention center in Newark in two separate rounds of bidding. *Id*. ¶ 22.

### Guaranteed Minimums

Many private detention contracts provide for "guaranteed minimums"—provisions that

require ICE to pay private contractors for a specific number of detained immigrants regardless of whether beds are filled. *Id.* ¶¶ 11, 12. These guaranteed minimums are also present in local governments' subcontracts with private detention contractors. *Id.* ¶ 10. In June 2015, relying on documents obtained in the instant case, Plaintiffs published *Banking on Detention: Local Lockup Quotas and The Immigrant Dragnet*, which discussed the use of "guaranteed minimums" and argued that they engender considerable pressure and incentives for ICE to funnel arrested immigrants to private facilities, often located far from their communities. *Id.* ¶¶. 10-13. Within a week of the report's publication, Congressional representatives introduced a bill to end the use of guaranteed minimums, H.R. 2808, the "Protecting Taxpayers and Communities from Local Detention Quotas Act." *Id.* ¶ 14. Legislative criticism of private prison influence continues to grow: On September 17, 2015, representatives in both the Senate and the House introduced the "Justice is Not For Sale Act" to end the use of private prison contracts within two years. *Id.* ¶ 2.

**ARGUMENT**

I.     **THE GOVERNMENT CANNOT WITHHOLD FINANCIAL INFORMATION IN IMMIGRATION DETENTION CONTRACTS UNDER FOIA EXEMPTION 4 BECAUSE SUCH CONTRACT TERMS ARE NEITHER "OBTAINED FROM A PERSON" NOR "CONFIDENTIAL."**

Plaintiffs are entitled to judgment as a matter of law because bed-day rates, unit prices, staffing plans, and related financial information in private detention contracts do not qualify for withholding under Exemption 4. 5 U.S.C. §552(b)(4). Movants are entitled to summary judgment where "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and in a FOIA case, "the defending agency has the burden of showing that . . . any withheld documents fall within an exemption to the FOIA." *Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). Courts must conduct a *de novo* review of an

agency's decision to withhold documents, *New York Times Co. v. Dep't of Labor*, 340 F. Supp. 2d 394, 401 (S.D.N.Y. 2004) (citing 5 U.S.C. §552(a)(4)(B)), and, because the basic objective behind FOIA "is disclosure, not secrecy," the nine "exemptions are to be narrowly construed" *FBI v. Abramson*, 456 U.S. 615, 636 n.5 (1982) (citations omitted).

The Government cannot meet the statutory requirements for concealing bed-day rates, unit prices, staffing plans, and related pricing information in government contracts. To be exempt from disclosure under Exemption 4, information must: (1) "be a 'trade secret or 'commercial or financial' in character; (2) it must be 'obtained from a person' and (3) it must be 'privileged or confidential.'" *Nadler v. Fed Deposit Ins. Corp.*, 92 F.3d 93, 95 (2d Cir. 1996) (quoting 5 U.S.C. § 552 (b)(4)); *see also Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006). All three prongs must be met to justify the application of Exemption 4. The information redacted from the Government's contracts does not meet the second and third prongs of this test, and therefore cannot be withheld.

### A. UNIT PRICES, BED-DAY RATES AND STAFFING PLANS IN GOVERNMENT CONTRACTS ARE NOT PROPRIETARY INFORMATION "OBTAINED FROM A PERSON."

#### 1. Prices and Terms the Government Agrees to in Awarded Contracts Are Executive Decisions That Must Be Disclosed.

Where the government agrees to pay corporations to detain immigrants or agrees to a staffing plan as a term of such contracts, it cannot use Exemption 4 to withhold those rates or plans from the public. The United States Court of Appeals for the Second Circuit has made clear that Exemption 4 protects only proprietary information "obtained from a person,"[2] not information generated by the government itself. *See Bloomberg L.P. v. Bd. of Governors of the*

---

[2] 5 U.S.C. § 551(2) defines "person" as "individual, partnership, corporation, association, or public or private organization *other than an agency*") (emphasis added).

*Fed. Reserve Sys.*, 601 F.3d 143, 145-48 (2d Cir. 2010). *See also Natural Res. Def. Council, v. Dep't of Interior*, 36 F.Supp. 3d 384, 399-400 (S.D.N.Y. 2014) ("FOIA's definition of persons does not include government agencies."); *Consumers Union of U.S. v. Veterans Admin.*, 301 F.Supp. 796, 803 (S.D.N.Y. 1969) ("information must be obtained from outside the government to be exempt").

As the United States Supreme Court has recognized, because Exemption 4 "is limited to information 'obtained from a person,' that is, to information obtained outside the Government" it does not apply to "confidential information about Government contracts" which "is necessarily confined to information generated by the Federal Government itself." *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979). While the Court stated that information related to the negotiation of contracts might otherwise be protected before it is finalized under FOIA Exemption 5,[3] this protection "expires as soon as the contract is awarded or the offer withdrawn." *Id.*; *See* Gregory H. McClure, *The Treatment of Contract Prices under the Trade Secrets Act and Freedom of Information Act Exemption 4: Are Contract Prices Really Trade Secrets?* 31 Pub. Cont. L.J. 185, 220 (2002) (noting that while contract bids might be considered proprietary and confidential, post award contract prices should not).

The Second Circuit has similarly drawn a clear line between information submitted in proposals to the government, which may be proprietary, and the terms of contracts "actually made," which are not. *See Bloomberg*, 601 F.3d at 148. Addressing loans by the Federal Reserve to private banks, the Second Circuit held in *Bloomberg* that Exemption 4 did not apply because, in contrast to information contained in a loan application "obtained from a person," the terms of approved government loans, including loan amounts, the type of loan, and loan origination and

---

[3] Exemption 5 protects from disclosure government information that would be privileged in civil discovery, such as the government's internal deliberations. 5 U.S.C. §552 (b)(5).

maturity dates, "was generated within a Federal Reserve Bank upon its decision to grant a loan." *Id.* The court reasoned that, in fact, "the loan itself . . . did not come into existence until a Federal Reserve Bank made the decision to approve the loan request." *Id.*

Courts in this Circuit follow this distinction between government contracts which reflect "executive action," and therefore cannot be deemed "from a person," *see id.* at 149, and documents that reflect information submitted by private parties. *See Fox News Network, LLC v. Dep't of the Treasury*, 739 F.Supp.2d 515, 565-66 (S.D.N.Y. 2010) (information "in a letter generated by Treasury" listing applicants and recipients of federal loans in the wake of the financial crisis could not be withheld under Exemption 4 because Treasury created this information when it decided to grant the loans); *Buffalo Evening News, Inc. v. Small Bus. Admin.*, 666 F.Supp. 467, 469 (W.D.N.Y. 1987) (loan amounts "generated by" the Small Business Administration "in no way implicate[d] any of the financial information provided by the borrowers to the government").

Courts outside of this Circuit have similarly reasoned that contractually agreed-upon terms do not qualify as information "obtained from a person" under Exemption 4. *See, e.g.*, *Fisher v. Renegotiation Bd.*, 355 F.Supp. 1171, 1174 (D.D.C. 1974) (the terms of Renegotiation Agreements reflected agency decision-making rather than "sales, costs and profits…taken directly from the corporation"); *S. Alliance for Clean Energy v. Dep't. of Energy*, 853 F.Supp. 2d 60, 69 (D.D.C. 2012) (agency failed to demonstrate that terms and conditions of final "term sheets" for proposed loan guarantees to energy companies constituted "information obtained from a person"). Where the Government approves terms, analyzes, or takes action on information provided by private entities, the result is agency information. *See Philadelphia Newspapers, Inc. v. Dep't of Health & Human Servs.*, 69 F.Supp. 2d 63, 67 (D.D.C. 1999)

(holding Exemption 4 inapplicable to audits based upon privately-provided data because "[a]n audit is not simply a summary or reformulation of information supplied by a source outside the government[;] It also involves analysis, and the analysis was prepared by the government"); *In Defense of Animals v. Nat'l Insts. of Health*, 543 F.Supp. 2d 83, 102–03 (D.D.C. 2008) (incentive award amounts NIH agreed to pay private contractors were not "obtained from a person," in contrast to royalty rates private entities agreed to pay the NIH).

The principle established in these cases and adopted in *Bloomberg* and *Fox News* requires the disclosure of the detention unit prices and bed-day rates that the Government has agreed to pay. The principle applies equally to staffing plans, which reflect the labor the Government procures and agrees to pay for in a contract. *See id; Philadelphia Newspapers*, 69 F.Supp. 2d at 67. Plaintiffs do not seek contractors' bidding documents or similar submissions of information to the Government, but only the terms that ICE has agreed to—and is obligated by contract—to pay; that is, information that existed only once the Agency made the decision to enter into the contracts. *See Bloomberg*, 601 F.3d at 147-48.

## 2. What the Government Pays Per Day and Unit to Detain Immigrants Cannot Be Privileged as a Corporate Secret.

The logic underlying this interpretation of "obtained from a person" applies with particular force to unit prices and bed rates negotiated in government contracts. Unit prices "related to goods and services procured under a specific contract" are not private proprietary data. *See* McClure, *supra* at 223. Such agreed-upon terms are different from a contractor's actual costs or business profits, which may turn upon a number of fluctuating circumstances such as rates of labor and cost of materials beyond the Government's control. *Id.* Indeed, the Government has no part in determining a contractor's profit strategy or the actual cost borne by a contractor, which, in contrast to contract terms, may ordinarily be "obtained from" private

11

contractors. *Fisher*, 355 F.Supp. at 1174 (distinguishing Renegotiation Board's determination of "excess profits" based upon agency's "own accounting analysis" from information relating to "sales, costs and profits" which were "taken directly from the corporation").

But Plaintiffs do not seek access to cost, profit, or other information uniquely attributable to the contractors, but rather information for which the Government is accountable: "the specific per-detainee bed-day rate" that ICE agreed to pay, and staffing plans reflecting the labor procured by the Government in its contracts. *See Vaughn Index* (noting rates redacted from Contracts 1 and 3-6 and staffing plan redacted from Contract 4). The same is true of "the number of detainee bed spaces, the number of units, and unit price information" that ICE agreed to, which can be used to determine unit prices. *See Vaughn Index* (Contracts 1-4). This information constitutes Executive decision-making regarding how many individuals to detain and where, decisions with significant human costs for individuals who may be held far from their homes and families. These decisions also reflect Executive policy on the financial incentives in the Detention Bed Quota—precisely the kind of government information that FOIA intends to expose to public scrutiny. *See Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) (FOIA was passed to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed").

The Government claims that Exemption 4 applies because release of unit prices and bed-day rates will allow contractors' "competitors to identify the company's terms and conditions of its contract with the government." *See Vaughn Index*. But disclosure of the price terms in government contracts is the point. The Government cannot disclaim responsibility for the prices it agreed to pay by characterizing its own decisions as private entities' corporate secrets.

As discussed in Part B(2) *infra*, it does not matter that such contract terms might in theory shed light on information submitted by contractors. Simply because "information *about an individual can sometimes be inferred from information *generated within an agency* does not mean that such information *was obtained from* that person within the meaning of FOIA." *Bloomberg*, 601 F.3d at 147. Because Plaintiffs do not seek bid prices or other private information contained in the bidding documents, but only the terms of ICE's awarded contracts, the information cannot be withheld under Exemption 4. *See id*.

In sum, Exemption 4 does not justify the withholding of unit prices, bed rates and staffing plans contained in government contracts. *See N.Y. Times v. Dep't of Def.*, 499 F.Supp. 2d 501, 509 (S.D.N.Y. 2007) (summary judgment appropriate where "even on the agency's version of the facts" the information "falls outside the proffered exemption") (quotation omitted). Because the Government's failure to meet this prong alone ends the inquiry, the information must be released. *See Nadler*, 92 F.3d at 95.

**B. TERMS OF IMMIGRATION DETENTION CONTRACTS ARE NOT "CONFIDENTIAL" UNDER EXEMPTION 4 BECAUSE THEIR DISCLOSURE WILL NEITHER IMPAIR THE GOVERNMENT'S ABILITY TO OBTAIN SUCH INFORMATION IN THE FUTURE NOR CAUSE SUBSTANTIAL HARM TO THE COMPETITIVE POSITION OF THE PRIVATE CONTRACTORS.**

Plaintiffs are entitled to judgment as a matter of law because unit prices, bed-day rates and similar information in government immigration detention contracts are not "confidential" under FOIA Exemption 4. Financial information is "confidential" for the purposes of Exemption 4 if disclosure of the information is likely to (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *Nadler*, 92 F.3d at 95-96 (citing *Nat'l*

*Parks*, 498 F.2d at 770); *see also Inner City Press*, 463 F.3d at 244. The Government cannot establish either requirement to conceal unit prices in government detention contracts.

> ### 1. Disclosure Will Not Impair ICE's Future Ability to Contract with Private Entities Because Pricing is Required in Bids for Government Contracts.

The Second Circuit has distinguished between information the government obtains from persons voluntarily, which may be confidential and protected from disclosure, and information that private entities must provide to the government, which is not. *Inner City*, 463 F.3d at 245 (Exemption 4 "protects the government's ability to obtain information by 'encouraging cooperation by those who are not obliged to provide information to the government'") (quoting *Nat'l Parks*, 498 F.2d at 769). If a private entity is "compelled" to submit information to the government, "there is a presumption that the [government's] ability to obtain similar information will not be impaired in the future." *Inner City Press/Cmty on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 380 F.Supp.2d 211, 218 (S.D.N.Y. 2005), *aff'd in part, remanded in part sub nom*, 463 F.3d 239 (2d Cir. 2006); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992).

The Government has not claimed that disclosing prices or staffing plans would, in fact, inhibit the Government's future ability to contract for private detention services. Nor can it. Federal contracting regulations mandate that the Government consider "price or cost to the Government" in all contracting decisions, 48 C.F.R. § 15.304(c)(1), such that contractors must disclose proposed unit prices and costs as a compulsory part of seeking business with the Government. Indeed, in its communications with contractors, ICE appears to concede as much. 56.1 Statement ¶31. There is thus "no danger that public disclosure will impair the ability of the Government to obtain this information in the future." *Inner City*, 463 F.3d at 245 (quoting *Nat'l Parks*, 498 F.2d at 769-70); *see Raher v. Fed. Bureau of Prisons*, 749 F.Supp.2d 1148, 1156 (D.

Or. 2010) (Bureau of Prisons could not withhold unit prices in private prison contracts where contractors, including GEO and CCA, provided prices to the government "as a mandatory requirement of compliance with the [relevant] procurement process").

Defendants cannot show that the Government's ability to obtain detention pricing will be impaired by releasing the terms of awarded contracts.

**2. Disclosure Will Not Cause Substantial Competitive Harm to Contractors Because Immigration Detention Is Not a Competitive Market.**

The Government cannot establish that release of unit prices, bed day rates and staffing plans in ICE detention contracts will cause substantial competitive harm because they cannot show that private contractors actually compete for detention contracts. To demonstrate substantial competitive harm for purposes of Exemption 4, ICE must establish that the private corporations face "both (1) actual competition in the relevant market; and (2) likelihood of substantial competitive injury if the information were released." *Inner City*, 380 F.Supp. 2d at 219 (quoting *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983)); *Natural Res. Def. Council*, 36 F.Supp. 3d at 402. ICE cannot establish either requirement.

The Government cannot demonstrate beyond material dispute that a competitive market exists for detention contracts. In 2014 the Government Accountability Office itself concluded that private contractors do not meaningfully compete for immigration detention contracts and attributed the high cost of contracts with private detention companies to "the lack of competition that drives up prices." 56.1 Statement ¶ 15. Where the government itself documents a lack of competition, Exemption 4 should not apply. *See Natural Res. Def. Council*, 36 F.Supp. 3d at 402 (Government could not show actual competition under Exemption 4 where GAO and the Inspector General documented "limited, if any, competition" for coal leases).

The immigration detention market has just one primary consumer: ICE. *See Arizona v. United States*, 132 S.Ct. 2492, 2505-07 (2012) (upholding the federal government's exclusive immigration detention authority absent a delegation to local entities). This necessarily limits competition. *See Raher*, 749 F.Supp. 2d at 1156 (no competition where only one "customer in the relevant market"); Edward Rubin, *The Possibilities and Limitations of Privatization*, 123 Harv. L. Rev. 890, 897 (2012) (noting lack of a "competitive process" where "there is no nongovernment market for the product in question").

The pool of entities providing immigration detention services to ICE is likewise shallow, and, in fact, dominated by two private entities, GEO and CCA. *See Vaughn Index*, Contract 1, (GEO); Contract 3 (CCA); Contract 4 (CCA). This dominance is typical of the private prison industry where "very few entities are positioned to provide such complex and sophisticated services" such that contracts are unlikely "to benefit from the competitive effects of an efficient market" that lacks a "commercial analogue." Wendy Netter Epstein, *Contract Theory and the Failures of Public-Private Contracting*, 34 Cardozo L. Rev. 2211, 2216 (2013).

Consistent with these principles, the United States District Court for the District of Oregon in *Raher v. Fed. Bureau of Prisons*, in an identical factual scenario, held that pricing information in detention contracts could not be withheld under Exemption 4 where the Government failed to demonstrate actual competition in the market for detention of immigrants with federal convictions. 749 F.Supp.2d at 1157. The court cited the lack of evidence that "businesses other than the submitters are qualified, available, and capable of providing services and facilities that would compete with the secure detention facilities and services already provided by the submitters to BOP or that the submitters even compete against each other in any significant way." *Id.* The court directed BOP to provide additional information in support of

withholding. *Raher v. Bureau of Prisons*, No. CV-09-526-ST, 2011 WL 2014875, at *1-2 (D. Or. May 24, 2011). But even after granting the Government that additional opportunity, the court held that BOP still failed to demonstrate actual competition in the market, reasoning that two contractors, GEO and CCA, "dominated" the relevant "market" and did not actually compete for detention contracts. *See Raher*, 2011 WL 2014875, at *13 (noting GEO held 47 percent and CCA held 35 percent of "the 23,970 secure facilities beds" under private contract and characterizing them as "among a small number of entities. . . capable of supplying BOP with the facilities and services required").

Here, the same two contractors dominate the immigration detention market, with CCA and GEO operating "72 percent of the privately contracted ICE immigrant detention beds." 56.1 Statement ¶ 17. CCA and GEO have expanded their share of the total ICE immigrant detention system from 37 percent in 2010 to 45 percent in 2014). *Id.* ¶ 18. CCA and GEO's dominance is particularly apparent when contracts are rebid. Indeed, of the private contracts for the largest detention facilities analyzed by the non-partisan think tank Migration Policy Institute in 2009, *not one* changed hands to another private contractor by 2012. *Id.* ¶ 19. ICE has in some cases even rebid contracts without full and open competition as required by 10 U.S.C. § 2304, stating that "[n]o other parties expressed interest in competing," and noting that two potential contractors lacked detention facilities within 50 miles of a Field Office and were unable to provide detention services. *Id.* ¶¶ 20-21. This lack of competition in the market has also been evident when ICE delegates detention authority to local governments. For example, in 2011, Essex County, New Jersey, received only one bid for a contract to run a 450-bed immigrant detention center in Newark in two separate rounds of bidding. *Id.* ¶ 22. This entrenchment may partly be explained by the considerable transaction costs and upheaval in operations the

Government would incur if a truly competitive market existed. *See Raher*, 749 F.Supp. 2d at 1160 (noting the "need for continuity of operations and the significant costs of disruptions in continuity" if prisoners were transported to a successful bidder's facility).

In cases similarly lacking competition, courts have found Exemption 4 inapplicable to contract terms. *See, e.g.*, *Hercules, Inc. v. Marsh*, 659 F.Supp. 849, 854-55 (W.D. Va. 1987) (Exemption 4 inapplicable where private contractor "always award[ed] the contract"), *aff'd*, 839 F.2d 1027 (4th Cir. 1988); *see also Raher*, 749 F.Supp. 2d at 1157 (lack of competition where no evidence contractors "underbid by competitors" or that "BOP considered competing bids" in the renewal process); *Niagara Mohawk Power Corp. v. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999) ("competitive injury is too remote for purposes of Exemption 4 if it can occur only in the occasional renegotiation of long-term contracts").

In sum, all of these factors—the single buyer of immigration detention services, the shallow pool of qualified contractors, the lack of turnover in contracts awarded, the dominance of two primary contractors, and the complex nature of prison services, which do not lend themselves to a competitive market—all indicate that the immigration detention market lacks actual competition. Because ICE cannot establish this threshold, the requested information is not confidential under Exemption 4. Plaintiffs are entitled to judgment as a matter of law.

### 3. Disclosure of Unit Prices and Staffing Plans In Government Contracts Will Not Cause Substantial Competitive Injury to Private Contractors.

Disclosure of unit prices and staffing plans in awarded government contracts will not cause "substantial harm to the competitive position of" private detention contractors because this information will not impact their ability to secure future contracts. Even if ICE establishes actual competition in the market, to treat unit prices as confidential, it must separately demonstrate that the contractors will likely endure substantial competitive harm if the Government releases the

redacted information. *Inner City*, 380 F.Supp. 2d at 219. To establish that "substantial harm" is likely, the Government must show (1) "that if the requested information is disclosed, competitive harm would be 'imminent,'" and (2) "that the competitive harm will result from the affirmative use of the information by competitors of the person from whom the information was obtained, not merely injuries to that person's competitive position in the marketplace." *Bloomberg*, 649 F.Supp. 2d at 279 (citations omitted). The Government cannot show that the small pool of contractors engaged in detention services will use pricing information or staffing plans in awarded contracts to cause substantial and imminent harm to one another's competitive position.

As argued in Part I.A., pricing and staffing information in government contracts is not proprietary information owned by private contractors, and thus disclosure of this information cannot cause substantial injury under Exemption 4. *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1291 n.30 (competitive harm is "limited to harm flowing from the affirmative use of proprietary information by competitors," not "simply any injury to competitive position"). But even if the Court deemed such terms proprietary, which it should not, *see supra* Part I.A., disclosure still would not cause "imminent harm" because the Government cannot establish how contractors will use this information to win future contracts from rivals.

The Government considers a range of factors in awarding contracts, and past contracts do not automatically determine future terms. *See Raher*, 749 F. Supp. 2d at 1159 (distinguishing between "[d]isclosure of a contractor's overall bid price *during the bidding process* [which] would enable competitors to underbid the contractor" and disclosure of contract terms after the bidding process "has been completed" which would not cause similar harm) (emphasis added). The United States District Court for the Western District of Washington recently employed similar reasoning in a case involving pricing rates in ICE contracts for telephone services. In

*Prison Legal News v. Dep't of Homeland Sec.*, ---F.Supp.3d ----, *11, 2015 WL 3796318 (W.D. Wash. 2015), the district court rejected ICE's claim that disclosure of a 2009 performance incentive rate awarded to the contractor would allow competitors "to reverse engineer [the contractor's] entire business strategy" where past rates would not provide "competitors with insight into [the contractor's] future bids for future contracts" and there was no indication the contractor would "use the same rate in 2015." *Id.* Financial information from even the recent past is often too stale to lead to future harm. *See Lee v. FDIC*, 923 F. Supp. 451, 455 (S.D.N.Y. 1996) ("any potential detriment" from disclosure of information less than two years old "likely to have mitigated with the passage of time"); *New York Times*, 340 F. Supp. 2d at 402 (noting "employee hours for the year 2000 [were] nothing more than outdated information" in 2004).

Indeed, many courts have rejected speculative arguments regarding competitors' ability to reverse-engineer pricing strategies based upon the disclosure of unit prices in awarded government contracts. *See, e.g.*, *Ctr. for Pub. Integrity*, 191 F.Supp. 2d at 194-95 (disclosure of petroleum prices would not allow competitors to reverse-engineer contractor's pricing strategy where "world oil prices are volatile" and competitors cannot assume that a "bidder's business strategies and valuation methodologies remain the same over time in the face of changing market conditions"); *Pac. Architects & Eng'rs, Inc. v. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990) (disclosure of unit prices would not permit competitors to determine contractor's profit margin since price reflects "a number of fluctuating variables").

Similarly, here, a number of fluctuating variables will impact price, such as facility location, economic climate, and the desirability of continuity in prison operations. Thus, it is entirely speculative what role, if any, awarded contract price will play in future pricing. In addition, the Government must consider non-price factors before awarding a contact.

Specifically, 48 C.F.R. § 15.304(c) requires that the Government consider one or more factors related to quality such as past performance, technical excellence, management capability, personnel qualifications, and prior experience. Thus, past prices are not dispositive of future bid success and ICE cannot show how competitors will use historical pricing information to cause "imminent" harm to the contractor. In fact, whether competitors will win future contracts based upon old contract prices is not only speculative, it is unlikely. "To prevail in the bidding process, the rival bidder would have to not only undercut the [unit] price, but also cover the transaction costs of disrupting operations." *Raher*, 749 F.Supp.2d at 1160.

These principles apply equally to staffing plans. Defendants cannot show how staffing plans for facilities of varying size and location will be used by competitors to win future bids that may require different staffing plans. Moreover, given that ICE's Detention Standards require facilities to review and update such plans "at least annually" to ensure that staffing is sufficient to "maintain facility security and prevent or minimize events that pose a risk of harm," 56.1 Statement ¶ 9, the Government cannot show how a staffing plan based upon conditions from 2012, *see* Contract 4, will be used by competitors to underbid contracts in the future.

Second, the contractors who seek to withhold such information from the contracts are part of a discrete and shallow market, and all are subject to potential disclosure of their unit prices and staffing plans should Plaintiffs' Motion be granted. Thus, "imminent injury" would never materialize in this matter: all contractors would be subject to the same rules regarding the transparency of awarded government contracts, and none would be uniquely disadvantaged in the marketplace because of its dealings with the Government. In other words, "[d]isclosure of price charged the government is a cost of doing business with the government." *Racal-Milgo Gov't Sys., Inc. v. Small Business Admin.*, 559 F.Supp. 4, 6 (D.D.C. 1981).

In sum, releasing unit pricing and staffing plans will not lead to any imminent, substantial competitive harm to the contractors because other contractors are unlikely to use such information to evaluate and undermine future bidding. Accordingly, such prices are not confidential and Plaintiffs are entitled to judgment as a matter of law.

## II.     THE USE OF EXEMPTION 4 TO HIDE THE TERMS OF GOVERNMENT DETENTION CONTRACTS UNDERMINES THE PURPOSE OF FOIA

The purpose of FOIA is "to facilitate transparency about the government's policies even — or perhaps especially — when members of the public are disturbed by those policies and are fighting to end them." *Nat'l Day Laborer Org. Network v. ICE*, 877 F.Supp. 2d 87, 93 (S.D.N.Y. 2012). In a time of increasing private control over detention and incarceration, 56.1 Statement ¶¶ 10-22, the need for transparency and accountability for government contracting decisions is all the more important. The Government has invoked Exemption 4 to conceal the terms of its own contracts by claiming that these terms are corporate secrets. The Court should reject this attempt to undermine FOIA's most basic goal of democratic accountability through transparency.

Indeed, if the government's position is accepted, so long as a private contractor is involved, the public would have no window into the pricing and staffing schemes agreed to and paid for by the federal government in an area of traditional public concern—detention and incarceration. Upholding Exemption 4 in this context would allow the Federal Government to shield its agreements with private contractors, even though its identical or similar arrangements with local public entities are already open to scrutiny.

Nothing in the text of Exemption 4 or the FOIA justifies this anomalous result. To the contrary, "like all FOIA exemptions, Exemption 4 is to be read narrowly in light of the dominant disclosure motif expressed in the statute." *Washington Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 324 (D.C. Cir. 1989). Exemption 4 was not intended to except

government contracts from FOIA's presumption in favor of disclosure simply because the government procures goods or services from a private entity; to do so would give the Government a perverse incentive to increase the use of private contractual arrangements in order to evade FOIA's disclosure requirements, "thus undermin[ing] the central purpose of FOIA." *N.Y. Pub. Interest Research Grp. v. EPA*, 249 F. Supp. 2d. 327, 336 (S.D.N.Y. 2003).

Such a result can and should be avoided here, where the information sought bears on policies that are increasingly disturbing to the public: the growing role of private prison contractors. In the first nine months of 2015, Congressional representatives introduced two pieces of legislation addressing the dominance of private contractors in the traditionally public fields of detention and incarceration: 56.1 Statement ¶¶ 2, 14. Given this public debate, it is particularly important to "permit public scrutiny of the wisdom and efficiency of [the agency's] decisions and of the value received by taxpayers for these federal expenditures of taxpayer funds." *Raher*, 749 F.Supp. 2d at 1156. *See also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1194 (D.C. Cir. 2004) (Garland, J., dissenting) ("Disclosure permits the public to evaluate whether the government is receiving value for taxpayer funds, or whether the contract is instead an instance of waste, fraud, or abuse of the public trust.")

## CONCLUSION

In sum, the Government cannot meet its burden to show that redacted unit prices, bed day rates, and staffing plans contained in government contracts constitute information "obtained from a person" and that is "confidential." Neither the text of Exemption 4, nor the reasoning provided in the Defendants' *Vaughn* Index, nor the clear intent of FOIA to facilitate public scrutiny of Executive decisions, justifies withholding the redacted information. The Court should grant summary judgment to the Plaintiffs and order the information disclosed.

Dated: November 17, 2015

Respectfully submitted,

_____

GHITA SCHWARZ
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel.: (212) 614-6445
Fax:  (212) 614-6422
gschwarz@ccrjustice.org

JENNY-BROOKE CONDON
ANASTASIA A. STYLIANOU (Student Attorney)
JOHN P. BURNS (Student Attorney)
Center for Social Justice
Seton Hall Law School
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700
Jenny-Brooke.Condon@shu.edu