UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DETENTION WATCH NETWORK and
CENTER FOR CONSTITUTIONAL RIGHTS,

        Plaintiffs,

      v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT and UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY,

        Defendants.

14 Civ. 583 (LGS)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd floor
New York, New York 10007
Tel.: (212) 637-2679
Fax: (212) 637-2717
E-mail: Jean-David Barnea@usdoj.gov

JEAN-DAVID BARNEA
Assistant United States Attorney

    – Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

    A.    Procedural History ....................................................................................2

    B.    ICE's Contracts with Private Contractors ..............................................4

ARGUMENT .............................................................................................................6

I.    Legal Standards for Summary Judgment in FOIA Actions ...............................6

II.    ICE Properly Redacted the Pricing and Staffing Information Under Exemption 4............7

    A.    Standards Under FOIA Exemption 4 ......................................................7

    B.    The Pricing and Staffing Information Redacted from the Contracts Was "Provided" by the Private Contractors ....................................................9

    C.    Release of the Withheld Pricing and Staffing Information Will Likely Cause Substantial Competitive Harm to the Contractors ................................12

        1.    *Competition and Competitive Harm for SPC Contracts* .........................13

        2.    *Competition and Competitive Harm for CDF Contracts*.........................16

        3.    *Competition and Competitive Harm for Private Subcontractors in Certain IGSA Contracts* ...................................................................20

III.    ICE Properly Redacted the Staffing Information Under Exemption 7(E) ......................22

    A.    ICE May Assert a New Exemption After the Commencement of Briefing .........22

    B.    Standards for Exemption 7(E) ...............................................................24

    C.    The Staffing Plans Are Protected by Exemption 7(E) ...........................25

CONCLUSION..........................................................................................................28

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                          <u>**Page**</u>

*ACLU v. Department of Defense*,
  389 F. Supp. 2d 547 (S.D.N.Y. 2005)....................................................................22, 23

*ACLU v. Office of the Dir. of Nat. Intelligence*,
  No. 10 Civ. 4419 (RJS), 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ......................6

*Allard K. Lowenstein International Human Rights Project v. DHS*,
  626 F.3d 678 (2d Cir. 2010)........................................................................................24

*American Airlines, Inc. v. National Mediation Board*,
  588 F.2d 863 (2d Cir. 1978)..........................................................................................7

*August v. FBI*,
   328 F.3d 697 (D.C. Cir. 2003) ...................................................................................21

*Bloomberg, L.P. v. Board of Governors of the Federal Reserve System*,
  601 F.3d 143 (2d Cir. 2010).....................................................................................9, 11

*Bowen v. FDA*,
  925 F.2d 1225 (9th Cir. 1991) ....................................................................................26

*Buffalo Evening News, Inc. v. SBA*,
  666 F. Supp. 467 (W.D.N.Y. 1987) .............................................................................11

*CIA v. Sims*,
  471 U.S. 159 (1985).......................................................................................................6

*COMPTEL v. FCC*,
  910 F. Supp. 2d 100 (D.D.C. 2012) ..............................................................................9

*Carney v. DOJ*,
  19 F.3d 807 (2d Cir. 1994).............................................................................................6

*Church of Scientology v. IRS*,
   816 F. Supp. 1138 (W.D. Tex. 1993).........................................................................26

*Computer Professionals for Social Responsibility v. U.S. Secret Service*,
  72 F.3d 897 (D.C. Cir. 1996) ....................................................................................22

*Continental Stock Transfer & Trust Co. v. SEC*,
  566 F.2d 373 (2d Cir. 1977)......................................................................................7

*Council on American-Islamic Relations v. FBI*,
  749 F. Supp. 2d 1104 (S.D. Cal. 2010)..............................................................26, 27

*Center for Auto Safety v. U.S. Department of Treasury*,
  No. 11 Civ. 1048 (BAH), 2015 WL 5726348 (D.D.C. Sept. 30, 2015) ...............10, 11

*Center for Constitutional Rights v. Department of Defense*,
  968 F. Supp. 2d 623 (S.D.N.Y. 2013), *aff'd*, 765 F.3d 161 (2d Cir. 2014).................6

*Center for Public Integrity v. Department of Energy*,
  191 F. Supp. 2d 187 (D.D.C. 2002).........................................................................14

*Federal Open Market Committee of Federal Reserve System v. Merrill*,
  443 U.S. 340 (1979)................................................................................................11

*Ferguson v. FBI*,
  No. 89 Civ. 5071 (RPP), 1995 WL 329307 (S.D.N.Y. June 1, 1995),
  *aff'd*, 83 F.3d 41 (2d Cir. 1996)................................................................................6

*Fisher v. Renegotiation Board*,
  355 F. Supp. 1171 (D.D.C. 1974) ............................................................................11

*Fox News Network, LLC v. Department of the Treasury*,
  739 F. Supp. 2d 515 (S.D.N.Y. 2010)......................................................................11

*Gulf & Western Industrial v. United States*,
  615 F.2d 527 (D.C. Cir. 1979) ..................................................................................9

*Inner City Press v. Board of Governors*,
  380 F. Supp. 2d 211 (S.D.N.Y. 2005)......................................................................12

*Inner City Press/Community on the Move v. Board of Governors of the Federal
  Resource System*, 463 F.3d 239 (2d Cir. 2006)...........................................................7

iii

*Intellectual Property Watch v. U.S. Trade Representative*,
  No. 13 Civ. 8955 (ER), 2015 WL 5698015 (S.D.N.Y. Sept. 25, 2015) ......................8

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989)...............................................................................................6

*Judicial Watch, Inc. v. Export-Import Bank*,
  108 F. Supp. 2d 19 (D.D.C. 2000) ..........................................................................10

*Lee v. FDIC*,
  923 F. Supp. 451 (S.D.N.Y. 1996) ..........................................................................19

*Lion Raisins v. USDA*,
  354 F.3d 1072 (9th Cir. 2004) ................................................................................15

*McDonnell Douglas Corp. v. NASA*,
  180 F.3d 303 (D.C. Cir. 1999) ...........................................................................15, 20

*NRDC v. U.S. Department of Interior*,
  36 F. Supp. 2d 384 (S.D.N.Y. 2014)........................................................................8

*New York Times Co. v. DOJ*,
  872 F. Supp. 2d 309 (S.D.N.Y. 2012).......................................................................6

*New York Times Co. v. U.S. Department of Labor*,
  340 F. Supp. 2d 394 (S.D.N.Y. 2004)......................................................................20

*NAACP Legal Defense & Education Fund, Inc. v. HUD*,
  No. 07 Civ. 3378 (GEL), 2007 WL 4233008 (S.D.N.Y. Nov. 30, 2007)....................6

*Nadler v. FDIC*,
  92 F.3d 93 (2d Cir. 1996).........................................................................................7

*National Parks & Conservation Association v. Morton*,
  498 F.2d 765 (D.C. Cir. 1974) ..............................................................................7, 8

*Niagara Mohawk Power Corp. v. U.S. Department of Energy*,
  169 F.3d 16 (D.C. Cir. 1999) ..................................................................................16

*OSHA Data/CIH, Inc. v. U.S. Department of Labor*,
    220 F.3d 153 (3d Cir. 2000)..............................................................................15

*Pacific Architects & Engineers Inc. v. U.S. Department of State*,
    906 F.2d 1345 (9th Cir. 1990) .........................................................................14

*Philadelphia Newspapers, Inc. v. HHS*,
    69 F. Supp. 2d 63 (D.D.C. 1999) .....................................................................11

*Piper v. U.S. Department of Justice*,
    374 F. Supp. 2d 73 (D.D.C. 2005) ...................................................................22

*Prison Legal News v. DHS*,
    No. C14-479 MJP, 2015 WL 3796318 (W.D. Wash. June 18, 2015) ........................19

*Public Citizen Health Research Group v. NIH*,
    209 F. Supp. 2d 37 (D.D.C. 2002) ...................................................................10

*Raher v. BOP*,
    749 F. Supp. 2d 1148 (D. Or. 2010) ................................................................14

*Southern Alliance for Clean Energy v. U.S. Department of Energy*,
    853 F. Supp. 2d 60 (D.D.C. 2012) ..................................................................9, 10

*Schanen v. DOJ*,
    798 F.2d 348 (9th Cir. 1986) ..........................................................................22

*Trans-Pacific Policing Agreement v. U.S. Customs Service*,
    No. 97 Civ. 2188 (TFH), 1998 WL 34016806 (D.D.C. May 14, 1998),
    *rev'd on other grounds*, 177 F.3d 1022 (D.C. Cir. 1999)..........................................15

*U.S. Department of Interior v. Klamath Water Users Protective Association*,
    532 U.S. 1 (2001)...........................................................................................6

*United Technologies Corp. v. U.S. Department of Defense*,
    601 F.3d 557 (D.C. Cir. 2010) ..........................................................................8

*Utah v. U.S. Department of Interior*,
    256 F.3d 967 (10th Cir. 2001) ..........................................................................8

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ...................................................................3

*Vazquez v. DOJ*,
    887 F. Supp. 2d 114 (D.D.C. 2012) ........................................................26

*Westinghouse Electric Corp. v. Schlesinger*,
    392 F. Supp. 1246 (E.D. Va. 1974) .........................................................15

## Federal Statutes, Regulations, Administrative, and Legislative Materials

Freedom of Information Act, 5 U.S.C. § 552 ...............................................1, 5

    5 U.S.C. § 552(a)(4)(B) ...........................................................................6

    5 U.S.C. § 552(b)(7)(E) ...........................................................................1

    5 U.S.C. § 552(b)(4) ............................................................................1, 7

6 C.F.R. § 5.8 ................................................................................................2

Fed. R. Civ. P. 56(a) ....................................................................................6

H.R. Rep. No. 1497, at 6 (1966) ..................................................................6

U.S. Gov't Accountability Off., No. 15-153,
    *Immigration Detention: Additional Actions Needed to Strengthen*
    *Management and Oversight of Facility Costs and Standards* (Oct. 2014),
    http://www.gao.gov/assets/670/666467.pdf...............................................18

## PRELIMINARY STATEMENT

Defendant United States Immigration and Customs Enforcement ("ICE" or the "Government"), by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its cross-motion for partial summary judgment and in opposition to the motion ("Pl. Br.") of plaintiffs Detention Watch Network and the Center for Constitutional Rights (together, "Plaintiffs") for partial summary judgment in this case arising under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

Plaintiffs seek the release under FOIA of proprietary pricing and staffing information provided to ICE by private contractors and incorporated into contracts relating to services provided at government-owned and private detention facilities at which ICE detainees are held. The release of this information would competitively harm the private contractors that provided this information to ICE by enabling their competitors to reverse-engineer their proprietary pricing and staffing strategies and use that information to underbid the contractors.  ICE thus properly redacted the information in question from the contract documents pursuant to FOIA Exemption 4, 5 U.S.C. § 552(b)(4).  Furthermore, the staffing plans for detention facilities constitute confidential law enforcement information, and specifically law enforcement techniques or procedures within the meaning of Exemption 7(E), 5 U.S.C. § 552(b)(7)(E).  If publicly released, this material could compromise the safety and security of the staff and detainees at detention facilities housing ICE detainees.  ICE thus correctly withheld these staffing plans pursuant to FOIA Exemption 7(E).

## BACKGROUND

### A.      Procedural History

Plaintiffs submitted a FOIA request to ICE and to the U.S. Department of Homeland Security ("DHS") on November 25, 2013 [Docket No. 1, Ex. A].  The FOIA request sought, among other things, copies of certain executed agreements between ICE and private contractors relating to detention facilities.  *Id.*  On January 30, 2014, Plaintiffs filed the complaint in the instant action [Docket No. 1], and on March 5, 2014, ICE answered the complaint [Docket No. 16].  Thereafter, the parties negotiated a clarification and narrowing of the original FOIA request, which was finalized on March 25, 2014.  As part of this agreement, ICE agreed to process executed agreements between ICE and private contractors relating to detention facilities within the parameters of the request.

ICE has been making monthly productions of responsive documents to Plaintiffs since July 15, 2014, and included among the materials produced to date are many contracts with private contractors relating to detention facilities housing ICE detainees.  During its review of the private contract documents, ICE determined that Exemption 4 may protect the commercial pricing and staffing information at issue provided by the private contractors and incorporated into the contracts.  Pursuant to DHS's FOIA regulation, 6 C.F.R. § 5.8, ICE contacted several of the contractors to inform them of the FOIA request seeking the information they had provided to ICE and sought their views on the public disclosure of the information in question.  The contractors all responded that the information constitutes confidential business information that is protected under Exemption 4.  The documents were thus processed with the relevant pricing and staffing information redacted under Exemption 4.

After Plaintiff challenged these redactions, the parties agreed upon a representative sample of the contract documents to be used for the motions, and ICE prepared a *Vaughn* index[1] for the sample documents, which was filed with the Court on November 10, 2015 [Docket No. 69]. In accordance with the schedule set by the Court [Docket No. 70], Plaintiffs filed their opening brief on November 17, 2015 [Docket No. 17], and the Government now opposes that motion and cross-moves for partial summary judgment. In addition to Exemption 4, ICE now also asserts Exemption 7(E) with respect to the staffing plans associated with the contracts. A revised *Vaughn* index is attached to the declaration of Fernando Pineiro, ICE's Deputy FOIA Officer ("Pineiro Decl.").[2]

The six sample contracts attached to ICE's (original and revised) *Vaughn* index are:

- **Sample Contract 1**: a September 28, 2011, contract modification for detention bed-days at the Broward Transitional Center in Pompano Beach, Florida operated by GEO;

- **Sample Contract 2**: a November 4, 2011, contract modification for detention bed-days at the Farmville Detention Center in Farmville, Virginia, owned and operated by ICA;

- **Sample Contracts 3 and 4**: a June 30, 2011, contract modification for the Otay Mesa Detention Facility in San Diego, California, operated by CCA, and a June

---

[1] A *Vaughn* index describes the rationale for an agency's assertion of FOIA exemptions in connection with documents responsive to a FOIA request. *See generally Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973).

[2] The other attached declarations are from: James Dana Adams, Jr., Acting Assistant Director for the Detention Compliance and Removal Division of ICE's Office of Acquisition Management ("Adams Decl."); Ronald E. Gates, Vice President of Business Development and Contract Administration, for Asset Protection & Security Services, LP ("APSS") ("Gates Decl."); David Venturella, Senior Vice President, Business Development of The GEO Group, Inc. ("GEO") ("Venturella Decl."); Bart Verhulst, Vice President/Federal & Local Partnership Relations, Corrections Corporation of America ("CCA") ("Verhulst Decl."); and Russell B. Harper, Chief Executive Officer, Immigration Center of America-Farmville, LLC ("ICA") ("Harper Decl."). Just as with the contracts selected for the *Vaughn* index, which are representative of the contracts produced by ICE in response to the FOIA request, the declarations submitted with this motion are representative of the private contractors' concerns. We have not submitted a declaration from each private contractor — or even each private contractor whose contract appears in the *Vaughn* index — in order to avoid duplicative statements and arguments.

20, 2012, contract modification to update pricing at the same facility, attaching a staffing plan;

- **Sample Contract 5**: a March 11, 2011, contract modification for the Buffalo Federal Detention Facility in Batavia, New York, operated by ICE with Valley Metro-Barbosa Group JV providing detention and other services;[3] and

- **Sample Contract 6**: a June 1, 2009, contract modification for the Florence Detention Center in Phoenix, Arizona, operated by ICE, with Asset Protection providing detention and other services.

### B.    ICE's Contracts with Private Contractors

As part of its law enforcement mission, ICE identifies and apprehends removable aliens and detains them when necessary, prioritizing those aliens who are convicted criminals, those who pose a threat to national security, fugitives, recent border entrants, and aliens who thwart immigration controls.  *See* Pineiro Decl. ¶ 14.  ICE thus directs a broad program relating to the supervision, detention, and deportation of aliens who are in the United States illegally.  *See* Adams Decl. ¶ 5.

ICE contracts with several private companies that provide services with respect to the operation of facilities where aliens are detained.  *See id.* ¶ 6.  As relevant here, there are three types of contracting mechanisms by which ICE secures detention services by private contractors for housing detainees: (a) Service Processing Centers ("SPCs"), facilities that are owned by ICE and operated by commercial contractors; (b) Contract Detention Facilities ("CDFs"), privately owned and operated detention facilities; and (c) state and local jails, for which local governments contract with ICE through Intergovernmental Service Agreements ("IGSAs"), where private corporations serve as subcontractors.  *See id.* ¶ 6 & nn.1-4.

---

[3] The revised *Vaughn* index also attaches a revised version of Sample Contract No. 5, which was incompletely redacted on one page.  *See* Pineiro Decl. ¶ 21 n.4.  The Government has requested that Plaintiffs return the incompletely redacted version of this document and seek the Court's leave to permanently remove it from the public docket.

At all of these detention facilities, private contractors provide staff for such services as detention services (*i.e.*, security and correctional staff), food service, medical service, and transportation service for the detainees.  *E.g.*, Harper Decl. ¶ 1.  The private contractors may subcontract the provision of some of these services to other contractors.  *E.g.*, Harper Decl. ¶ 16.

The contracting process differs depending on the type of contract at issue.  SPC and CDF contracts are solicited by formal Requests for Proposals ("RFPs"), to which interested contractors can respond by bidding.  *See* Adams Decl. ¶ 8.  IGSA contracts may be awarded after ICE has been approached by local governments, sometimes with their commercial partners.  *See id.* ¶ 16.  A more detailed description of the contracting process, and the competition among prospective contractors for these contracts, is included *infra* at 12-21.

The contracts between the private contractors and ICE contain the contractors' pricing and staffing information for the services to be provided.  The pricing can be provided as a fixed monthly amount (sometimes referred to as an "aggregate" fee) based on housing an anticipated number of detainees, or as a "bed-day" rate, representing the contractor's full cost of operating the facility divided by an expected number of detainees to be housed and the number of days, to arrive at a per-detainee, per-day rate.  *See* Adams Decl. ¶ 10; Pineiro Decl. ¶ 16.  Many contracts also include staffing plans, which detail the number of personnel working at a particular detention facility, the number of personnel assigned by shift, and how and where the personnel are posted within the facility.  *See* Pineiro Decl. ¶ 17; Adams Decl. ¶ 19.

ICE has redacted the bed-day rates and fixed monthly rates from the contracts under Exemption 4, and has redacted the staffing plans under Exemptions 4 and 7(E).

## ARGUMENT

### I.    Legal Standards for Summary Judgment in FOIA Actions

The Freedom of Information Act, 5 U.S.C. § 552, represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, at 6 (1966)); *Ctr. for Constitutional Rights v. Dep't of Def.*, 968 F. Supp. 2d 623, 631 (S.D.N.Y. 2013), *aff'd*, 765 F.3d 161 (2d Cir. 2014).  Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001) (citations omitted); *see also John Doe Agency*, 493 U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application")

Most FOIA actions are resolved through motions for summary judgment.  *See, e.g., Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994); *Ctr. for Constitutional Rights*, 968 F. Supp. 2d at 631.  Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In a FOIA case, courts consider whether the government has properly withheld records or information under any of FOIA's exemptions.  *See* 5 U.S.C. § 552(a)(4)(B).  "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."  *Carney*, 19 F.3d at 812 (footnote omitted).  An

agency's declarations in support of its determination are "accorded a presumption of good faith." *Id*. (quotation marks omitted).[4]

## II.     ICE Properly Redacted the Pricing and Staffing Information Under Exemption 4

### A.     Standards Under FOIA Exemption 4

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  This exemption covers two distinct categories of information: (1) trade secrets, and (2) information that is (a) commercial or financial, and (b) obtained from a person, and (c) is privileged or confidential.  *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 868 (2d Cir. 1978) (Exemption 4 "does not apply to information (other than trade secrets) which does not satisfy the three requirements stated in the statute").  In this case, the second category applies, because the information withheld is commercial or financial; it was obtained from persons, *i.e.*, the contractors; and it is confidential.  *See id.*; *Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996).

"[I]nformation is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information —

_____

[4] The Government has not submitted a counterstatement to Plaintiffs' Local Rule 56.1 statement [Docket No. 75-1], nor its own Local Rule 56.1 statement, as "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment" and a Local Rule 56.1 statement "would be meaningless."  *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff 'd*, 83 F.3d 41 (2d Cir. 1996); *N.Y. Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012); *ACLU v. Office of the Dir. of Nat. Intelligence*, No. 10 Civ. 4419 (RJS), 2011 WL 5563520, at *1 n.1 (S.D.N.Y. Nov. 15, 2011).  Further, the materials cited in Plaintiffs' Rule 56.1 statement are all publicly available documents, articles, and reports, the authenticity of which the Government does not contest, but their characterization by Plaintiffs, or their relevance to this FOIA action, is disputed.  In following the practice of not submitting a Rule 56.1 statement or not responding to Plaintiffs' statement, the Government does not admit the accuracy or the materiality of any purported fact asserted by Plaintiffs.  *See NAACP Legal Def. & Educ. Fund, Inc. v. HUD*, No. 07 Civ. 3378 (GEL), 2007 WL 4233008, at *1 (S.D.N.Y. Nov. 30, 2007) (denying plaintiff's request to "deem[] admitted" plaintiff 's assertion of undisputed facts as "incorrect and irrelevant").  The Government, however, reserves the right to respond to Plaintiffs' Local Rule 56.1 Statement should the Court deem a response appropriate in this action.

necessary information — in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Res. Sys.,* 463 F.3d 239, 244 (2d Cir. 2006) (quoting *Cont'l Stock Transfer & Trust Co. v. SEC,* 566 F.2d 373, 375 (2d Cir. 1977) (adopting standard of *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)). The legislative history of FOIA "firmly supports an inference that [Exemption 4] is intended for the benefit of persons who supply information as well as the agencies which collect it." *Nat'l Parks*, 498 F.2d at 767-70. In this case, ICE has withheld pricing and staffing information because its release would cause substantial competitive harm to the private contractors.

Plaintiffs do not dispute, nor could they, that the pricing and staffing information redacted from the contracts is "commercial or financial" in character. The only questions to be resolved by the Court, therefore, are (1) whether this information — provided by the private contractors to ICE — should lose its status as information "provided by a [private party]" because it was incorporated into an ICE contract, and (2) whether releasing this information could cause substantial competitive harm to the private contractors. As explained below, information submitted by private contractors to the Government does not lose its status as protected by Exemption 4 simply because it is incorporated into a Government contract. And there is ample evidence before the Court to support the conclusion that public release of this information would competitively harm the private contractors.[5]

---

[5] There is no basis for Plaintiffs to object, as they indicated they might at the pre-motion conference, to ICE's submission of declarations from the private contractors. Indeed, courts in this District and elsewhere have accepted and considered declarations from the third-party submitters of information at issue in Exemption 4 cases. *See, e.g.*, *NRDC v. U.S. Dep't of Interior*, 36 F. Supp. 2d 384, 401 n.10 (S.D.N.Y. 2014) (finding that such declarations are "relevant and based on personal knowledge," and thus that "[t]he Court is . . . at liberty to consider the declarations"); *Utah v. U.S. Dep't of Interior*, 256 F.3d 967, 970 (10th Cir. 2001)

**B.     The Pricing and Staffing Information Redacted from the Contracts Was "Provided" by the Private Contractors**

Exemption 4 applies to, and shields, only information that is not "generated within the Government." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,* 601 F.3d 143, 148 (2d Cir.2010).  "Textually, that is because Exemption 4 applies to information that is obtained from a person, 5 U.S.C. § 552(b)(4), and FOIA's definition of persons does not include government agencies, *see id.* § 551(2)." *NRDC*, 36 F. Supp. 3d at 400 (internal quotation marks omitted).  "Exemption 4 thus aims to shield outside entities' — as opposed to the Government's — confidential commercial and financial information from disclosure." *Id.*

"Consistent with this purpose, 'portions of agency-created records may be exempt if they contain information that was either supplied by a person outside the government or that could permit others to extrapolate such information.'" *Id.* (quoting *S. Alliance for Clean Energy v. U.S. Dep't of Energy,* 853 F. Supp. 2d 60, 67 (D.D.C. 2012), citing *Gulf & W. Indus. v. United States,* 615 F.2d 527, 529-30 (D.C. Cir. 1979)).  "'[T]he key distinction — which will obviously be blurry in many instances — is between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency, such

_____

(considering declarations from the two private entities whose information was sought to be disclosed); *cf. Intellectual Prop. Watch v. U.S. Trade Representative*, No. 13 Civ. 8955 (ER), 2015 WL 5698015, at *14 (S.D.N.Y. Sept. 25, 2015) (criticizing Government because "the sole piece of evidence meant to represent the views of actual private-sector actors comes from the agency's declaration, and this too is vague and conclusory"); *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010) (criticizing agency for not redacting under Exemption 4 sensitive information identified in a private contractor's affidavit: "where, as here, a contractor pinpoints by letter and affidavit technical information it believes that its competitors can use in their own operations, the agency must explain why substantial competitive harm is not likely to result if the information is disclosed").  Indeed, the private parties whose commercial interests are protected by Exemption 4 sometimes intervene in FOIA litigation and fully participate in the litigation, even beyond the submission of declarations.  *E.g.*, *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 146 (2d Cir. 2010); *Utah*, 256 F.3d at 968; *Pub. Citizen v. HHS*, 66 F. Supp. 3d 196, 200 (D.D.C. 2014).

that it is no longer a person's information but the agency's information.'  Exemption 4 shelters

only the former."  *Id.* (quoting *S. Alliance for Clean Energy,* 853 F. Supp. 2d at 68).

As a district court recently summarized the applicable case law:

"[I]nformation originally obtained from an outside source, but later included in
agency documents, may be considered 'obtained from a person'" and qualify for
Exemption 4 protection.  *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 117 (D.D.C.
2012).  Courts have explained, "information in an agency-generated [document] is
still 'obtained from a person' if such information was supplied to the agency by a
person or could allow others to 'extrapolate' such information."  *S. All. for Clean
Energy*[], 853 F. Supp. 2d [at] 68[] (citing *Gulf & W. Indus.*[], 615 F.2d [at], 529-
30[]); *see also Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 28
(D.D.C. 2000) ("[D]ocuments prepared by the federal government may be
covered by Exemption 4 if they contain summaries or reformulations of
information supplied by a source outside of the government.").  Also, when
"information was initially obtained from outside the agency and then was
modified through negotiations," the negotiations do not change the fact that the
information was "obtained from a person" and qualifies for exemption.  *S. All. for
Clean Energy*, 853 F. Supp. 2d at 68 (citing *Pub. Citizen Health Research Grp. v.
Nat'l Insts. of Health*, 209 F.Supp.2d 37, 45 (D.D.C. 2002)).

*Ctr. for Auto Safety v. U.S. Dep't of Treasury*, No. 11 Civ. 1048 (BAH), 2015 WL 5726348, at

*9 (D.D.C. Sept. 30, 2015).

Here, the unit pricing and staffing plans included in the sample contracts were provided

by the private contractors to ICE.  *See* Adams Decl. ¶¶ 18-19; Gates Decl. ¶ 16; Venturella Decl.

¶ 13; Harper Decl. ¶ 8.  This information was included in the contractors' bids and either

reproduced in the final contracts (subject to further minor modifications over time, such as those

required to take account of changes in staff salary, due to collective bargaining agreements and

applicable wage orders), or included in the contracts after further negotiation with ICE.  *See*

Adams Decl. ¶¶ 17-19; Gates Decl. ¶ 13; Venturella Decl. ¶ 13.  Either way, this information

falls well within the bounds of Exemption 4.  *See Ctr. for Auto Safety*, 2015 WL 5726348, at *9

(Exemption 4 protects "[i]nformation originally obtained from an outside source, but later

included in agency documents," as well as "information [that] was initially obtained from outside the agency and then was modified through negotiations" (internal quotation marks omitted)).

The cases cited by Plaintiffs on this point are inapposite. *See* Pl. Br. at 9-11. Plaintiffs argue that Exemption 4 does not apply to the redacted information because Exemption 4 "is limited to information 'obtained from a person,' that is, to information obtained outside the Government," it does not apply to "confidential information about Government contracts" which "is necessarily confined to information generated by the Federal Government itself." Pl. Br. at 9 (citing *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill,* 443 U.S. 340, 360 (1979)). But while *Merrill* states the principle correctly, it does not address the circumstance, discussed in the case law cited above, where information is provided by a contractor and incorporated into government contracts. In that circumstance, courts have held that the contractor-provided information does not lose its status by virtue of having been incorporated into a contract. *See Ctr. for Auto Safety*, 2015 WL 5726348, at \*9 (collecting cases). By contrast, the *Bloomberg* and *Fox News* cases cited by Plaintiffs, *see* Pl. Br. at 9-10, concerned the identities of applicants for federal-agency loans; the withheld information "was generated within [the agency] upon its decision to grant a loan," and "[l]ike the loan itself, it did not come into existence until [the agency] made the decision to approve the loan request." *Bloomberg,* 601 F.3d at 148; *accord Fox News Network, LLC v. Dep't of the Treasury*, 739 F. Supp. 2d 515, 565-66 (S.D.N.Y. 2010). Here, ICE is not attempting to shield the identities of the private contractors it hired, or the overall price of the contracts, but only specific, proprietary elements of the contractors' bids that it incorporated into the final contracts.

As other cases cited by Plaintiffs note, *see* Pl. Br. at 10-11, Exemption 4 does not protect information about amounts "generated by" an agency so long as that information "in no way

implicate[s] any of the financial information provided by the borrowers to the government." *Buffalo Evening News, Inc. v. SBA*, 666 F. Supp. 467, 469 (W.D.N.Y. 1987); *accord Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171, 1174 (D.D.C. 1974) (terms of Renegotiation Agreements reflected agency decision-making rather than "sales, costs and profits … taken directly from the corporation"); *Phila. Newspapers, Inc. v. HHS*, 69 F. Supp. 2d 63, 67 (D.D.C. 1999) (Exemption 4 is inapplicable to agency audits based upon privately-provided data because "[a]n audit is not simply a summary or reformulation of information supplied by a source outside the government"; "[i]t also involves analysis, and the analysis was prepared by the government"). Here, in contrast, the unit pricing and staffing plans are the very information provided by the private contractors to ICE in their bids, except as amended in some cases through further negotiation.  *See* Adams Decl. ¶¶ 17-19; Gates Decl. ¶ 13; Venturella Decl. ¶ 13.  This information has not been audited, analyzed or otherwise transformed into government information by its mere inclusion in a contract.  This information was thus "provided by a person" as required by Exemption 4.

### C.   Release of the Withheld Pricing and Staffing Information Will Likely Cause Substantial Competitive Harm to the Contractors

"To establish competitive harm, the Government must show that 'the person who submitted the information faces both (1) actual competition and (2) a likelihood of 'substantial' competitive injury if the information were released."  *NRDC*, 36 F. Supp. 3d at 402 (quoting *Inner City Press v. Bd. of Governors,* 380 F. Supp. 2d 211, 219 (S.D.N.Y. 2005), *aff'd* 463 F.3d 239 (2d Cir. 2006)).  Because the competitive considerations are different for the three types of contracting mechanisms at issue, they are discussed separately.

1.      *Competition and Competitive Harm for SPC Contracts*

SPCs are detention facilities owned by ICE in which contractor employees provide services such as staffing (*i.e.*, guards), transportation, and supervisory personnel.  *See* Gates Decl. ¶ 2; Adams ¶ 6 & n.1.  ICE currently operates five such facilities around the country, though previously there were more.  *See* Adams Decl. ¶ 6 & n.1; Gates Decl. ¶ 7.  There is vibrant competition among a number of private contractors for the opportunity to provide these services to ICE.  *See* Adams Decl. ¶ 13; Gates Decl. ¶¶ 8-9.

Specifically, ICE periodically puts out contract RFPs seeking contractors to supply staff for SPCs.  *See* Adams Decl. ¶ 19.  These RFPs request that the bidding contractors offer pricing and parameters for their services, either on a bed-day or an aggregate (*i.e.*, fixed monthly) basis. *See id.*  There are at least five or six entities that regularly compete for these contracts.  *See id.* ¶ 13; Gates Decl. ¶ 9.  There is steep competition in price and otherwise for these RFPs, and price is the most important factor ICE considers when awarding these contracts.  *See* Adams Decl. ¶¶ 12-13; Gates Decl. ¶ 18.  The bids may be quite close to one another.  *See* Adams Decl. ¶ 12; Gates Decl. ¶ 20.  The incumbent provider (*i.e.*, the contractor that is providing the services at the SPC prior to and during the RFP and bidding process) has little to no advantage in bidding over other contractors.  *See* Adams Decl. ¶ 13; Gates Decl. ¶ 21.  There are numerous recent examples of a different contractor (or combination of contractors) replacing the incumbent when the contract at a particular SPC facility was renewed.  *See* Adams Decl. ¶ 14; Gates Decl. ¶¶ 14, 21.  Indeed the APSS sample contract (Contract Document 6) for services at ICE's facility in Florence, Arizona, was awarded to APSS in 2009, displacing a different contractor that had held the contract previously.  *See* Gates Decl. ¶ 14.

The bed-day rates or aggregate prices in these contracts represent an amalgam of the contractor's cost structure: wages and associated costs, general and administrative costs, and

profits.  *See* Adams Decl. ¶ 17; Gates Decl. ¶ 12.  While the hourly wages at SPCs are generally

set by a combination of collective bargaining agreements and U.S. Department of Labor wage

orders, the remaining price elements are "highly sensitive" and proprietary to each contractor.

*See* Adams Decl. ¶ 17; Gates Decl. ¶¶ 12, 19.  Even with respect to wages, though the hourly

wages for each position may be set, the number of staff in each position may vary from bidder to

bidder, as specified in the bidders' proprietary staffing plans.  *See* Adams Decl. ¶¶ 13, 20.

Bidders often compete with one another to devise plans that meet ICE detention requirements but

require fewer staff through, for example, the creative use of technology.  *See* Adams Decl. ¶ 13;

Gates Decl. ¶¶ 12, 24.

If a contractor's bed-day rates (or aggregate prices) and staffing plans were disclosed, its

competitors could use this information to reverse-engineer the contractor's pricing strategies

with a fair amount of precision.  *See* Adams Decl. ¶ 22; Gates Decl. ¶ 23.  This in turn would

enable the competitors to underbid the contractor in future bids, causing clear competitive harm.

*See* Adams Decl. ¶ 22 ("If other vendors were aware of the bed-day rates or staffing plans

proposed in these contracts, they would be likely to modify their bidding strategy accordingly in

an attempt to underbid their competitors during both the initial contract and follow-on

competition for ICE detention services contracts by copying their proprietary staffing models.");

Gates Decl. ¶¶ 23-24 (describing the calculations a competitor could use to ascertain the

contractor's pricing strategy and underbid it in a subsequent contract).[6]

---

[6] Plaintiffs cite a case that held that pricing information in contracts is not always
protected by Exemption 4.  *See* Pl. Br. at 16-17 (citing *Raher v. BOP*, 749 F. Supp. 2d 1148,
1157-59 (D. Or. 2010)).  In that case, the magistrate judge concluded that the private contractor's
declaration did not adequately explain "the process through which a competitor having the
information sought to be protected from disclosure could reverse-engineer the contractor's prices
and costs and predict its bid on a future contract."  *Raher*, 749 F. Supp. 2d at 1159.  "Without
[such an] explanation of the process by which a competitor could use specific information to

This is precisely the type of competitive harm that Exemption 4 is designed to avert.  In a similar case, the D.C. Circuit agreed with a private contractor (over the agency's objection) that, even though the overall contract price was publicly disclosed, its line item pricing was protected under Exemption 4 because its publication "would help [the contractor's] domestic and international competitors to underbid it," as "the company claimed that disclosure of the line item pricing data would allow competitors to calculate its actual costs with a high degree of precision."  *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C. Cir. 1999).

Similarly, courts have held that substantial competitive harm could come from the release of information that "could give a submitter's competitors insight into the [submitter's] productivity, hours worked, market share and production," because "a competitor could use information about a business's number of employees and employee work-hours to calculate estimates of that company's labor costs and productivity, which would give that competitor valuable inside information to assist its pricing strategies."  *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor*, 220 F.3d 153, 166-67 (3d Cir. 2000); *accord id.* ("information appearing in a business's equal employment opportunity workforce report and affirmative action plan could, if disclosed, enable competitors to calculate (via 'reverse engineering') that business's labor costs

---

gain such a competitive advantage," the court concluded, "the harm remains theoretical."  *Id.* Plaintiffs also discuss cases in which courts found that it would not be possible to reverse-engineer a contractor's prices using the redacted information.  *See* Pl. Br. at 20 (citing *Ctr. for Pub. Integrity v. Dep't of Energy*, 191 F. Supp. 2d 187, 194 (D.D.C. 2002) (rejecting argument that "if [only] the total amount of a bidder's offer is known, then the bidder's competitors can reconstruct each factor in the bidder's calculations in order to discern its valuation methodology"); and *Pac. Architects & Engineers Inc. v. U.S. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990) (agreeing with agency, over contractor's objection, that information should not be redacted because a contractor's "'unit price rates' are made up of a number of fluctuating variables . . . , a competitor would not be able to calculate [its] profit margin from the 'unit price rates'")).  Here, in contrast, the record contains a precise description of how a competitor could use the redacted information from one contract to underbid the incumbent in a different contract. *See, e.g.*, Gates Decl. ¶¶ 23-24.

and profit margins" (citing *Westinghouse Elec. Corp. v. Schlesinger*, 392 F. Supp. 1246, 1249

(E.D. Va. 1974))); *accord Lion Raisins v. USDA*, 354 F.3d 1072, 1080-81 (9th Cir. 2004)

(upholding Exemption 4 withholding where disclosure of government inspection forms of raisin

facilities would enable competitors to ascertain the types and quantities of raisins being produced

and underbid on those types of raisins); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*,

No. 97 Civ. 2188 (TFH), 1998 WL 34016806, at *4 (D.D.C. May 14, 1998) (Exemption 4

authorizes agency to withhold customs code numbers for import shipments that could be used by

a "knowledgeable person . . . to uncover information concerning the nature, cost, profit margin,

and origin of [the] shipments," which would "injure the competitive position of the importers"),

*rev'd on other grounds*, 177 F.3d 1022 (D.C. Cir. 1999) (remanding for segregability review).[7]

The pricing and staffing information in SPCs should thus be protected under Exemption 4.

> ### 2.    *Competition and Competitive Harm for CDF Contracts*

CDFs are privately run detention facilities with which ICE contracts to house detainees;

the private contractors (and their subcontractors) provide all staffing in these facilities.  *See*

Adams Decl. ¶ 6; Verhulst Decl. ¶ 7.  ICE currently contracts with seven CDFs, which are

operated by two private contractors, GEO and CCA.  *See* Adams Decl. ¶ 6 & n.4; Verhulst Decl.

¶ 10.  Other federal agencies, including the Federal Bureau of Prisons ("BOP") and the U.S.

Marshals Service ("USMS"), also contract with CDFs to house their inmates and detainees, as do

state authorities.  *See* Venturella Decl. ¶ 19.  And other private contractors in addition to GEO

and CCA operate CDFs, just not any that are currently contracting with ICE.  *See* Venturella

Decl. ¶ 18; Verhulst Decl. ¶ 5.  There is competition among CDF operators for detention services

---

[7] While Plaintiffs have argued that the long-term nature of ICE contracts means that
competition is too episodic to qualify for the protection of Exemption 4, *see* Pl. Br. at 18 (citing
*Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)), this
disregards the fact that the terms of these contracts are staggered and competition is nationwide,
such that a contract is up for rebidding every year or two.  *See* Gates Decl. ¶¶ 4, 7.

contracts with ICE and other federal and state agencies.  *See* Adams Decl. ¶¶ 14-15; Venturella

Decl. ¶ 17; Verhulst Decl. ¶ 13 (noting that "a facility suitable for a federal solicitation is also

likely to be suitable for use by other agencies," and giving examples of CDF facilities

transitioning from contract with one agency to another).

When ICE receives bids for CDF contracts, it evaluates them based on several criteria, of

which price is often the most significant.  *See* Adams Decl. ¶ 22 ("[T]he bed-day rate is a

primary factor ICE considers when selecting a commercial contract . . . ."); Venturella Decl.

¶¶ 15-16.  Just as with SPCs, ICE typically evaluates bid prices based on a bed-day rate,

representing the total cost of operations divided by the number of detainees and days per year.

*See* Adams Decl. ¶ 17.  Each CDF operator has developed a proprietary cost model to determine

its pricing, which it uses to determine the bed-day rate it will provide in its bid.  *See* Adams Decl.

¶ 22; Venturella Decl. ¶ 12; Verhulst Decl. ¶ 16 ("This [pricing] algorithm was developed based

on historical data obtained from CCA's unique and proprietary staffing patterns, and its

experiences with subcontractors, real-estate transactions, healthcare providers, transportation

services, utilities and waste removal services, inmate programming services, and other relevant

factors.").  Contractors also provide detailed staffing plans, also based on their proprietary

models, that specify the assignment of facility staff by position and shift.  *See* Adams Decl. ¶ 19;

Venturella Decl. ¶ 14; Verhulst Decl. ¶ 17.  The CDF contracts are generally for 1-to-5-year

terms but can be extended.  *See* Verhulst Decl. ¶ 11.[8]

Solicitations for CDF contracts are often geographically limited (*e.g.*, seeking a facility

"within 50 miles of the ICE Houston Field Office," *id.*) and there are not always multiple CDF

operators that have suitable facilities in the required area.  *See* Adams Decl. ¶ 14; Venturella

---

[8] As with SPC contracts, these contracts are staggered such that there are some contracts
up for rebidding each year.  *E.g.*, Verhulst Decl. ¶ 10.

Decl. ¶¶ 20, 27.  Nevertheless, these contracts are competitively bid and there is actual

competition between CDF operators for many ICE and other contracts.  *See* Adams Decl. ¶¶ 14-

15; Venturella Decl. ¶¶ 21-22 (listing examples of competitively bid CDF contracts); Verhulst

Decl. ¶ 6 (same); *see also id.* ¶ 4.  Moreover, ICE has recently taken steps to further increase

competition among CDF operators by announcing its RFPs sufficiently in advance of the date the

service is to begin to enable operators who may not have an existing facility to explore

opportunities to construct or acquire one in time to compete for the contract.  *See* Adams Decl.

¶ 15.[9]

If CDF operators' pricing and staffing information were made public, it would enable

their competitors to reverse-engineer their proprietary pricing and staffing models and enable

---

[9] Plaintiffs cite (Pl. Br. at 6, 15), with much fanfare, a statement in a footnote of a report by the U.S. Government Accountability Office that addressed concerns about ICE's costs for housing immigration detainees that touched on competition for CDF contracts.  *See* U.S. Gov't Accountability Off., No. 15-153, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Facility Costs and Standards* at 27 n.54 (Oct. 2014), http://www.gao.gov/assets/670/666467.pdf (an excerpt of which is attached to Plaintiffs' declaration as Exhibit 2).  The report addressed issues in ICE's inspection of detention facilities and tracking costs associated with them, and recommended steps to improve these issues.  *See id.* at 44-46.  It identified several primary drivers of cost, separately for each type of detention facility:  For SPCs, the report noted the existence of separate contracts for various service types (*e.g.*, guards, food, maintenance) and low detainee-staff ratios; in a footnote, the report added that poor facility design for SPCs may also contribute to high staffing needs, as may the location of the facilities in high-wage areas, and a failure to consolidate detention bed capacity among facilities within common operating areas.  *Id.* at 27 & n.53.  For CDFs, the report concluded that the primary cost issues were "high profit margins for contracts that do not guarantee a minimum amount of business over a longer time period, and facility construction costs that are initially factored into the per diem rate, but are not removed upon completion of payment for the construction debt."  *Id.* at 27.  In a footnote, without elaboration, the report also stated that "other issues at CDFs contributing to higher costs were a need to consolidate detention bed capacity among facilities within common operating areas and the lack of competition that drives up prices."  *Id.* at 27 n.54.  The report did not address costs at IGSAs.  *Id.* at 28.  Ultimately, with respect to addressing the costs of detention, the report recommended that ICE more explicitly consider cost in deciding at which detention facility given detainees should be placed.  *See id.* at 44-45.  The statement in this report about competition for CDF contracts cited by Plaintiffs does not negate the actual evidence of competition provided to the Court in the attached declarations.

them to underbid the contractors in future contracts.  *See id.* ¶¶ 21-22 ("If other vendors were aware of the bed-day rates or staffing plans proposed in those contracts, they would be likely to modify their bidding strategy accordingly in an attempt to underbid their competitors during both the initial contract and follow-on competition for ICE detention services contracts by copying their proprietary staffing models."); Venturella Decl. ¶¶ 24-25; Verhulst Decl. ¶¶ 18-19 ("CCA has developed its pricing formulas at great expense and through years of experience and refinement. . . .  Allowing a CCA competitor access to this proprietary information would allow it to shortcut CCA's development work and compete unfairly against CCA."); *id.* ¶ 22 ("[B]y combining the [redacted] pricing data . . . with publicly available information, including the forms and processes required by the solicitations themselves, competitors could easily determine the algorithm CCA uses to develop its pricing models.  Specifically, competitors would be able to use information about CCA's incremental pricing and CCA's staffing pattern to determine CCA's marginal profit rate.  Competitors could then use that against CCA to gain an unfair competitive advantage in the procurement process.").

Since the CDF operators use the same proprietary pricing and staffing model for all of their facilities, moreover, release of the redacted information for a contract for which a particular contractor did not face a competitive bid would enable a competitor to underbid the contractor in a future contract with ICE or another agency.  *See* Venturella Decl. ¶ 27; Verhulst Decl. ¶¶ 20, 23, 25 ("[B]ecause CCA uses the same proprietary algorithm to predict costs at all facilities, the release of confidential and proprietary information regarding CCA's pricing models and staffing patterns from any one contract (such as a contract with ICE) may be used to determine to a fair degree of accuracy CCA's bid in future procurement processes at other facilities, or in contracts with other federal and state agencies. Thus, release of information regarding the pricing models

and staffing patterns from non-competitive contracts, such as those awarded to sole source providers in a particular geographic area, is equally damaging.").[10]

Again, this is precisely the type of competitive harm that Exemption 4 is designed to avert. *See McDonnell Douglas*, 180 F.3d at 306 (upholding redaction of line item contract pricing because its publication "would help [the contractor's] domestic and international competitors to underbid it," as "the company claimed that disclosure of the line item pricing data would allow competitors to calculate its actual costs with a high degree of precision"). The pricing and staffing information in CDFs should thus also be protected under Exemption 4.

### 3.     Competition and Competitive Harm for Private Subcontractors in Certain IGSA Contracts

IGSAs are agreements between ICE (or another agency) and a state or local government to house detainees at a local jail or other facility. *See* Adams Decl. ¶ 6 & n.2. In some cases, the local government subcontracts with a private contractor to operate the facility and provide staffing for it. For some IGSAs, like the Farmville facility, the private subcontractor owns the facility outright and provides all services within it. *See* Adams Decl. ¶ 16; Harper Decl. ¶¶ 2-3.

---

[10] The same can be said for Plaintiffs' argument that releasing pricing information from older contracts could not affect future competition. *See* Pl. Br. at 19-20. While that may be the case for telephone providers' "performance incentive rate," *Prison Legal News v. DHS*, No. C14-479 MJP, 2015 WL 3796318, at *4 (W.D. Wash. June 18, 2015) (disclosure "would reveal only [the provider's] risk tolerance in 2009, based on the state of the company then, . . . [though] [t]here is no indication in the record that [the company] in 2015 is in exactly the same financial position as it was in 2009; [it] today may have a higher or lower risk tolerance than it did in 2009"); financial information submitted in connection with seeking regulatory approval for a bank merger that had been consummated two years prior, *Lee v. FDIC*, 923 F. Supp. 451, 455 (S.D.N.Y. 1996); or worksite statistics relating to employee illness and injuries, *N.Y. Times Co. v. U.S. Dep't of Labor*, 340 F. Supp. 2d 394, 402 (S.D.N.Y. 2004) ("[E]ven if employers relied on the secrecy of employee hours to maintain a competitive advantage in 2000, there is no reason to believe that releasing those hours four years later would cause competitive injury; the employee hours for the year 2000 are nothing more than outdated information. This is particularly true given that contemporaneous information regarding hours is [now] available at worksites."), the record does not support the same conclusion for the pricing and staffing information at issue here.

ICE does not hold formal bidding competitions for IGSAs.  Rather, it receives informal proposals from local authorities, often in combination with private subcontractors, to consider housing detainees at existing or proposed facilities.  *See* Adams Decl. ¶ 16.  Like contracts for SPCs and CDFs, IGSA contracts are negotiated on the basis of bed-day rates; when an IGSA facility is operated by a private contractor, the bed-day rate reflects the proprietary expense and budgetary calculations of the contractor.  *See* Adams Decl. ¶ 16; Harper Decl. ¶¶ 7-8.

IGSA facilities operated by private subcontractors are similarly situated to CDFs in certain respects, and experience competition.  *See* Adams Decl. ¶ 16; Harper Decl. ¶¶ 12-14.  At the expiration of each contract, there is no guarantee that ICE will renew it; at that time, ICE may choose to contract with a different IGSA or a nearby CDF to house detainees in that geographic area.  *See* Adams Decl. ¶ 16; Harper Decl. ¶¶ 20-22.  Thus, a competitor facility with knowledge of the IGSA private contractor's bed-day rate could use that information to reverse-engineer the contractor's pricing strategy and, in effect, underbid the contractor — *i.e.*, persuade ICE not to renew the IGSA contract and instead contract with it.  *See* Harper Decl. ¶¶ 14, 18-19.  There is also competition among private contractors to serve as a subcontractor to a local government on an IGSA.  *See* Adams Decl. ¶ 16; Venturella Decl. ¶ 23.  Thus, like the contractors in SPCs and CDFs, the private contractors in IGSAs would suffer substantial competitive harm should their pricing information be revealed.  *See* Harper Decl. ¶ 19 ("[T]he per-bed day rate and flat fee components, if disclosed, would provide key data points for competing firms to analyze the revenue and cost structure of the ICE Contract, and ICA would lose a critical competitive advantage.").  The pricing and staffing information in IGSAs with private contractors should thus also be protected under Exemption 4.

21

### III.     ICE Properly Redacted the Staffing Information Under Exemption 7(E)

#### A.     ICE May Assert a New Exemption After the Commencement of Briefing

ICE did not previously assert Exemption 7(E) with respect to the staffing plans.[11]  It is nevertheless proper for the Court to consider ICE's assertion of the exemption at this juncture. Although, as a general rule, the Government "must assert all exemptions at the same time, in the original district court proceedings," *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (citation and internal quotation marks omitted), courts have permitted the Government to assert new FOIA exemptions or arguments for the first time at later stages of the litigation at both the district court and appellate levels.  *See, e.g.*, *id.* at 701-02 (remanding case to district court to consider additional exemptions raised for the first time on appeal); *Computer Prof'ls for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 903 (D.C. Cir. 1996) (reversing district court's denial of Rule 60(b) motion to reconsider based upon Secret Service's new *in camera* declaration, and ruling that Exemptions 7(C) and 7(D) were properly invoked in light of new declaration, where Secret Service showed good faith and speed in bringing motion); *Schanen v. DOJ*, 798 F.2d 348, 349 (9th Cir. 1986) (allowing Government to assert FOIA exemptions for first time on appeal on motion for rehearing where "[r]elease of the documents would endanger the lives and well-being of agents and informants"); *Piper v. U.S. Dep't of Justice*, 374 F. Supp. 2d 73, 78-79 & n.1 (D.D.C. 2005) (allowing the Government to raise new FOIA exemptions in Rule 60(b) motion filed while plaintiff had pending appeal, where the Government had "apparently acted in good faith, if also with sluggish neglect, and with the interests of the third-party individuals at heart").

---

[11] ICE made other redactions on the contract documents under Exemption 7(E), which Plaintiffs do not contest.  These redactions relate to certain accounting information. *E.g.*, Sample Contract No. 1, at 2-7 (ICE 2014FOIA03585.003210-.003215).

In particular, courts in this district have allowed the Government to raise new arguments or claim additional FOIA exemptions after the Government's initial submission in district court. In *ACLU v. Department of Defense*, 389 F. Supp. 2d 547, 574-75 (S.D.N.Y. 2005), Judge Hellerstein permitted the Government to raise a new argument under FOIA Exemption 7(F) after the Government's motion for summary judgment was fully briefed and more than two months after the motion was initially argued.  Despite arguments by the plaintiffs and *amici* that the Government's supplemental argument could have been presented much earlier and that its belated invocation would delay the ultimate resolution of the issues, Judge Hellerstein ruled that "the government's opposition, although filed late, should be considered."  *Id.* at 575.  In *National Council of La Raza v. Department of Justice*, 03 Civ. 2559 (LAK), 2004 WL 2314455, at *1 (S.D.N.Y. Oct. 14, 2004), Judge Kaplan allowed the Government to make a new argument under FOIA Exemption 5 and to present a document for *in camera* inspection for the first time on reconsideration.  Citing Local Civil Rule 6.3, Judge Kaplan noted that strict compliance with the rule would require denial of the motion for reconsideration, but reconsidered his ruling "[n]evertheless, . . . [because] FOIA Exemption 5 . . . serve[s] important public interests."  2004 WL 2314455, at *1.

As these cases demonstrate, courts have not hesitated to consider belatedly raised arguments or exemptions under FOIA to protect substantial public interests, such as the sensitive law enforcement information protected by Exemption 7(E).  Here, the invocation of the new exemption by the Government is hardly late at all: it is made in the Government's initial moving papers.  And while Plaintiffs have already filed a motion for summary judgment, the assertion of Exemption 7(E) will cause them no prejudice, as they will have an opportunity to file an

opposition brief and address the applicability of Exemption 7(E) in a few weeks' time.[12]  The

Court should thus consider ICE's invocation of Exemption 7(E) for the staffing plans.  *See*

*Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 138-39 (D.D.C. 2014) ("The

prudential rule that requires the government to raise all of its exemptions at once is generally

designed to foreclose the government from fully litigating one exemption, only to raise another if

it loses.  But that scenario is not the case . . . , where the . . . arguments [relating to the newly

asserted exemption] have been raised in the same time frame as the arguments related to [the

initial exemption].").

### B.   Standards for Exemption 7(E)

"A threshold requirement for the application of Exemption 7(E) is that the documents

must be 'compiled for law enforcement purposes.'"  *Bishop v. DHS*, 45 F. Supp. 3d 380, 386

(S.D.N.Y. 2014).  "Once this threshold requirement is satisfied, a court must determine if either

of Exemption 7(E)'s 'two alternative clauses' applies."  *Id.* at 387 (quoting *Allard K. Lowenstein*

*Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010)).  "That is, Exemption 7(E)

protects from disclosure "either (1) techniques and procedures for law enforcement

investigations, or (2) guidelines for law enforcement investigations if disclosure of such

guidelines could reasonably be expected to risk circumvention of the law."  *Id.*

> The Second Circuit has explained the distinction between "techniques and
> procedures" and "guidelines" as follows: "The term 'guidelines' — meaning,
> according to Webster's Third New International Dictionary (1986), 'an indication
> or outline of future policy or conduct' — generally refers in the context of
> Exemption 7(E) to resource allocation.  For example, if a law enforcement agency
> concerned with tax evasion directs its staff to bring charges only against those
> who evade more than $100,000 in taxes, that direction constitutes a 'guideline.'
> The phrase 'techniques and procedures,' however, refers to how law enforcement
> officials go about investigating a crime.  *See* Webster's Third New International
> Dictionary (1986) (defining 'technique' as 'a technical method of accomplishing a

---

[12] To the extent Plaintiffs seek additional time or space to respond to this argument, the
Government has no objection.

desired aim'; and 'procedure' as 'a particular way of doing or of going about the accomplishment of something'). For instance, if the same agency informs tax investigators that cash-based businesses are more likely to commit tax evasion than other businesses, and therefore should be audited with particular care, focusing on such targets constitutes a 'technique or procedure' for investigating tax evasion."

*Id.* (quoting *Lowenstein*, 626 F.3d at 682).

### C.     The Staffing Plans Are Protected by Exemption 7(E)

ICE properly withheld the staffing plans under Exemption 7(E). First, the staffing plans were compiled by ICE for law enforcement purposes. As ICE's declarant explains:

> [T]he information [in the staffing plans] is collected and used by ICE to assist the agency in its mission of arresting and detaining certain aliens, including those that pose a risk to public safety, and ensuring that detained aliens do not escape from ICE custody to facilitate their appearance at or during immigration enforcement proceedings. Staffing plan information is compiled by ICE to determine the specific amount and allocation of personnel needed at a detention facility holding ICE detainees to ensure compliance with [the agency's] law enforcement mandate. This information is critical to ensuring the operation and security of the detention facility, as well as that of the personnel and detainees inside the detention facility.

Pineiro Decl. ¶ 27; *accord Am. Immigration Council v. DHS*, 30 F.Supp.3d 67, 74 (D.D.C. 2014) (CBP documents satisfied the "compiled for law enforcement purposes" requirement where "the withheld records ha[d] a rational nexus to the agency's law-enforcement duties, including the prevention of terrorism and unlawful immigration").

Second, the staffing plans reflect law enforcement techniques and procedures. Staffing plans reflect "(1) the total amount of personnel needed to operate and maintain security at a detention facility; (2) the locations within the detention facility where facility personnel are to be posted; and (3) the specific number of personnel that are to be allocated per shift." Pineiro Decl. ¶ 29. Staffing plans also include "information concerning the actions that detention facility personnel are to perform during normal and emergency situations to ensure the security and safety of both personnel and detainees inside the detention facility." *Id.*

The release of this information "could reasonably be expected to allow a person to know when the detention facility would be most vulnerable to efforts to avoid detection and apprehension when organizing an escape or disturbance, and would allow them to know how to frustrate or thwart security measures or procedures to prevent or quell such incidents." *Id.* ¶ 30. Furthermore, "[p]ublic awareness of this operational information would aid those seeking to gain unauthorized entry to a detention facility holding ICE detainees, as they would readily know the ICE detention facility's staffing limitations or when the facility would be most vulnerable, which could be exploited to overrun and gain unauthorized entry to the facility or frustrate security measures taken while transporting ICE detainees." *Id.*; *accord* Verhulst Decl. ¶ 19 ("Public policy concerns . . . weigh heavily against disclosing CCA's staffing patterns, as they contain sensitive information regarding the number of correctional staff members on duty and shift changes, which if publicly available, would pose legitimate safety and security concerns for the facility.").

Although Exemption 7(E) is generally "limited to techniques and procedures not generally known to the public. . . . it is well-established that an agency does not have to release all details concerning law enforcement techniques just because some aspects of them are known to the public." *Bishop*, 45 F. Supp. 3d at 391 (citations and internal quotation marks omitted). In particular, as courts have acknowledged, "Exemption 7(E) applies even when the identity of the techniques has been disclosed, but the manner and circumstances of the techniques are not generally known, or the disclosure of additional details could reduce their effectiveness." *Id.* (quoting *Council on Am.-Islamic Relations v. FBI*, 749 F. Supp. 2d 1104, 1123 (S.D. Cal. 2010), citing *Bowen v. FDA,* 925 F.2d 1225, 1228-29 (9th Cir. 1991)); *id.* (collecting cases: *Vazquez v. DOJ*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012) ("Even commonly known procedures may be

protected from disclosure if the disclosure could reduce or nullify their effectiveness."); *Church of Scientology of Tex. v. IRS,* 816 F. Supp. 1138, 1162 (W.D. Tex. 1993) ("[E]ven if known by the public to some extent, [the techniques and procedures] are nevertheless exempt if disclosure of the circumstances of their use could lessen their effectiveness.")).

Here, while the public may generally know "that detention facilities housing ICE detainees employ personnel to operate and maintain the security of those facilities or to transport detainees, the public does not know the total number of personnel employed at these facilities, the number of facility personnel present during each shift to maintain security at the detention facilities or while transporting detainees, or the assignments of facility staff during each shift." Pineiro Decl. ¶ 32.  Courts have held that non-public details of this sort are properly withheld from disclosure under Exemption 7(E).  For example, courts have upheld the withholding under Exemption 7(E) of "non-public details about when, how, and under what circumstances the FBI conducts surveillance," *Labow v. DOJ*, 66 F. Supp. 3d 104, 127-28 (D.D.C. 2014), and "information pertaining to the location and identity of investigative units," *Council on Am.-Islamic Relations*, 749 F. Supp. 2d at 1123.  The same conclusion should apply to information about the number, placement, and work schedules of personnel who are responsible for the safety and security of ICE detainees.  ICE thus properly withheld the staffing plans associated with ICE contracts under Exemption 7(E).

**CONCLUSION**

For the foregoing reasons, ICE respectfully requests that the Court grant its cross-motion

for partial summary judgment and deny Plaintiffs' motion.

Dated:    New York, New York
          December 22, 2015

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York

                        By:       s/Jean-David Barnea
                                        JEAN-DAVID BARNEA
                                        Assistant United States Attorney
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2679
                                        Fax: (212) 637-2717
                                        Email: Jean-David.Barnea@usdoj.gov