UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DETENTION WATCH NETWORK and
CENTER FOR CONSTITUTIONAL RIGHTS,

                  Plaintiffs,

      v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT and UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY,

                Defendants.

14 Civ. 583 (LGS)

**DECLARATION OF JAMES DANA ADAMS, JR., IN SUPPORT OF UNITED STATES
IMMIGRATION AND CUSTOMS ENFORCEMENT'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT**

I, James Dana Adams, Jr., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**I.     INTRODUCTION**

1.     I am the Assistant Director for the Detention Compliance and Removal Division

("DCR"), Office of Acquisition Management ("OAQ"), U.S. Immigration and Customs

Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS") in Washington, D.C.

DCR/OAQ is responsible for providing acquisition support to the Office of Enforcement and

Removal Operations ("ERO"), our client.  I have served in this role since August 2015.  Prior to

this position, I have served in a variety of acquisition positions within DCR/OAQ, including

Deputy Assistant Director ("DAD") since February 2008.  From November 2006 until February

2008, I was a contract specialist with DCR.  Prior to joining ICE, I gained twenty (20) years of

contracting experience with the U.S. Department of Defense in the United States, England,

Bahrain, Luxembourg, and Afghanistan.

2.      In my capacity as the Assistant Director of DCR/OAQ, I manage and oversee all contracting staff within my division.  I am therefore familiar both with ICE's process of competing and awarding contracts for services provided at ICE detention facilities, as well as and more specifically, the six (6) sample contracts and agreements described in ICE's *Vaughn* Index associated with this litigation.

3.      I make this declaration in support of ICE's Cross-Motion for Partial Summary Judgment and in opposition to Plaintiff's Motion for Partial Summary Judgment in the above-captioned action. The statements I make in this declaration are based on my personal knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties.

## II.    ICE DETENTION FACILITIES

4.      Our client, ERO, conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States. ERO manages the logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, and other related functions.

5.      To carry out its mission, ERO plans, manages, and directs a broad program relating to the supervision, detention, and deportation of aliens who are in the United States illegally.  ERO arranges for the detention of certain aliens when detention becomes necessary.

6.      There are several types of contracting mechanisms by which ICE contracts for facilities to house ICE detainees.  These facilities include: (1) Service Processing Centers ("SPCs");[1] (2)

---

[1] SPCs are facilities that are owned by ICE and operated by commercial contractors.  There are five active SPCs, located in Krome, FL; Batavia, NY; Port Isabel, TX; El Paso, TX; and Florence, AZ.  Sample Contracts No. 5 (2014FOIA03585.018716-22) and No. 6 (2014FOIA03585.017352-54) are representative of the type of contract that ICE enters with SPCs.

Intergovernmental Service Agreements ("IGSAs");[2] (3) U.S. Marshals Service
Intergovernmental Service Agreements ("IGAs");[3] and (4) Contract Detention Facilities
("CDFs").[4]   I understand that the six (6) contracts at issue in this motion concern detention
facilities obtained through SPCs, CDFs, and IGSAs.

## III.   THE PROCESS FOR COMPETING AND AWARDING DETENTION SERVICE CONTRACTS

7.      ERO conducts preliminary inspections of the potentially eligible facility/facilities, or
service providers, and outlines the requirements for OAQ to include in the performance-based
request for proposals ("RFP").  OAQ reviews the proposals' technical components, the proposed
contractors' past performance, and proposed price.

8.      The results of market research generally play a key role in identifying ICE's acquisition
strategy and outlining the acquisition plan. The acquisition plan in turn considers factors such as:
(1) whether the facilities/services will be procured via contract with a private company or via an
IGSA; (2) whether the contract should be procured through a small business set-aside or full and
open competition; and (3) the location of the desired facility, etc.  The RFP for an SPC or CDF is
competed issued using the federal government's FedBizOpps internet portal.  Thus, any eligible
service/facility provider meeting the criteria described in the RFP and capable of meeting ICE's

---

[2] IGSAs are agreements between ICE and state or local governments whereby the state/local government provides both the detention facility and detention services for ICE detainees.  For purposes of this declaration, I discuss IGSAs where the local government has subcontracted all detention services to a commercial contractor.  The Farmville IGSA, Sample Contract No. 2, (2014ICEFOIA03585.015538-40) is with the Town of Farmville, Virginia, who has subcontracted the entire operation of the facility to a commercial firm, Immigration Centers of America, LLC ("ICA").  The bed-day rate proposed by the Town thus reflects ICA's cost of operation and profit, with a marginal mark-up by the Town.  Releasing the bed-day rates paid under the Farmville contract would thus essentially reflect ICA's bed-day rates.
[3] IGAs are state and local facilities that have contracted with the U.S. Marshals Service, where ICE may house detainees. This is not a subject of this briefing.
[4] CDFs are privately owned facilities, and are also known as Contractor Owned Contractor Operated (COCO) facilities.  There are currently seven CDFs:  GEO operates CDFs in Washington State, Texas, Florida, and Colorado, and CCA operates CDFs in New Jersey, Texas, and California.  Each of these operators, in turn, use the services of numerous subcontractors, including small-business subcontractors.  Sample Contracts No. 1 (2014FOIA03585.003209-15), No. 3 (2014FOIA03585.006215-19), and No. 4 (2014FOIA03585.006242-50) are representative of time type of contracts that ICE enters into with CDFs.

needs can submit a proposal for evaluation by the source selection panel.  RFPs for CDFs call for

the submission of subcontracting plans.

9.      After award, the total contract (potential) value is publicized in FedBizOpps.

Historically, contracts to provide detention facility services at SPCs have been subject to a 5-year

term.  However, ICE may with sufficient justification enter into detention facility contracts that

last for up to fifteen (15) years.  In addition, a contract to provide detention facility services can

be modified unilaterally or by ICE bilaterally.  The authority to modify a contract to provide

detention facility services at a SPC rests with the ICE Contracting Officer.

10.     ICE detention service contracts, whether they are commercial contracts or IGSAs,

contain terms and conditions, a detailed description of the services that the contractor must

deliver (Performance Work Statement), and the amount that ICE will pay the contractor for those

delivered services.  Reimbursement for services can be via bed-day rates, fixed monthly amounts

for a guaranteed minimum, or a combination thereof.

11.     IGSAs are not commercial contracts nor are they based on the Federal Acquisition

Regulations ("FAR") (with a few exceptions, such as mandatory compliance with Service

Contract Act ("SCA").  ICE negotiates directly with potential local governments (to include

cities, counties and local jails) that submit jail-cost statements (detailed cost breakdowns on how

the bed-day rate was derived) for evaluation by ICE.  The IGSA with the Town of Farmville,

included in this sample, is an IGSA where the local government has subcontracted 100% of the

services to a commercial entity named ICA.   There are other companies such as CCA, GEO

Group, Management and Training Corporation ("MTC"), Community Education Centers

("CEC"), and Emerald who are sub-contractors to IGSA holders and who are competitors of

ICA.  In such a case, the staffing plans and bed-day rates contained in the IGSA are essentially

4

those of the private contractor, not the local government, and thus reflect the private contractor's costs and staffing, not the local government's. For purposes of FOIA, ICE treats IGSAs with commercial subcontracts as it would commercial contracts for SPCs or CDFs.

## IV.    COMPETITIVE MARKET FOR DETENTION SERVICE CONTRACTS

### A. SPC Detention Service Contracts

12.    Commercial contractors that have competed and provided services at SPCs include: (1) Asset Protection & Security Services LP, (2) Akal Security Inc., (3) Akima LLC, (4) Doyon Security Services, and (5) Ahtna Support and Training Services, LLC. These companies have actively competed against one another for SPC detention contracts. With few exceptions, SPCs are competed *solely* amongst small businesses. Any private contractor wanting to provide detention services at an SPC contracted facility must compete and submit a proposal to ICE in accordance with Part 15 of the FAR regulations. When competitive proposals are received there is no set pricing pattern. For some proposals, there may be larger differences between proposals, and in other cases the range of proposals is closer. There is active competition at SPCs for both initial and follow-on contracts, as the incumbent to a SPC detention service contract does not have any guarantee that it will be awarded the next contract, nor any guarantee that it will be able to submit the best proposal. As such, the incumbent private contractor does not have a competitive advantage over other companies competing in the detention services market. In addition, since geography doesn't play a part in the selection of the service provider, companies constantly compete against one another for SPC contracts. For example, there are small businesses based in Alaska (Akima) providing detention services in Krome and Batavia.

13.    The prices proposed by SPCs while competing against one another are dependent upon a multitude of factors, such as how well it understands the requirements and the local working

5

environment; balances risk and profit; innovates to save costs; has learned from past performance at other locations, in particular past mistakes; and how eager it is for business. For example, in response to the Krome SPC RFP for detention services, Akima, a small business, came up with an electronic monitoring system (which had not been previously envisioned by ICE or Akima's competitors). This system significantly reduced the need for staff throughout the facility. Akima's reduction in staff resulted in a corresponding drop in the bed-day rate quoted by that small business. Akima was ultimately awarded the contract. When competing the Krome SPC detention services contract ICE received eight proposals that ranged from $266 million to $389 million. There have been other instances where an incumbent SPC has lost its contract to other competitors due to pricing competition. In November of 2014 Akima Global Services, LLC displaced the incumbent, Valley Metro Security, LLC Small and Disadvantaged Business (SDB)/Barbosa Group at the Batavia, NY SPC. In September 2015 Global Precision Systems LLC (SDB)/APSS displaced Doyon, Limited/Akal Security at the El Paso SPC.

### B. CDF Detention Service Contracts

14.     In the case of CDFs, while these types of contracts are also competed by ICE, the pool of private contractors (CCA, GEO Group, CEC, MTC and Emerald) competing for CDF detention contracts has traditionally been smaller than that for SPC detention contracts, as a contractor's ability to submit an offer for a CDF contract depended on it having an available facility in the relevant geographical area. Nevertheless, any contractor seeking to win a CDF detention service contract is not excluded from competing against existing service providers, as they may choose to acquire or build a new facility and compete against CDF detention service providers.

15.     Six months ago, OAQ modified how CDF contracts are competed to stimulate even more competition in the CDF detention services market. This was accomplished by allowing service

providers to provide their proposals sufficiently in advance of the anticipated contract date to allow other contractors to propose the construction of a new facility to compete against an the incumbent. OAQ recently competed the Houston CDF contract receiving multiple offers.[5] This clearly indicates market competition between CDF private contractor especially when the services providers are given enough time to submit a proposal and if selected to build a new facility to provide the detention services in a timely fashion.

**C. IGSA Detention Service Contracts**

16.     Although IGSAs are generally not competed under the FAR, prior to deciding whether to negotiate a new IGSA, ICE may perform market research. As part of that market research, ICE may receive unsolicited proposals from different interested parties for review and consideration. These unsolicited proposals could involve a county/city who subcontracts fully to a commercial detention serve provider, such as the sample contract IGSA with the Town of Farmville, which subcontracted to ICA. ICE thoroughly evaluates all of these unsolicited proposals taking into account the bed-day rate, technical merit and past performance, which mirrors the process by which ICE evaluates proposals in response to an RFP for SPCs and CDFs. If ICE finds an unsolicited proposal attractive, it sends out by email an electronic RFP, including a jail cost statement for completion.   IGSAs although generally awarded on a sole source basis are always in competition with one another, as the award of a new IGSA could result the termination of another IGSA. A city/county in partnership with an commercial entity could always build or acquire a new facility to compete against an existing IGSA in a nearby location. Often new IGSAs  subcontract all the detention services to a commercial subcontractor. In essence as the

---

[5] The Procurement Integrity Act, 41 U.S.C. § 423, prohibits ICE from providing additional information regarding these offers, including identifying the number of offers that ICE received, the identity of the competitors, or the dollar amounts of the offers, until the contract for the Houston CDF is awarded.

IGSAs compete with one another, so do their respective subcontractors. Also, the potential

IGSA holder always has the option of competing commercial subcontractors.

### V.  DISCLOSURE OF BED-DAY RATES AND STAFFING PLAN INFORMATION WOULD LIKELY CAUSE COMPETITIVE HARM TO PRIVATE CONTRACTORS

17.     As indicated above, a private contractor competing for a detention services contract must

compete and submit a proposal to ICE. Prior to award ICE and the private contractor may have

subsequent discussions or negotiations, as a result of which the contractor will submit a new or

revised proposal. These detention services contracts are performance based agreements and

private contractors respond differently to them by submitting different bed-day rates and staffing

plans. The RFP for SPCs and CDFs generally requests a bed-day rate and/or a flat monthly rate

covering a guaranteed minimum number of beds. Flat monthly rates should be treated the same

as bed-day rates, as anyone could derive a bed-day rate from the flat monthly rate, simply by

dividing it by the days in the month and the number of beds guaranteed. Bed-day rates reflect

the private contractor's fixed cost, variable cost, overhead, and profits for providing detention

services under the contract. Bed-day rates quoted by private contractors vary because they have

different costs (overhead, general and administrative, salaries, staff) and profit margins. These

service contracts are subject to the SCA, which requires contractors to pay wages in accordance

with wage determinations established by the U.S. Department of Labor. Wage determinations

(WDs) either reflect local pay or Collective-Bargaining Agreements ("CBAs"), which would be

incorporated into the WD when the CBA comes into existence. SPCs must pay their personnel

at least those wages as outlined by the Act. In some circumstances, a private contractor may pay

higher rates than required in order to retain its employees or compete with other employers in the

local economy. Any such higher wages could increase the bed day rate as proposed by that

8

private contractor.  Other factors considered by the private contractors to set their bed day rates

beyond salary, may be general and administrative cost, overhead and profits, which are also

sensitive and vary by contractor.

18.     The bed-day rates included in the contract are those submitted in the successful

contractor's final offer and as agreed by the Government.  Bed-day rates could still be negotiated

after the contract is awarded, for example if there were a change in the wage determination in

that area or if there were a new CBA.  In the case IGSAs such as Farmville, the bed-day rate

reflects the bed-day rate that was submitted by the commercial subcontractor, not the prime

contractor.

19.     Detention services contracts require private contractors to provide detention services at

SPCs or CDFs 24 hours a day and seven days a week.  Thus, when submitting a proposal for a

detention services contract, private contractors are required to submit a staffing plan that lays out

the amount of personnel and positions it proposes using to meet this 24/7 requirement.  For

example, if a private contractor proposes to utilize 200 employees to provide services at any one

time during an eight-hour shift, the contractor would need up to 600 employees to meet the 24/7

staffing requirement (though some services, e.g., food services, do not need to be provided at

night and others can be provided on a limited basis over the weekend).  The staffing plans

included in ICE contracts or IGSAs are those provided by the successful offeror as part of their

offer or the subcontractor servicing the IGSA contract.  The staffing plans proposed in either

case may be accepted by ICE as is or modified during negotiations.  The contract may include a

staffing plan exactly as the contractor proposed or one which changed as the result of

negotiations.

20.     The proprietary staffing plan submitted by a commercial contractor whether through FAR

based competition or during negotiation of an IGSA contract is evaluated by ICE prior to award

to ensure that the service provider understands the scope of work that it will be expected to

perform under the contract. Private contractors (whether they are primes or a subcontractors)

decide to position their staff differently based on the company's own assessment of the number

of staff that it will need to perform.  So it is not uncommon to see differences in the staffing

plans submitted by private contractors or subcontractors (submitted through a city/county jail),

which reflect the companies' proprietary assessments, business objectives and strategy which

would go into drafting their staffing plans.

21.     Release of the bed-day rate (including guaranteed minimum monthly rates where the bed-

day rates can be easily derived) and staffing plan information included in SPC or CDF detention

services contracts and IGSAs could compromise the procurement integrity of the competition for

initial and subsequent follow-on detention services contracts.

22.     Therefore, a significant competitive edge that private contractors who compete for ICE

detention facility services contracts or for IGSAs have over their competitors is their strategy

regarding their bed-day rates that they will quote in their proposals and the specific amount of

staff that they intend to use to fulfill their 24/7 service requirement.  If other vendors were aware

of the bed-day rates or staffing plans proposed in those contracts, they would be likely to modify

their bidding strategy accordingly in an attempt to underbid their competitors during both the

initial contract and follow-on competition for ICE detention services contracts by copying their

proprietary staffing models.  The disclosure of the bed-day rates and staffing plans could also

harm the competitive advantage of private contractors whether they are prime contractors or

subcontractors to IGSA holders.  The disclosure of the bed-day rates and staffing plans quoted by

10

private contractors could place them at a competitive disadvantage because the bed-day rate is a

primary factor ICE considers when selecting a commercial contract or an IGSA detention facility

contract awardee.

I declare under penalty of perjury, that the foregoing is true and correct.

Signed this 22nd day of December, 2015 in Washington, D.C.

James Dana Adams, Jr., Assistant Director
Detention Compliance and Removal Division
Office of Acquisition Management
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement

11