UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DETENTION WATCH NETWORK and CENTER FOR CONSTITUTIONAL RIGHTS, Plaintiffs, v. UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Defendants. | 14 Civ. 583 (LGS) **DECLARATION OF BART VERHULST** |

I, Bart Verhulst, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am employed by Corrections Corporation of America ("CCA"), as Vice President/Federal & Local Partnership Relations.  I am familiar with CCA's process for procuring and maintaining government contracts.  I submit this declaration based on my personal knowledge to protect the redactions of certain information from CCA's contracts with Immigration and Customs Enforcement ("ICE"), including bed-day rates and staffing plans.

2.      CCA is the nation's largest provider of contract corrections and detention services, with over 30 years of experience in the industry.  CCA partners with various federal, state, and local governments to provide corrections, detention and re-entry services.  CCA owns or controls a total of 66 correctional and detention facilities located in 16 states and the District of Columbia, and manages 11 additional facilities owned by CCA's state and local governmental partners.

3.      CCA partners with ICE as a primary contractor at 3 Contract Detention Facilities ("CDFs"): Elizabeth Detention Center (NJ); Houston Processing Center (TX); and the Otay Mesa Detention Center (CA).  CCA also owns and operates 5 facilities that house ICE detainees through

an Intergovernmental Service Agreement ("IGSA"): Eloy Detention Center (Eloy, AZ through City of Eloy); South Texas Family Residential Center (Dilley, TX through City of Eloy, AZ); Stewart Detention Center (Lumpkin, GA through Stewart County, GA); T. Don Hutto Residential Center (Taylor, TX through Williamson County, TX); and Laredo Processing Center through (Laredo, TX through Webb County, TX).

4.      Approximately 60% of CCA's current contracts were awarded via competitive procurement processes for government contracts to provide corrections or detention services. The remaining contracts were obtained through non-competitive bids, of which approximately 30% were through an IGSA with CCA's state or local government partner. Contracts are awarded based on bed availability, cost, quality and range of services, experience in designing, constructing and managing facilities, and reputation of management and personnel.

5.      In its federal solicitations for detention services contracts, CCA has faced competition from similar providers. Among the private contractors that regularly compete with CCA are the Geo Group, Management and Training Company ("MTC"), LaSalle Corrections, Community Education Centers ("CEC"), and Emerald Management. CCA also competes with state and local governments (and their private contractor partners) that contract with the federal government via IGSAs.

6.      Federal agencies, including ICE, have awarded contracts over the last five years for correctional, detention and family residential services. For example, the following contracts were awarded through a selective procurement process in which CCA and others placed competing bids:

- In March 2013, the Federal Bureau of Prisons ("BOP") issued Solicitation No. RFP-PCC-0022, soliciting offers for two facilities. The first was to house 1,565 to 2000 low-security adult males in one of the following states: OH, MI, PA, DE, NJ or NY. The second was to house 1,565 to 2,000 low-security adult male inmates at a facility located "anywhere in the United States." Both contracts were awarded to the Geo Group on December 29, 2014. CCA also bid for these contracts.

- In July 2010, the BOP issued Solicitation No. RFP-PCC-0019, to manage operate a contractor owned or leased facility housing approximately 1,000 low security, adult male inmates in Groesbeck, TX. The contract was awarded to CEC on March 15, 2011. CCA, MTC and LaSalle also bid on this procurement.
- In April 2010, the BOP issued Solicitation No. RFP-PCC-0018 to house approximately 3,000 inmates at its facility in Raymondville, TX. CCA and GEO also bid on this procurement. The contract was awarded MTC on June 6, 2011.
- In December 2010, ICE awarded operation of the Texas Civil Detention Center to the GEO Group through an existing IGSA with Karnes County, TX. CCA competed for the contract through its IGSA partnership with Williamson County, TX.
- In January 2015, ICE issued Solicitation No. HSCEDM-15-R-00004 for provision of a 1000-bed Contract Detention Facility within a 50-mile radius of the ICE Houston Field Office. The deadline to submit proposals was December 4, 2015. CCA submitted proposals, but this contract has not yet been awarded.

7.     For the CDFs, CCA provides total facility management, including all supervision, security, and operations, except detainee healthcare, which is provided by the ICE Health Service Corps. Aside from the CDFs, ICE may enter into a non-competitively bid IGSA with another government entity to meet immediate bed space needs at a particular location for an uncertain duration. As noted in Paragraph 3, CCA provides detention beds to ICE as a primary contractor for the competitively bid CDFs, and also as a secondary contractor through an IGSA and its partnership with local government entities.

**SAMPLE CONTRACTS**

8.     The parties have selected two CCA contract documents as samples. CCA was awarded Contract ODT-5-C-0003 to provide detention services at the Otay Mesa Detention Center in San Diego, California (the "Otay Mesa Contract"). Sample Contract Document 3 (Bates No. 2014FOIA03585.006215-19) represents an April 12, 2012 order modification for a one-month extension of this contract and to provide additional funding. Sample Contract Document 4 (Bates No. 2014FOIA03585.006242-50) represents a July 1, 2012 order modification to update pricing information. Sample Contract Document 4 also contains a staffing plan of how CCA intends to fulfill its detention-services obligations under the contract.

9.     The Otay Mesa Contract is a typical example of a competitively bid federal contract that contains confidential business information. The contract was issued in response to Solicitation ODF-4-R002.   It was awarded for an initial three-year base period, and included five additional three-year option periods.   For the base and each option period, CCA bid separate prices for the following:  detention services for a minimum of 900 ICE detainees per month; a per-detainee price for any additional ICE detainees over 900, but less than 1,000; an hourly price for off-site guard services for ICE detainees, such as custodial supervision at an off-site medical center and a per-mile rate for transportation; and detention services for U.S. Marshals Service ("USMS") detainees. The Otay Mesa Contract also includes a staffing plan that contains security-sensitive information regarding the number of personnel assigned to each post during each shift, and proprietary information regarding how CCA manages its labor costs.

**COMPETITION FOR ICE CONTRACTS**

10.     There are seven ICE Contract Detention Facilities ("CDF") in the United States.  CCA currently contracts to operate three CDFs, which are listed in paragraph 3.  These contracts are set to expire August 31, 2016 (Elizabeth); March 30, 2016 (Houston); and June 30, 2017 (Otay Mesa), unless any remaining options are exercised.  In addition, ICE has awarded four other CDFs in Washington, Colorado, Texas, and Florida to the Geo Group, CCA's main competitor in the CDF contracts market.  While the GEO Group and CCA are the only two companies that have been currently awarded CDF contracts, nothing prevents the other private and public entities listed in Paragraph 5 from competing in this market.  CCA believes they will likely do so if information relating to CCA's proprietary pricing algorithm is revealed publicly.

11.     ICE generally awards CDF contracts by accepting bids from private contractors under a competitive procurement process pursuant to the Federal Acquisition Regulations.

Currently, CCA is competing with certain other undisclosed bidders to provide detention services for a 1000-bed facility to be located within 50 miles of the ICE Houston Field Office. Additionally, CCA's existing CDF contracts are typically for 1 to 5 year terms, and a particular contract may have several optional renewal periods. CCA understands that ICE will competitively rebid these contracts, as nothing prohibits ICE from submitting a CDF contract to re-competition instead of exercising an optional renewal.

12.     CCA also serves as a sub-contractor to local government authorities through IGSAs, in contracts to house detainees/prisoners for ICE and other federal and state agencies. In addition to the 5 IGSA facilities housing ICE detainees listed in Paragraph 3, CCA is a subcontractor in 12 facilities that serve other federal, state, and local government entities through an IGSA.[1]

13.     CCA's ability to compete in the ICE detention facilities market depends on its continued ability to formulate competitive bid proposals that offer substantial cost savings to its government customers while allowing CCA to earn a fair rate of return over the term of the contract and any optional renewal periods. CCA's detention facilities are not limited to serving ICE, because they are not restricted to any particular prisoner or detainee population. At the federal level, a facility suitable for a federal solicitation is also likely to be suitable for use by other agencies. As an example, when CCA lost the contract with the BOP to operate California City Correctional Center in a highly competitive federal solicitation, CCA began the process of closing the facility. Near the closing date, however, the USMS opted to place federal detainees at the

---

[1] These are Bent County Correctional Center through Bent County, CO; Crowley Correctional Center through Crowley County, CO; and Kit Carson Correctional Center through City of Burlington, CO (Colorado DOC contracts); Hardeman County Correctional Center through Hardeman County, TN; Trousdale Turner Correctional Facility through Trousdale County, TN; and Whiteville Correctional Facility through Hardeman County (TN DOC contracts); Central Arizona Detention Center through Pinal County, AZ; Citrus County Detention Facility through Citrus County; Silverdale Detention Facility through Hamilton County; Torrance County Detention Facility through Torrance County, NM (USMS contracts); and Correctional Treatment Facility through D.C. (USMS and BOP contracts).

facility via an IGSA between the Office of the Federal Detention Trustee and California City, California. That decision prevented some employee layoffs at the facility.  Similarly, at one time the BOP housed prisoners at the CCA operated Eloy Detention Center in Eloy, Arizona, via an IGSA with a local government entity. When the BOP ceased using the Eloy facility, ICE opted to utilize it.

14.    Because the federal government may enter into IGSAs with state and local government agencies without relying on a competitive procurement process, federal agencies have wide latitude in relocating a population from a CCA facility to another facility rather than renewing a contract.  Most, if not all, of CCA's private competitors also operate as sub-contractors in IGSA facilities that house federal prisoners on behalf of local governments.

15.    CCA also participates in several contracts where prisoners from one state are housed in CCA facilities in other states. Hence even some state governments participate as potential customers in a broader national market for correction/detention services. As with its competitors, many CCA facilities are simultaneously viable for intrastate, interstate, and federal prisoner/detainee housing, and may therefore be used by at least three federal agency buyers; the state and local government where the facility is located; and numerous potential interstate users.

**LIKELIHOOD OF COMPETITIVE HARM**

16.    Publicly revealing various pricing items (fixed bid pricing, incremental unit pricing, and ramp up pricing) and staffing plans in CCA's contracts with ICE will cause the company substantial competitive harm.  CCA's process for formulating its bid in response to a solicitation is a cross-departmental process involving CCA's Real Estate, Partnership Development, Operations, Human Resources, Legal, and Finance Departments. CCA considers a variety of uncertain and unknowable risks, and relies upon the expertise of the entire team to arrive at its

final proposal. CCA has been able to offer competitive bids (bed-day rates) and beat other market competitors by utilizing a proprietary algorithm that predicts its fixed and incremental costs to a reasonable degree of accuracy. This algorithm was developed based on historical data obtained from CCA's unique and proprietary staffing patterns, and its experiences with subcontractors, real-estate transactions, healthcare providers, transportation services, utilities and waste removal services, inmate programming services, and other relevant factors.

17.     Some components of CCA's pricing are already available to the public. For example, where CCA operates a facility under Service Contract Act requirements, various employee wages are available via publications of the US Department of Labor. CCA and its competitors often object to the FOIA revelation of contract *staffing patterns* because confidential staffing patterns combined with publicly available wage data would reveal the details of the largest component of bidder pricing on federal contracts: total labor cost.

18.     Fixed bid pricing represents the guaranteed minimum payment based on the anticipated minimum number of detainees during each contractual term. Incremental pricing relates to the pricing for housing additional detainees at the facility above the minimum. And ramp-up prices reveal the per prisoner per day ("per diem") price at various stages of activating a facility. Ramp-up (and ramp-down) prices reflect CCA's competitive business decisions relating to staffing levels for various positions when a vacant or substantially vacant facility is filled with inmates before reaching the minimum contractually guaranteed population, or when those inmates are removed at the termination of a contract. Release of fixed bid pricing information would likely harm CCA competitively as it would allow competitors to determine CCA's pricing algorithm for the expected minimum population of the facility. Similarly, release of incremental and ramp-up pricing would reveal by basic mathematics the price per prisoner that CCA offers at specific

population levels, which would allow competitors to determine CCA's pricing algorithm.

19.     With both incremental prices and ramp-up prices, CCA has developed its pricing formulas at great expense and through years of experience and refinement. CCA's staffing patterns also reflect over 30 years' corrections experience in managing labor costs. Allowing a CCA competitor access to this proprietary information would allow it to shortcut CCA's development work and compete unfairly against CCA. Public policy concerns also weigh heavily against disclosing CCA's staffing patterns, as they contain sensitive information regarding the number of correctional staff members on duty and shift changes, which if publicly available would pose legitimate safety and security concerns for the facility.

20.     Among all of its existing contracts, CCA has 15 facilities with terms expiring in 2016, but which may have one or more renewal options. CCA's governmental partners in these contracts are not required to exercise the renewal option, however, and may try to solicit lower bids from competitors for performance in future years. Because CCA and its competitors serve numerous user agencies at the state, local, and federal levels, and because substantial similarity exists in the demand for facilities and services, publicly revealing pricing and staffing patterns will substantially harm CCA, not just in federal procurements, but also in state and local procurements, by revealing information that competitors could use to underbid CCA or replicate its confidential and unique proposals.

21.     While CCA is aware that ICE publishes the total amount paid under a particular contract, those numbers do not generally allow competitors to determine the individual line-item pricing for both the initial and optional renewal terms. If CCA option prices were publicly released, private and public competitors would likely underbid CCA, allowing ICE to select an alternate bidder based on price rather than select CCA, thus resulting in competitive harm to CCA.

22.    CCA believes that by combining the types of pricing data described above with publicly available information, including the forms and processes required by the solicitations themselves, competitors could easily determine the algorithm CCA uses to develop its pricing models.  Specifically, competitors would be able to use information about CCA's incremental pricing and CCA's staffing pattern to determine CCA's marginal profit rate.  Competitors could then use that against CCA to gain an unfair competitive advantage in the procurement process.

23.    Additionally, because CCA uses the same proprietary algorithm to predict costs at all facilities, the release of confidential and proprietary information regarding CCA's pricing models and staffing patterns from any one contract (such as a contract with ICE) may be used to determine to a fair degree of accuracy CCA's bid in future procurement processes at other facilities, or in contracts with other federal and state agencies. Thus, release of information regarding the pricing models and staffing patterns from non-competitive contracts, such as those awarded to sole source providers in a particular geographic area, is equally damaging.

24.    The Otay Mesa Contract contains redactions to the total price of line items, but not the quantity.  In other contracts, ICE has not redacted the total price for line items, but has redacted the quantity and unit price.  Access to both the quantity and the total price for a line item will permit competitors to calculate CCA's bed-day rates, and reverse engineer CCA's proprietary algorithm. Coupled with CCA's staffing patterns, competitors will be able to predict CCA's marginal profit rate, and underbid CCA in option renewal bids and future procurement bids.

25.    The competitive harm to CCA from releasing its pricing and staffing plan information reaches far beyond the market for ICE detention services.  Release of the pricing information contained in CCA's ICE contracts and IGSAs with a CCA partner, will permit a competitor access to information sufficient to reverse engineer CCA's pricing algorithm.  With

such information, a competitor will be able to underbid CCA in all markets for corrections and detention services. Indeed, nothing prevents competitors from using such information to set predatory rates to gain an unfair market share and/or drive CCA out of the market.

26.    While CCA and its competitors compete in the same federal detention services market, each commercial entity, including CCA, develops a proposal based on its unique and individual understanding of the evaluative criteria its potential customers use to select winning bidders. Elements of CCA's proposals should not be revealed publicly because those elements— which were developed at great expense and commitment of time, energy, and corporate resources—make it possible for CCA to compete in the market. If CCA's proprietary per-diem rates and staffing plans were publicly revealed, competitors could adopt or replicate those elements in future proposals, unfairly profiting from CCA's proprietary and confidential work, likely causing CCA substantial financial harm in the competitive market for corrections and detention services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of December, 2015 in Nashville, Tennessee.

Bart Verhulst
Vice President, Federal & Local Partnership Relations
Corrections Corporation of America