UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DETENTION WATCH NETWORK and CENTER FOR CONSTITUTIONAL RIGHTS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | 14 Civ. 583 (LGS)<br><br>**DECLARATION OF RUSSELL B. HARPER** |

I, Russell B. Harper, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the chief executive officer and manager of Immigration Center of America-Farmville, LLC ("ICA"), the sub-contractor providing all services under the Intergovernmental Service Agreement (the "ICE Contract") between the Town of Farmville, Virginia (the "Town"), and the U.S. Department of Homeland Security/U.S. Immigration and Customs Enforcement ("ICE"). In this capacity, I am responsible on behalf of the Town and ICA for all aspects of the ICE Contract, including security, staffing, planning, facility management, food supply, medical services, transportation and all other services rendered under the ICE contract. I am well versed in the business of servicing of the ICE contract, managing and operating a detention facility. I submit this declaration based on my personal knowledge in support of ICE's motion for partial summary judgment which seeks to withhold certain pricing information and staffing plans under FOIA exemption (b)(4).

**BACKGROUND ABOUT THE COMPANY AND THE FACILITY**

2. ICA owns, operates and manages a detention facility in Farmville, Virginia (the

"Farmville Detention Center"), pursuant to an agreement with the Town. I understand that in 2007-2008 ICE was considering the operation of a detention facility in Virginia. ICE explored siting a facility in various locations and discussed different options, including meeting its detention needs through private and public facilities. As a result of these various informal negotiations, the Town and ICA expressed interest in offering a joint proposal. Because the Town did not have a facility to meet the needs of ICE under the terms of the ICE Contract, the Town procured and contracted with ICA to build, own, operate, and manage such a facility. ICA is responsible for delivering all of the services under the ICE Contract on behalf of the Town. The facility is entirely dedicated to housing ICE detainees.

3.      Under the Town's contract with ICA, the Town bears no responsibility for any aspect of the operations, management or maintenance of the ICA facility or any contractual obligation of the Town owed to ICE. All contractual obligations to ICE, including contract administration and negotiations are the sole responsibility of ICA. As such, I will refer to the ICE Contract as ICA's, since ICA communicates, negotiates and otherwise administers the ICE Contract directly with ICE.

4.      The facility became operational in May of 2010 and the first detainees were transferred to the facility in August of 2010. The contract between ICE and the Town was signed on September 15, 2008. The ICE Contract is for a ten year term, ending on September 15, 2018. ICE is not required to extend the current contract and has several avenues for detention services, including transfers of detainees to other ICE-contracted facilities, bidding for services, and renegotiating a new contract with the Town. While the ICE Contract is a ten year agreement, each year new rates are negotiated. Because the Town passes along all responsibility for the ICE Contract, these negotiations are between ICE and ICA. The contract amendment reflecting the

current, negotiated rates under which ICA operates became effective May 1, 2015, and expires on April 30, 2016.

5. The ICE Contract has been modified frequently regarding payment schedules, with changes in payments reflecting the applicable rates applied for periods often ranging from three to six months. The ICE Contract has components of payments based off of hourly rates, fixed monthly charges, reimbursements, and per-day payments. ICA has taken great pains over the years to recruit, hire, and retain its staff for the ICA facility. Because of the uniqueness of its staffing, vendors, rates and contractor services, ICA guards this information and treats it internally as confidential and proprietary. The ICE Contract itemizes hourly rates for some staffing, including for instance the hourly and overtime rates for guards and transportation coordinators. These rates are frequently amended during the course of an extension and vary by region, based on prevailing wage rates in the area. There are also fixed monthly charges, such as to provide interpretation services, and items that are pass-through costs, such as utilities. In the course of the planning of its operations and development of its administration of the ICA facility, including management and negotiations with its subcontractors, ICA's cost structure has stayed competitive with other facilities, both public and private.

6. The ICE Contract, including amendments, is based off of a form, standard contract utilized by ICE with all of its contracts with private detention facilities. As such, it is representative of those used nationwide. I understand that a representative contract amendment document, with items redacted in the form and notated with the reason(s) for redaction, has been provided to the Court (Sample Contract 2, Bates No. ICE 2014FOIA03585.015538-40). This contract amendment, dated November 4, 2011, represents a modification of the ICE Contract to increase the funds allocated to the contract. These modifications are issued from time to time to

ensure adequate funding by ICE to pay for the services delivered under the ICE Contract. As such, as funds become available, the itemization of line items under the ICE Contract is restated so that payment to ICA can be made. Modifications reflect negotiations on daily rates, pass-through costs as incurred by ICA, and worker hourly rates. Each of these items represents parts of the cost structure which ICA has developed in order to be a cost-effective services provider.

7. The primary compensation to ICA is a proprietary and confidential "per bed day rate," essentially paying ICA per detainee each day. This rate incorporates all other components of the payments to ICA for services that are not billed as pass-through reimbursement, fixed rate charges or hourly. For example, overhead, capital costs, maintenance, facility operating costs, food service and cleaning are all cost components paid under the day rate. The reason the day rate is confidential is that it represents a negotiated line item for all non-pass-through items. In other words, if a rate or cost is not delineated elsewhere in the ICE Contract, ICA must cover such costs from the day rate. It is the bulk of the expense to ICE under the ICE Contract and is the critical element of competition among detention providers.

8. The bed day rate number is initially proposed by ICA to ICE in ICA's contract bid and the number ultimately incorporated into the final ICE Contract is based on a daily rate as negotiated between ICE and ICA. The most recent rate change for the per-bed day rate was negotiated between ICA and ICE and made effective in the current terms of the ICE Contract. The current ICE Contract also contains a "Guarantee Minimum Number of Bed/Day," which guarantees a minimum monthly payment to ensure access to a minimum number of beds, though it does not guarantee a minimum number of detainees.

9. The current bed day rate was negotiated to be effective May 1, 2015. The bed day rate is proposed by ICA each year, and then ICE and ICA enter into negotiations on the rate.

10. While the ICE Contract does not include a specific staffing plan, it has specific requirements of services to be provided and available to detainees. For instance, education, recreation, translation, and medical services must be provided, as well as typical detention, security and housing services. The staffing plan developed by ICA to meet these service demands is unique to ICA. As ICE requires additional services under the ICE Contract, ICA must meet those demands through negotiations and a final determination by ICE that ICA will meet its needs. Release of the hourly rates and hours would provide competitors information that ICA treats as proprietary and such insight into ICA's business would cause competitive harm to ICA, since its competitors could duplicate these servicing methods and costs and underbid ICA for contracts.

**COMPETITION FOR ICE DETENTION CONTRACTS**

11. ICE contracts with third-party vendors to house detainees in its custody. There are numerous entities nationwide that contract with ICE to provide such services. ICA competes with these companies to provide services and security as directed by ICE. ICA's facility is an ICE-only facility. It is not set up for any other types of prisoners or inmates. It is specifically designed to meet ICE needs. On the other hand, local jails can often house many types of detainees, prisoners or inmates. If the Town lost the ICE Contract, the Town would immediately terminate the ICA relationship, since the ICA facility cannot meet other Town needs. As such, although the Town is the ICE Contractor, ICA is the real party in interest in the ICE Contract, the cost driver, the responsible party and fully at risk in negotiations with ICE.

12. ICA's competitors in the region and nationally include Corrections Corporation of America and the GEO Group, Inc., among others. ICA and its competitors provide similar services under similar contracts with ICE. There is not an unlimited demand for the services provided by ICA, as only government agencies are the customer base for these services. While

state and local governments offer some locations, the difficulty is that a detention facility is not readily relocated. Even the federal government seeks sites which are spread out to match the needs and locations of the populations requiring services. Developing a site satisfactory to the needs of the government agency requires a large capital investment and long-term commitment. When making such a large commitment with limited other opportunities available, at least in the near term, private firms must be very aggressive in pricing.

13. Competition between the parties consequently centers on the cost of providing the services and security of the detainee population for ICE. Due to shifting population needs, ICE uses its detention facilities to service a wide geographic area. In ICA's case, we provide services throughout Virginia and up to the District of Columbia. As such, transportation costs, for instance, can be a driver of operational costs. This line item cost — and others just like it throughout the ICE Contract — if known by our competitors or customers, would be detrimental to ICA in its business.

14. Further, competition exists from local jail facilities. Due to financial pressures to house as many prisoners, inmates, and detainees as their facilities can fit, local governments actively seek ICE detainees, since federal funds reduce the pressure on local budgets. Local governments account for costs very differently than private contractors, and thus, their service offerings are often very attractive. For example, retirement costs are shared with the state and they are tax exempt on purchases. This places enormous financial pressure on ICA in its bids and negotiations. I am aware that, from time to time, jails in proximity to the ICA facility will approach ICE with proposals to house detainees in their local facilities due to under-utilization. So, while not a direct competition source in the bidding context, there exists on-going competition and risk of competitive harm to ICA if its rates and financial information is disclosed.

15. As noted, detainees can be transported across a wide geographic area. ICE field offices are not limited to placing detainees in a location proximate to home, residence, family, facility or any other site. As such, ICE may transfer or place detainees outside of the ICA service area. Furthermore, ICE may place detainees in local Virginia jails (which ICE has done and currently does through numerous, negotiated intergovernmental services agreements) and pay for such detention services outside of the ICA contract. For instance, ICE has an agreement for detention services with Piedmont Regional Jail, which is sited in the adjacent county to the ICA facility. Regional jails also look to reduce costs, including staffing with private contractors and vendors (such as the private companies listed above). These factors create competition for ICA among these alternatives for detention services.

16. For certain services requiring specialized staffing or access to vendors or distributors, ICA contracts with firms on negotiated, arm's length transactions. For instance, medical services are contracted out to third party vendors because of the specialized nature of those services. Food service is also contracted, as these services require access to food distribution networks. These vendors are often regional and national in scope, such as SYSCO or Performance Food Group.

**LIKELIHOOD OF COMPETITVE HARM**

17. We understand that the Court is considering whether ICE should have to release the material redacted under FOIA Exemption (b)(4) on private contract documents, including ICA's. ICA is concerned that such disclosure would inflict substantial harm upon ICA, weakening its competitive position in the private detention facility industry.

18. If the daily rates or, alternately, days and line-item payments are disclosed, competing firms could analyze this data, "reverse engineer" and determine the negotiated rates.

The disclosure of this information, along with a competitor exploring and researching ICA's subcontracts to outside vendors such as food service, would cause ICA to lose competitive advantage by gaining an understanding of the cost structure and rates used by governmental units in procuring vendor services such as that offered by ICA. Further, subcontractors could place pricing pressure on ICA, as noted above.

19. Other than the hourly rates from Department of Labor ("DOL") standards and pass-through costs, the other payment components are negotiated with ICE. As such, the per-bed day rate and flat fee components, if disclosed, would provide key data points for competing firms to analyze the revenue and cost structure of the ICE Contract, and ICA would lose a critical competitive advantage. Hourly rates, while set to DOL standards, are also competitive, since the hourly rates have both standard and overtime rates and further vary by metropolitan region. The mix of these rates applied to the hours of a facility can make certain operations plans more competitive than that which could be proposed by other firms. These staffing plans (and thus the hours reported that explain them) are critical components of the ICE Contract and afford a competitive advantage over alternative firms. For instance, a line item might disclose the hourly rates paid in northern Virginia, multiplied by the number of hours, to show the payment amount due for that service line item. Staffing a facility with northern Virginia-rated staff might be advantageous as compared to, say, Norfolk rates. If the hours and rates or, alternately, rates and line-item payments are disclosed, competing firms can analyze this data, "reverse engineer," and determine the staffing plan and develop models that would cause ICA to lose competitive advantage.

20. As mentioned above, ICE does not have a plethora of facilities under contract. As such, each contract is highly sought by companies offering these services. ICE provides a

8

very detailed and comprehensive servicing list, facility floor plan oversight, and itemization of operations. With few facilities and very detailed standards of operation, aggressive pricing and innovation are needed to be a successful bidder and contractor when competing for contracts to provide detention services to state and local detention facilities. While the total amounts paid to the private vendors under an existing contract with ICE are disclosed, the elements in line items should not be. By simple math, if two elements are disclosed, the third can be re-calculated, to the disadvantage of and competitive harm to ICA. For instance, if the per-day rate and line item total are provided, one can calculate the number of days. Alternatively, if the number of days and the line item total are provided, the negotiated day rate can be calculated. As such, at least two elements on each line must be protected from disclosure as competitors will gain almost perfect knowledge of ICA's staffing plans, pricing information, and key service elements. With this knowledge about the business model, pricing and service delivery, ICA's competitors will gain the upper hand in future procurements by submitting bids that are lower than ICA's bids on future ICE and other private detention facilities procurements and otherwise competing at an unfair advantage and to the detriment of ICA. Because the margins on detention services are so narrow, even small, incremental rate changes can improve one offer over another in a competitive procurement by a governmental agency.

21. Further, disclosure of this confidential financial and staffing information would also harm ICA in its future competition with potential governmental customers, such as ICE. If ICA's customers obtained access to its current pricing and staffing information, its customers could use this information in future contract competition with ICA and this could have a detrimental impact on ICA's ability to negotiate with the governmental customer when all of its cost structures are known, much less to be able to make a profit from those contracts.

22. The rates under the current ICA Contract modification will be re-negotiated in the Spring of 2016, since the ICA Contract rates re-set May 1, 2016. Of greater concern, the ICE Contract expires September 15, 2018. Because of relocation costs, cost analysis under the current contract and other preliminary work to be done to re-let the ICE Contract so that there is no disruption in detention services, ICE will likely need to review its internal jail costs statement for the ICA facility and begin preparations for replacing the current ICE Contract within the next few months. As mentioned, alternative sites - even within Virginia - could be used for detainees. The ICE Contract is not set in stone, as ICE could transfer detainees to a multitude of competitor sites and simply terminate the ICE Contract. ICA will soon be entering into a critical business phase regarding protecting its rates, staffing, and cost structures. Public and private detention facilities can place undue negotiating pressure on ICA in this ICE Contract rate and contractual review and procurement process, disrupting the marketplace and the ICA business model structure. For the reasons set forth above, the release of the redacted information in the ICE Contract is likely to cause competitive financial harm to ICA - particularly in light of upcoming negotiations for 2016 and the preliminary evaluations of costs, populations, service options and other factors by ICE for continuity of services at the end of the ICE Contract in 2018.

23. For the reasons set forth above, the release of the redacted information in the ICE Contract would likely cause substantial competitive financial harm to ICA. Release of this information, which is not publicly available, could likely cause competitive financial harm to ICA by providing sensitive information to its competitors and customers. Competitors could use this information to the detriment of ICA in future contract negotiations, or to underbid ICA in future procurements whether to serve as a sub-contractor to an IGSA or to directly compete for ICE detention service contracts.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this **18** day of December 2015, in Richmond, Virginia.

                                                        RUSSELL B. HARPER
                                                      Chief Executive Officer
                                                      Immigrations Center of America-Farmville, LLC