**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DETENTION WATCH NETWORK, CENTER FOR CONSTITUTIONAL RIGHTS,

          *Plaintiffs*,

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY,

          *Defendants*.

DOCKET NO.:  14-CV-583 (LGS)

**Document Electronically Filed**

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION

**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6445

Ghita Schwarz
Omar Farah
gschwarz@ccrjustice.org

**CENTER FOR SOCIAL JUSTICE SETON HALL LAW SCHOOL**
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700

Jennifer B. Condon
Jenny-Brooke.Condon@shu.edu

## Table of Contents

ARGUMENT ..................................................................................................1

I.  Under FOIA, Summary Judgment Cannot Be Based Upon
    Conclusory, Speculative, Erroneous, Incomplete, or Contradicted
    Statements in Defendants' Declarations, Which Do Not
    Constitute Statements of Undisputed Fact .........................................1

II. Exemption 4 Does Not Justify Withholding Unit Prices and
    Staffing Plans, Because It Protects Only Information
    "Obtained from a Person," Not Executive Action and Decision-making.........3

III. Unit Prices and Staffing Plans Are Not Confidential,
     Because Defendants Have Not Shown that the Detention Market is
     Competitive or that Disclosure Will Cause
     Substantial Competitive Harm .........................................................7

     (A) The Government Fails to Demonstrate a Competitive Market ...................7

     (B) The Government Fails to Demonstrate that Disclosure of
         Unit Prices and Staffing Plans Will Cause Substantial
         Competitive Harm ....................................................................10

            1. There is No Competitive Harm Where All Contractors
               Disclose the Same Information, and Where Identical
               Information is Already in the Public Domain ..............................11

            2. Defendants' Declarations are Insufficient to Demonstrate
               That Reverse-Engineering, Even if Possible,
               Will Result in Substantial Competitive Harm ..............................13

IV. Exemption 7(E) Does Not Apply to Detention Facilities' Staffing Plans .......17

     (A) Staffing plans are not documents
         "compiled for a law enforcement purpose." ................................18

     (B) Staffing plans do not constitute "techniques and
         procedures for law enforcement investigations"........................20

     (C) The information requested is already known to the public .....................21

# Table of Authorities

## CASES

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*,
626 F.3d 678 (2d Cir. 2010)................................................................................17, 20

*Am. Civil Liberties Union Found. v. U.S. Dep't of Justice*,
No. 12 CIV 7412 WHP, 2014 WL 956303, at *7 (S.D.N.Y. Mar. 11, 2014)............ 21-22

*Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141 (D.D.C. 2011)...............................18

*Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
601 F.3d 143 (2d Cir. 2010)................................................................................4, 5, 6, 7, 15

*Coastal States Gas Corp. v. U.S. Dep't of Energy*,
617 F.2d 854 (D.C. Cir.1980) ............................................................................15

*Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283 (D.C. Cir.2006).................2

*Council on American-Islamic Rels., California v. FBI*,
749 F. Supp. 2d 1104 (S.D. Ca. 2011) ................................................................20

*Ctr. for Auto Safety v. U.S. Dep't of Treasury*, No. 11 Civ. 1048,
2015 WL 5726348 (D.D.C. Sept. 30, 2015) ........................................................5, 15, 16

*Families for Freedom v. C.B.P.*, 837 F. Supp. 2d 287 (S.D.N.Y. 2011) ..........................18

*Fox News Network, LLC v. Dep't of the Treasury*,
739 F.Supp.2d 515 (S.D.N.Y. 2010).....................................................................6, 15

*Jefferson v. U.S. Dep't of Justice, Office of Professional Responsibility*,
284 F.3d 172 (D.C. Cir. 2002) .............................................................................18, 19

*Judicial Watch, Inc. v. Export-Import Bank*, 108 F.Supp.2d 19 (D.D.C. 2000).................6

*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) ....................... 1-2

*Lamont v. Dep't of Justice*, 475 F. Supp. 761 (S.D.N.Y. 1979)........................................21

*Lee v. FDIC*, 923 F. Supp. 451 (S.D.N.Y 1996)...............................................................16

*Lion Raisins v. USDA*, 354 F.3d 1072 (9th Cir. 2004) ....................................................12

*Maydak v. U.S. Dep't of Justice*, 362 F. Supp. 2d 316 (D.D.C. 2005) ..............................19

*McDonnell Douglas Corp. v. NASA,* 180 F.3d 303 (D.C. Cir. 1999) ..................... 8, 11-12

*MTB Group v. United States*, 65 Fed Cl. 516 (Fed. Cl. 2005) ...................................... 12, 13

*Natural Res. Def. Council, v. Dep't of Interior,*
36 F.Supp. 3d 384 (S.D.N.Y. 2014) .................................................................................. 5

*Niagara Mohawk Power Co. v. U.S. Dep't of Energy,*
169 F. 3d 16 (D.C. Cir. 1999) ....................................................................................... 2,3

*OSHA Data/CIH, Inc. v. U.S. Dep't of Labor,*
220 F.3d 153 (3d. Cir. 2000) ......................................................................................... 12

*Raher v. Bureau of Prisons*, 749 F. Supp. 2d 1148 (D. Or. 2010) ................................ 8, 14

*Raher v. Bureau of Prisons*, 2011 U.S. Dist. LEXIS 56211
(D. Or. May 24, 2011) .................................................................................................... 19

*Scudder v. C.I.A.*, 25 F. Supp. 3d. 19 (D.D.C. 2014) ......................................................... 2

*Tax Analysts v. I.R.S.*, 214 F.3d 179 (D.C. Cir. 2000) ........................................................ 2

## FEDERAL STATUTES

6 C.F.R. § 5.8 ........................................................................................................ *passim*

5 U.S.C. §552 ........................................................................................................ *passim*

## OTHER AUTHORITIES
Edward Rubin, *The Possibilities and Limitations of Privatization*,
123 Harv. Law Rev. 870, 921-22 (2010) ........................................................................ 7

Despite clear Second Circuit precedent and indeed the purposes of FOIA itself, Defendants take the unfounded position that the terms of government-negotiated contracts belong not to the public, but to the private interests who profit from the lucrative immigration detention industry. Their position must be rejected. First, the Government has improperly invoked Exemption 4, attempting to keep secret the financial terms to which the Government has agreed.  But despite voluminous submissions from private contractors, Defendants have not shown that the terms of government contracts are confidential, because they cannot demonstrate that such terms are either "obtained from a person" or, if disclosed, likely to cause substantial competitive harm. Second, the Government has wrongly and belatedly invoked Exemption 7(E) to protect information in staffing plans, including information regarding the assignments of medical, food service, and recreational staff.  The Government's position that information about such staff constitutes "techniques and procedures for investigation and prosecution" defies clear Second Circuit precedent as well as common sense.  The Government's position here, too, must be rejected, and the unit prices and staffing plans that Plaintiffs seek must be disclosed.

## ARGUMENT

**I.     Under FOIA, Summary Judgment Cannot Be Based Upon Conclusory, Speculative, Erroneous, Incomplete, or Contradicted Statements in Defendants' Declarations, Which Do Not Constitute Statements of Undisputed Fact.**

The Government's brief misstates the standard for evaluating when facts are beyond material dispute for summary judgment purposes. While in some cases, agency declarations may be sufficient to support government withholdings, this is only so if they are not called into question by evidence in the record. *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) ("In FOIA cases, summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory

statements, *and if they are not called into question by contradictory evidence in the record* or by evidence of agency bad faith.") (internal quotation marks and citations omitted). Summary judgment is not appropriate when FOIA plaintiffs' "countervailing facts disput[e] agency declarations." *Scudder v. C.I.A.*, 25 F. Supp. 3d. 19, 50 (D.D.C. 2014) (citing *Tax Analysts v. I.R.S.*, 214 F.3d 179, 185 (D.C. Cir. 2000)) or when the government's arguments are "plagued by factual disputes." *Niagara Mohawk Power Co. v. U.S. Dep't of Energy*, 169 F. 3d 16, 19 (D.C. Cir. 1999); *Scudder*, 25 F. Supp. 3d at 30.

Here, portions of Defendants' declarations are called into question by material facts asserted in Plaintiffs' Rule 56.1 statement, which the Government has declined to contest. *See* Dfs.' Br. at 7 n.4. Accordingly, the factual record is in dispute and summary judgment cannot be based upon contested portions of the Defendant's declarations.[1] In addition, even if the Court were to credit portions of the agency declarations that are not directly contradicted in the record, it cannot do so for declarations submitted by private contractors. This is particularly true where the private contractors' declarations contain assertions that lack factual support and are peppered with outright errors, misstatements, and speculative fantasizing disguised as fact. For example, the GEO Group's declarant, David Venturella – a former director of ICE's Enforcement and Removal Operations – speculates that the entire detention system will collapse should ICE reveal the terms of contracts, because if smaller contractors withdraw from the market, competition

---

[1] Taking the Government's declarations at face value is particularly inappropriate here given ICE's shifting justifications and misstatements of facts. While ICE was required to notify and seek input from contractors regarding the invocation of Exemption 4 promptly after receiving Plaintiffs' FOIA Request in 2013, 6 C.F.R. § 5.8, it failed to do so until March of 2015. Pls.' 56.1 ¶ 8. Further, contrary to both regulatory requirements and previous representations to the Court, ICE did not even seek input from CCA and GEO until September of 2015, when briefing was imminent. Pineiro Decl. ¶ 11, and long after it had represented to the Court that it had done so. *See* Pls.' 56.1 ¶ 26; ECF No. 61-2 (Letter from FOIA Privacy Office stating that ICE had already sent notifications to the "relevant contractors").

among the largest public and private contractors will become so "acrimonious" that they will "withdraw from the detention market . . . leaving ICE with no viable detention contractors." Venturella Decl. ¶ 33. This speculative chain of future events not only defies logic – why would contractors leave the market just as their share is growing?  – but also improperly posits the remotest of possibilities as fact. Declarations such as these, which are filled with "speculative opinion" or "self-serving statement[s]," cannot "establish the requisite risk of impairment [to private interests]" necessary for awarding summary judgment to the government. *Niagara Mohawk*, 169 F. 3d at 18. Thus, these declarations do not provide facts beyond material dispute required for summary judgment in the government's favor.

The Government's reliance on factually weak declarations – particularly after giving the contractors several opportunities, through the process outlined in 6 C.F.R. § 5.8, to give detailed analysis of their need for confidentiality[2] – underscores that it has not met its burden under FOIA. Rather than weigh the need for secrecy under Exemption 4 against FOIA's imperative of public disclosure, the Government has instead, inappropriately and without adequate factual justification, deferred to private third parties to make decisions about government transparency. Summary judgment cannot be granted to the Government in this context.

## II.     Exemption 4 Does Not Justify Withholding Unit Prices and Staffing Plans, Because It Protects Only Information "Obtained from a Person," Not Executive Action and Decision-making.

The Government agrees – as it must – that the unit prices and staffing plans at issue constitute the terms of government contracts, but, nevertheless, argues that the very same contract terms are "obtained from a person" and thereby exempt from disclosure under

---

[2] Both the *Vaughn* indices filed with the court and the commentary that contractors gave to ICE through the regulatory process contain only conclusory statements defending nondisclosure. Prior to Defendants' filing of the contractors' declarations with their brief, ICE had not explained its withholdings beyond reciting the rule associated with the claimed exemption.

Exemption 4. That position is irreconcilable with the law in this Circuit. Under *Bloomberg L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, Exemption 4 protects only proprietary information "obtained from a person"; it does not protect the content of government decisions "actually made." 601 F.3d 143, 148 (2d Cir. 2010) (holding that the terms of approved government loans were not protected by Exemption 4 because such information constituted government decisions and action that "did not come into existence until a Federal Reserve Bank made the decision to approve the loan request"). As a result, this dispute turns on the nature of the information in question; specifically, whether it reflects agency decision-making and Executive action, which *must* be disclosed under FOIA, or merely private information the Government happens to obtain. Here, the unit prices, bed-day rates and staffing plans in ICE's awarded government contracts reflect Executive contracting decisions; they are not proprietary information "obtained from a person" and therefore must be disclosed. *See id; see also* Pls.' Br. 8-11.

To sidestep dispositive Second Circuit law, the Government tries to wash its hands of its role in negotiating its own contracts, claiming instead that the withheld terms constitute information submitted by private contractors in bids that were merely "incorporated," often unchanged, into the final government contracts. *See, e.g.*, Dfs.' Br. at 10 (arguing that unit prices and staffing plans "were provided by the private contractors to ICE" and that the government did not audit, analyze or otherwise transform the information). That argument is undermined, however, by the Government's own declarations, which concede that the terms of ICE detention contracts are, in fact, negotiated.[3] More importantly, even in the *absence* of meaningful

---

[3] *See, e.g.*, Adams Decl. ¶17 ("Prior to award ICE and the private contractor may have subsequent discussions or negotiations, as a result of which the contractor will submit a new or revised proposal."); Adams Decl. ¶ 19 ("The staffing plans proposed in either case may be accepted by ICE as is or modified during negotiations. The contract may include a staffing plan exactly as the contractor proposed or one which changed as the result of negotiations."). The private contractors who have submitted declarations concede that the unit prices and staffing

negotiation – i.e., where the government accepts proposed contracts terms as is – its contracts still reflect Executive decision-making for which Exemption 4 protection[4] does not apply.  The Second Circuit has already resolved this issue in favor of Plaintiffs, rejecting past attempts by the Government to distance itself from the final terms of its own contracts simply because in some cases they happened to mirror the terms initially proposed by a private counterparty.  *See Bloomberg*, 601 F.3d at 149 ("even if the loans were granted automatically" the final terms are not information "supplied by the borrowing banks" because those terms "did not come into existence *until the Federal Reserve Bank took executive action by granting the loan*.") (emphasis added). The Government cannot be permitted to re-litigate controlling Circuit precedent here.

To be clear, Plaintiffs do not argue that, by virtue of contracting with the government, private parties automatically sacrifice the right to keep proprietary financial information secret. But that is of no consequence here.  The issue before this Court is whether Exemption 4, which

---

plans agreed to in the Government's contracts are subject to negotiation. *See, e.g.*, Venturella Decl. ¶ 13 ("The bed-day rates and staffing plans contained in the contractor's proposal or bid are incorporated into the final contract, unless they are revised as a result of subsequent negotiations with ICE."); Harper Decl. ¶¶ 3-4 (acknowledging ICA "negotiates" with ICE); *id.* at ¶ 13 ("The bed day rate number is initially proposed by ICA to ICE in ICA's contract bid and the number ultimately incorporated into the final ICE Contract is based on a daily rate *as negotiated between ICE and ICA*.") (emphasis added); *Id.* ¶¶ 7, 9, 15, 16, 18, 21, 22.

[4]   Despite *Bloomberg's* clear guidance, the Government goes to considerable lengths to convince the Court that the test for whether information in a government contract is "obtained" from a private person in fact depends upon how similar the information is to that supplied by a private party.  *See* Dfs.' Br. at 9-10 (citing *Natural Res. Def. Council, v. Dep't of Interior*, 36 F.Supp. 3d 384, 400 (S.D.N.Y. 2014) and related cases). This argument not only misstates the law, but also relies on inapposite cases.  *Center for Auto Safety* did not even involve government contracts at all, but instead turned on whether the content of certain emails was obtained from a person where it was unclear to the Court whether the emails were authored by representatives of the auto companies or government agency personnel.  2015 WL 5726348, at *10-12. None of the cases cited by the Government apply to the instant dispute, which does not address private information that lands in the Government's hands, but rather the terms of the *Government's own contracts*.

permits the government to withhold certain information it receives in private submissions, also permits the Government to withhold the terms of contracts it has agreed to and concluded.

*Bloomberg* settles this question unequivocally; it forecloses the Government's attempt to withhold contract unit prices and staffing plans under Exemption 4. In *Bloomberg*, the Second Circuit recognized that, in contrast to information contained in loan applications, Exemption 4 did not protect the terms of loans awarded by the Federal Reserve to private banks. *Bloomberg*, 601 F.3d at 148. That holding and distinction carries equal force here. Unlike information contained in the private contractors' bids, the unit prices and staffing plans the Government agreed to be bound by "did not come into existence until ….[it] made the decision" to award the contract. *Id.* The terms of the Government's contracts are therefore not proprietary information belonging to private interests, and are not "obtained from a person" pursuant to Exemption 4.

Perhaps because *Bloomberg* so clearly rejected its position, the Government attempts, unsuccessfully, to distinguish it, claiming that the information requested in that case was different from that requested here. *See* Dfs.' Br. at 9-11 (noting that *Bloomberg* and a district court decision that followed it, *Fox News Network, LLC v. Dep't of the Treasury*, 739 F.Supp.2d 515, 565-66 (S.D.N.Y. 2010), concerned the identities of applicants for federal-agency loans and here "ICE is not attempting to shield the identities of the private contractors it hired, or the overall price of the contracts, but only specific, proprietary elements of the contractors' bids that it incorporated into the final contracts"). The Government's characterization of the information requested in *Bloomberg* is incomplete and self-serving. In addition to the "identities of applicants for federal-agency loans," the Court *ordered* the release of other information related to the terms of the government loans, including "the dollar amount of the loans, the loan origination and maturity dates, and the collateral securing the loan." *Bloomberg,* 601 F.3d at 147. The Court

deemed all of this information subject to public disclosure because it was not "information . . .

'obtained from' the borrowing banks within the meaning of FOIA Exemption 4." *Id.* Thus, there

is no material basis for distinguishing *Bloomberg*.

The Government has not and cannot establish that the unit prices and staffing plans

contained in government detention contracts constitute information "obtained from a person"

under Exemption 4.  Plaintiffs are therefore entitled to judgment as a matter of law and release of

the redacted information. Because all three prongs of the Exemption 4 analysis must be met in

order to justify withholding, and because Defendants have not met their burden to demonstrate

that the information sought was "obtained from a person," this Court need "not reach the

question whether such information is "privileged or confidential."  *Id*.

### III.   Unit Prices and Staffing Plans Are Not Confidential, Because Defendants Have Not Shown that the Detention Market is Competitive or that Disclosure Will Cause Substantial Competitive Harm.

#### (A)   The Government Fails to Demonstrate a Competitive Market.

Defendants fail to address crucial elements of Plaintiffs' argument that there is no

competitive market for detention services. First, they do not address the fact that the detention

market is a monopsony, with ICE as the sole buyer of immigration detention services. *See* Pls.

Br. at 16, 18. This fact alone demonstrates a lack of a competitive market:

> [D]istortions of the competitive market reinforce each other because government monopsony breeds contractor monopoly. . . Monopsony is not a problem when the government is one of many buyers, first, because the seller must produce a competitive product in order to retain its nongovernment sales, and second, because the nongovernment buyers set a market standard that the government can simply follow. However, when the government is the only buyer, which generally means that it is buying a specialized product, the market failure of monopsony arises.

Edward Rubin, *The Possibilities and Limitations of Privatization*,123 Harv. Law Rev. 870, 920-

21(2010). The detention market thus differs sharply from one in which government is among

many buyers of private products, as in *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303 (D.C. Cir. 1999), on which the Government almost exclusively relies (Dfs.' Br. 15, 20).    The Government's passing, conclusory reference to "vibrant competition among … private contractors," Dfs.' Br. at 13, thus misses the point:  *Price-competition* is not the same as *market competition*.  Even if rival suppliers compete on pricing in order to win ICE detention contacts, they are not bidding in an open, competitive market.  *See* Pls.' Br. at 16, citing *Raher,* 749 F. Supp. 2d at 1156-57 (where "BOP is the only customer in the relevant market," submission by a "small number of entities . . . does not establish competition in the relevant market.").

Second, the Defendants have not demonstrated the existence of a competitive market for all suppliers, and they omit crucial information that would allow the Court to evaluate their assertions. For example, the declaration provided by CCA admits that as many as 40% of CCA's contracts for both "corrections [and] detention services" were obtained via "non-competitive bids." Verhulst Decl. ¶ 4. Notably, CCA fails to include any statement regarding what proportion of DHS contracts for immigration detention contracts – as opposed to BOP contracts for corrections services – are competitively bid.  *See id*. It is thus impossible to determine, based on these declarations, whether ICE uses a competitive process to award the bulk of its contracts, and ICE has not otherwise met its burden to demonstrate that it does.

Even if the Court were to take the declarations at face value and grant that there may be some competition among suppliers for select, portable detention services such as food or transportation, the Court cannot do the same for CDF contracts or IGSA subcontracts, because both ICE the contractors themselves concede that competition is limited at best. For example, CCA concedes that CCA and GEO "are the only two companies that have been currently awarded CDF contracts." Verhulst Decl. ¶10, and provides no information about how CDF

contracts are bid.[5] ICE declarant Adams admits that the CDF market is limited, "as a contractor's ability to submit an offer for a CDF contract depend[s] on it having an available facility in the relevant geographic area." Adams Decl. ¶ 14. *See also* Venturella Decl. ¶ 28 ("[S]maller private companies do not have access to the capital needed to win a large facility."). Given these significant barriers to entry, ICE's contention that other contractors are not "excluded" from the market cannot be credited as evidence of competition, as the obstacles are so significant as to render real competition wholly speculative. A market for highly specialized, multi-faceted services with one buyer and two suppliers is not "competitive"; it is not even much of a market. For precisely these reasons, *Raher v. Bureau of Prisons*, 749 F. Supp. 2d 1148 (D. Or. 2010), which turned on the same facts presented here and involved the same companies – GEO and CCA – concluded that suppliers' pricing information should not be shielded from disclosure.

Indeed, the GEO Group admits that the process for awarding IGSA contracts is not "structured as a competitive procurement," and, while stating that IGSA subcontracts hypothetically "can be competitively bid," provides only two examples, one from 2003 and the other from 2007, in which such competitive bidding occurred, at least one of which is a corrections contract with the BOP, not a civil immigration contract with ICE. Venturella Decl. ¶ 23. Similarly, ICE's declaration regarding the procurement process for IGSAs only confirms the impression that serious competition is highly unlikely. While one ICE declarant puts forth the possibility that "the award of a new IGSA *could* result in the termination of another IGSA," or that "a city/county in partnership with an [*sic*] commercial entity *could* always build a new facility to compete against an IGSA in a nearby location," ICE provides no concrete example of

---

[5] ICE obscures this fact by claiming that additional contractors compete for CDF contracts, declining to mention that only the dominant contractors, CCA and GEO, actually win CDF contracts. *See* Adams Decl. ¶ 14.

this ever having happened. Adams Decl. ¶16 (emphasis added). These statements, untethered to present reality, form exactly the sort of "speculative opinion" that courts have found inadequate for purposes of summary judgment. *Scudder*, 25 F. Supp. 3d at 19.

The contractors' declarations are also patently insufficient with regard to competition for rebids, as their only evidence for competition in the contract renewal process is speculative. For example, CCA muses that "nothing prohibits ICE from submitting a CDF contract to re-competition instead of exercising an optional renewal," Verhulst Decl. ¶ 11, but fails to provide a single example of ICE having done so. Similarly, CCA speculates that ICE "could relocat[e] a population from a CCA facility to another facility rather than renewing a contract" but cites no specific time when such a costly and disruptive relocation ever occurred. Verhulst Decl. ¶ 14. Nor does ICE. *See generally* Adams Decl. Likewise, GEO's limited examples of actual competition during rebids involve either BOP facilities or an unusual ICE facility in Guantanamo Bay, Cuba. Venturella Decl. ¶ 21.  ICE fails altogether to discuss competition in the context of rebids for private services. *See generally* Adams Declaration.

In sum, neither the Government's nor the contractors' declarations overcome the uncontested facts in Plaintiffs' 56.1 statement, much less the conclusion of another government agency, the GAO, that the market for detention services is not competitive.  *See* Dfs.' Br. at 4 n. 7 (opining only that the GAO report does not "negate" the contractors' claims of competition). The existence of a competitive market is a subject of material dispute and thus precludes summary judgment for the Defendants.

**(B)     The Government Fails to Demonstrate that Disclosure of Unit Prices and Staffing Plans Will Cause Substantial Competitive Harm.**

Exemption 4 exists to protect private interests not from competition generally, but from "substantial competitive harm." Yet Defendants and their private contractors appear to believe

10

that participation in an open market, and the possibility that future competitors could join that market, constitutes "substantial competitive harm." But open, competitive markets will have winners and losers, and contrary to the contractors' suggestion, Exemption 4 cannot be used to protect contractors even from "acrimonious competition."  Venturella Decl. ¶ 32.  Rather, it exists to prevent contractors from the risk of being unfairly undercut by a rival.

Defendants have not shown that disclosure of unit prices and staffing plans poses any such risk. First, disclosure of all the contractors' pricing schemes does not expose one company's information to a rival, but rather places all the contractors on the same playing field. Second, the reverse engineering argument upon which the Government so heavily relies is based on speculative and conclusory statements, particularly with regard to the CDF and IGSA contracts; exposure of unit prices and staffing plans in other contexts have not resulted in the market collapse that some of the contractors predict.[6] Third, disclosure of historical contracts cannot be used to undercut contracts many years in the future.

1.    **There is No Competitive Harm Where All Contractors Disclose the Same Information, and Where Identical Information Is Already in the Public Domain.**

Where, as here, Plaintiffs seek the uniform disclosure of contract information across all suppliers of detention-related services to ICE, Defendants cannot establish the likelihood of substantial competitive harm, because all competitors will be subject to the same disclosure requirements. Thus, the impact of disclosure here differs markedly from that at issue in cases cited by the Government, where suppliers use FOIA to single out rival competitors for release of potentially sensitive financial information. Dfs.' Br. at 15-16, citing *McDonnell Douglas Corp. v.*

---

[6] Some contractors have suggested that disclosure of unit pricing and staffing plans will cause prison contractors simply to withdraw from this highly lucrative market. *See, e.g.*, Venturella Decl. ¶ 32. The idea that contractors would stop themselves from supplying detention services just as they won an ever-larger market share – and that these profitable companies would do so because the competition became too "acrimonious" – is, at best, implausible.

*NASA* 180 F.3d 303 (D.C. Cir. 1999) (company sought access to financial information provided by another NASA contractor); *Lion Raisins v. USDA,* 354 F.3d 1072, 1077-78 (9th Cir. 2004) (raisin producer made retaliatory FOIA requests for information about its competitors after it was suspended by Agriculture Department for falsifying records).[7] No competitive injury is likely where the requesters do not seek private entities' internal information, but the terms of awarded government contracts, with a uniform impact on all suppliers.

   Further, the Government's contention that disclosure would competitively harm *private* contractors ignores the fact that it already discloses precisely the same information in its contracts with *public* entities. Pls.' Br. at 22. Thus, upholding Exemption 4 here would produce an illogical double standard, rendering the terms of Government contracts with public entities transparent while private entities enjoy government secrecy. Placing private contractors on the same playing field as public ones does not subject private contractors to substantial competitive harm; it merely subjects them to the same rules with which local and state contractors already comply. Yet the private contractors are not satisfied with the substantial advantages they have over public contractors, in one instance complaining that local jails have "service offerings that are very attractive" and positing that "ongoing competition" with local jails who "approach ICE with proposals to house detainees" demonstrates "risk of competitive harm to ICA if its rates and financial information is [*sic*] disclosed." Harper Decl. ¶ 7. Contrary to Defendants' assertion, this scenario describes competition, not competitive harm. "The possibility that competition … may become tighter, while disfavored by plaintiff, does not constitute harm." *MTB Group v. United States*, 65 Fed Cl. 516, 531-32 (Fed. Cl. 2005) (rejecting challenge to federal auction procurement process where plaintiff could not identify how the process would "*improperly*

---

[7] *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor* does not address whether Exemption 4 applied, but only whether the Department of Labor was bound to issue a pre-disclosure notification pursuant to federal regulations. *See* 220 F.3d 153, 167-68 (3d. Cir. 2000) (citations omitted).

affect[] plaintiff's competition with fellow bidders") (emphasis supplied).

Notably, ICA admits that local jails are able to compete effectively with private contractors despite having their unit prices disclosed; it is clear that disclosure of the terms of public contractors' agreements with ICE does not result in the withdrawal of these entities from the market, as GEO baselessly speculates. *See* Venturella Decl. ¶¶ 28-30 (asserting that disclosure will cause local government entities to lose ICE contracts and eventually revenue bond financing, apparently unaware that ICE already discloses unit pricing of public entities with no such result). ICA and other contractors plainly are not worried that jails will undercut them unfairly, but rather that jails will be better able to compete if private contract terms are stripped of secrecy. While loss of a potential contract may be unpleasant for a contractor, it is part of competition, and it is not the equivalent of competitive harm. *MTB Group*, 65 Fed Cl. at 531.

Similarly, Defendants' concerns about the disclosure of staffing plans are misplaced, because at least one private contractor, CCA, has had its staffing plans disclosed, without any discernible damage to its competitive position. For example, in 2014, the publication Prison Legal News obtained five of CCA's staffing plans from three facilities contracted with Tennessee's Department of Correction within six weeks of filing a state Freedom of Information Law request. *See* Schwarz Reply Decl. Exhs. 13-15. Yet CCA continues to dominate the private prison market, and there is no indication that competitors have used these plans either to reverse-engineer CCA's pricing scheme or to undercut CCA's future bids. It is plain that the harms predicted in the contractors' declarations are unlikely to come to pass.

**2.    Defendants' Declarations are Insufficient to Demonstrate that Reverse-Engineering, Even if Possible, Will Result in Substantial Competitive Harm**

In erroneously claiming that disclosure of bed day-rates and staffing plans would enable the reverse-engineering of otherwise confidential financial information, the Government takes

for granted that such reverse-engineering would necessarily result in "substantial competitive harm" for the contractors. Dfs' Br. at 14. The Government is wrong on both counts.

First, it is not enough for the contractors to claim reverse-engineering is possible in the abstract. To put forth a credible claim that they will suffer substantial competitive harm via reverse-engineering, they must provide "evidentiary support and detailed analysis," including "an explanation in detail, by way of a number of examples, of the process through which a competitor having the information … could reverse-engineer the contractor's prices and costs and predict its bid on a future contract." *Raher*, 749 F. Supp. 2d at 1159. But of the four contractor declarations submitted by the government, three make no attempt to describe the process by which a competitor could use staffing plans or unit prices to "reverse engineer" proprietary information, and the fourth fails to explain why its hypothetical process would lead to competitive harm. *See* Verhulst Decl. ¶¶25-26 (stating, without evidence or analysis, only that "[r]elease of the pricing information. . . will permit a competitor access to information sufficient to reverse engineer CCA's pricing algorithm"); Venturella Decl. ¶ 24 (stating, without evidence or analysis, only that "if a competitor obtained GEO's bed-day rates and staffing plans, it could . . . reverse engineer GEO's cost and pricing structure and use this relative comparison to identify GEO's pricing model"); Harper Decl. ¶ 18 (stating, without any evidence or analysis, that "if the daily rates, or alternately [*sic*], days and line-items are disclosed, competing firms could analyze this data, 'reverse engineer,' and determine the negotiated rates.").[8]

These conclusory statements are insufficient to demonstrate competitive harm, because "[w]ithout evidence and an explanation of the process by which a competitor could use specific

---

[8] It is not surprising that the contractors cannot provide practical evidence of how reverse-engineering might occur, because the bed-day rate is an amalgam of "all daily operating costs of the facility, including personnel, food, health care, supplies, utilities, maintenance, infrastructure depreciation, cost of capital, overhead, and profit." Venturella Decl. ¶ 24.

information to gain such a competitive advantage . . . the alleged harm remains theoretical." *Raher*, 749 F. Supp. 2d at 1159. *See also Ctr. for Auto Safety*, 2015 WL 5726348 at \*10 (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir.1980)) ("Courts may not 'speculate as to whether [an] [e]xemption [ ] might, *under some possible congruence of circumstances not proven or even asserted* be properly applied.'") (emphasis added).

The remaining contractor declaration, submitted by Ronald Gates of APSS, cites a purportedly mathematical process by which reverse-engineering could theoretically occur, at least in the relatively simple context of an SPC contract for transportation or security services. But here too the claims are overbroad and speculative. First, APSS' theory is inapplicable to most ICE contracts, because SPC contracts lack the other variables involved in the "daily operation of a facility" such as a CDF or IGSA contracts for full operation of a facility. Venturella Decl. ¶ 24.  Indeed, given the few variables involved in APSS' contracts, it is unclear why reverse-engineering is even necessary for a competitor to devise a means of submitting a competitive bid in the case of SPCs. It does not take a sophisticated algorithm to understand that, with wage rates set by the Department of Labor or a collective bargaining agreement, a contractor's pricing strategy depends on having as few employees on staff and earning overtime as possible, Second, even if APSS' theory of reverse-engineering had wider application, APSS offers no evidence that "competitive harm would be imminent," the standard in the Second Circuit. *Bloomberg*, 649 F. Supp. 2d. at 279, *aff'd*, 601 F.3d 143 (2d Cir. 2010).

This is because "competitive harm is 'limited to harm flowing from the affirmative use of proprietary information by competitors.'" *Fox News Network,* 739 F. Supp. 2d at 565, (internal citations omitted). Indeed, courts require agencies to disclose information under Exemption 4's competitive harm prong unless they are able to demonstrate that release of the information would

be of substantial assistance to competitors in estimating and undercutting a bidder's future bids. "Merely conclusory allegations of competitive harm, even if repeated numerous times, are not sufficient." *Ctr. for Auto Safety*, 2015 WL 5726348 at *15(collecting cases).

Here, Defendants cannot show imminent or substantial competitive harm, both because considerations other than price influence ICE's calculus, and because price itself is affected by other fluctuating variables, such as the location of the detention facility, and the desirability of consistency in prison operations among others. *See* Pls.'Br. at 20. Thus, a hypothetical reverse-engineering process provides no indication that competitors can predict and undercut a rival's bids in a market where prices depend on multiple, fluctuating variables. Indeed, the fact that pricing schemes in local and state contracts are disclosed, Pls. 56.1 at ¶ 25, but these public entities continue to provide detention services, demonstrates that the ability to see unit pricing does not lead to the bid undercutting by competitors such as CCA, GEO, APSS, or ICA.

Furthermore, even if Defendants could show imminent competitive harm for current contracts, they could not for the contracts that are the subject of the current litigation. The six representative contracts agreed upon for purposes of this litigation each concluded between five and seven years ago, and any contracts that Defendants may produce through this litigation are necessarily a year or more old. Yet beyond a footnote in the government's brief asserting, without analysis, that other cases are distinguishable based on the type of information sought, neither Defendants nor the contractors attempt to explain "how the release of old information could possibly be used by competitors affirmatively to harm the companies today at all, let alone substantially." *Ctr. for Auto Safety*, 2015 WL 5726348 at *16. This is plainly insufficient to demonstrate that disclosure of outdated contract terms are likely to cause imminent, substantial competitive harm. *Lee v. FDIC*, 923 F. Supp. 451, 455 (S.D.N.Y 1996).

In sum, even if Defendants can show beyond material dispute that a competitive market exists, they have not shown that they face substantial competitive harm should private contractors' unit prices and staffing plans be disclosed. At most, all that the disclosure will do is put private contractors closer to a level playing field with the local and state entities they consider their competitors, as ICE does not invoke Exemption 4 to protect unit prices in public contracts. Private contractors, unlike state and local contractors, currently enjoy the benefits of ICE's sheltering their unit prices and staffing plans from public view; removal of those benefits, if it has any effect at all, does not amount to substantial competitive harm.

**IV**. **Exemption 7(E) Does Not Apply to Detention Facilities' Staffing Plans**

Despite months of negotiation between the parties over the disclosure of contract terms, Defendants chose to invoke Exemption 7(E) to protect staffing plans for the very first time in cross-motion papers on summary judgment, providing no notice to the Court or to Plaintiffs even as it sought declarations from private contractors to support this claimed exemption. Unsurprisingly, the Government's eleventh-hour invocation of Exemption 7(E) paints an alarming if misleading picture of what would follow if the Court rules in favor of Plaintiffs.

The Government's *Vaughn* index claims that revelation of the numbers of staff present in various positions in detention facilities "would disclose law enforcement techniques or procedures, the disclosure of which could reasonably be expected to risk circumvention of the law."[9] Pineiro Decl. Exh. 1. Defendants' declarations go even further, speculating ominously that detention facilities could be "overrun" if the Court orders disclosure. Pineiro Decl. ¶ 30. But fear-mongering is not a shortcut to establishing entitlement to Exemption 7(E), which provides

---

[9] The *Vaughn* index misstates the law. Exemption 7(E) does not protect all "techniques and procedures," but only those used "*for law enforcement investigations and prosecutions*." 5 U.S.C. § 552(b)(7)(E) (emphasis added). *See Allard Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010).

no basis for keeping private contractors' staffing plans secret.

Plaintiffs cross-move for summary judgment that Defendants have improperly withheld staffing plans pursuant to Exemption 7(E) on two grounds: First, Defendants cannot establish that staffing plans are "compiled for a law enforcement purpose" or will disclose "techniques and procedures for law enforcement investigation and prosecutions." 5 U.S.C. §552 (b)(7)(E); and second, private staffing plans have been made public in other contexts – with none of the security consequences about which the government so dramatically warns – and therefore the government cannot demonstrate that the information it seeks to shield is unknown to the public.

**(A)      Staffing plans are not documents "compiled for a law enforcement purpose."**

The government bears the burden of showing that the information it seeks to shield was "compiled for a law enforcement purpose" under Exemption 7. While the Second Circuit "has not elucidated precisely what constitutes 'law enforcement purposes,'" *Families for Freedom v. C.B.P.*, 837 F. Supp. 2d 287, 294 (S.D.N.Y. 2011), the D.C. Circuit has articulated a two-part test: "'the investigatory activity that gave rise to the documents is related to the enforcement of federal laws, *and* there is a rational nexus between the investigation at issue and the agency's law enforcement duties.'" *Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 146 (D.D.C. 2011), quoting *Jefferson v. U.S. Dep't of Justice, Office of Professional Responsibility*, 284 F.3d 172, 177 (D.C. Cir. 2002).  The information in the staffing plans does not meet this test.

The Government formulaically claims that information in detention-facility staffing plans "is collected and used by ICE to assist in its mission of arresting and detaining certain aliens," Pineiro Decl. ¶ 27.  But conclusory statements are insufficient to show that the information was compiled for a law enforcement *purpose*. Without more, "status as a law enforcement agency responsible for the welfare of inmates in its custody, its staff and the public at large," does not

establish that any records compiled are for a law enforcement purpose. *Id*. at 146-47 (recordings of inmate telephone conversations not compiled for a law enforcement purpose). *See also Maydak v. U.S. Dep't of Justice*, 362 F. Supp. 2d 316, 321-24 (D.D.C. 2005) (records of inmate recreation, staff names/titles, and inmate profiles not compiled for a law enforcement purpose). Instead, the government must show not only that the investigatory activity within the documents relates to the enforcement of federal laws, but also that it demonstrates a rational nexus between the investigation and the agency's law enforcement duties. *Jefferson*, 284 F.3d at 177. This it cannot do, because staffing numbers do not reveal or relate to investigatory activity. *See* Pineiro Decl. ¶ 17 ("A staffing plan is a document . . . that illustrates how many personnel are used at a detention facility where ICE detainees are held, how many personnel are on duty at any given time, and how and where personnel are posted inside the detention facility.").

The distinction between what information is – and is not – compiled for law enforcement purposes is all the more important with mixed-function agencies, like ICE, that perform both administrative and law enforcement duties. *See Raher*, 2011 U.S. Dist. LEXIS 56211 at *22 (D. Or. May 24, 2011) (BOP "has both administrative and law enforcement functions and, thus, must demonstrate that each withheld document was compiled for law enforcement purposes."). Law enforcement duties, which may be entitled to Exemption 7(E) protection, relate specifically to "apprehension, crime detection, or crime prevention" within the facility. *Raher,* 2011 U.S. Dist. LEXIS 56211 at *22. In contrast, "oversight of the performance of duties by [] employees" is a quintessentially administrative task, not one of law enforcement. *Jefferson*, 284 F.3d at 177.

Staffing plans are "quintessentially administrative." *Id*. The Government's own declarations bear this out: they are plainly created to meet administrative standards set by the ERO, a branch of ICE responsible for "all logistical aspects" of detention and removal. Piniero ¶

25. And as ICE states, these records contain "operational information" identifying staffing numbers and assignments as well as general instructions to respond to "normal and emergency situations." Verhulst Decl. ¶ 19; Pineiro Decl ¶ 29.  In addition, these plans include numbers of staff providing medical care, food service, and recreation supervision.  *See, e.g.,* Exh. 2, 7-9 (listing job titles in staffing plans); *see also* Schwarz Reply Decl. Exh. 13-15 (CCA staffing plan). Thus staffing plans relate only to the performance of duties by employees – reflecting policies aimed at facilitating the smooth day-to-day running of the agency's custodial duties – but have nothing whatsoever to do with the detection or apprehension of individuals committing crimes or breaching facility security. Staffing plans thus do not fall within Exemption 7.

**(B)     Staffing plans do not constitute "techniques and procedures for law enforcement investigations" shielded under Subsection 7(E).**

To invoke Exemption 7(E), the government must also demonstrate that the records also reveal "techniques and procedures for law enforcement investigations." 5 U.S.C. § 552 (b)(7)(E); The Second Circuit has defined "techniques and procedures" as referring to "how law enforcement officials go about investigating a crime." *Allard K. Lowenstein* , 626 F.3d at 682 (2d Cir. 2010). The information contained in the staffing plans, consisting of staff assignments to various positions including food service and medical care, does not fit within this definition.

Nowhere does the government identify a case where a court found the number of staff hired or assigned to detention or prison facilities to qualify as a "technique or procedure for law enforcement investigations or prosecutions." Instead, the government relies on inapposite cases involving the clearly investigatory technique of surveillance. *See* Dfs.' Br. at 27, citing *Labow v. DOJ*, 66 F. Supp. 3d 104, 127-28 (shielding circumstances of targeted FBI surveillance of a suspected domestic terror incident); *Council on American-Islamic Rels., California v. FBI*, 749 F. Supp. 2d 1104 (S.D. Ca. 2011) (no challenge to investigative nature of FBI surveillance

information.). That Defendants fail to cite cases on point is unsurprising, as the numbers of security, food service, or medical personnel have nothing to do with investigative techniques.

Rather than addressing this central failing in its argument, the government declarations instead trots out a parade of hypothetical disasters waiting to unfold should the staffing plans be disclosed. One ICE declarant claims that release of information – including the numbers of medical or chaplain service staff – could make facilities "vulnerable" to efforts to avoid detection when organizing an escape or disturbance," or permit "those seeking to gain unauthorized entry …. to overrun" the facility. Pineiro Decl. ¶ 30. But the possibility of a rare internal disturbance does not transform banal information like the number of food service workers on a shift into a sensitive investigatory technique. As for the possibility that disclosure could lead to a detention center being "overrun" from the outside, the Court should dismiss such speculative hyperbole outright, particularly when unsupported by a single example and where not even a tenuous link between staffing plans and investigative techniques is in the record.

**(C)     The information requested is already known to the public.**

Lastly, if security issues are implicated here at all – which they are not – the Government concedes that relevant information is already in the public domain. According to the government, the public already knows "that detention facilities housing ICE detainees employ personnel to operate and maintain the security of those facilities. Dfs.' Br. at 27, citing Pineiro Decl. ¶ 32. That is a material admission: there is no protection under Exemption 7 for "routine techniques or procedures which are generally known outside the Government." *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 780 (S.D.N.Y. 1979) (*citing* H.R.Conf.Rep.No.93-1380, 93d Cong., 2d Sess. (1974)). This rule applies when equivalent information, with the same level of specificity, has already been disclosed by another agency. *See Am. Civil Liberties Union Found. v. U.S. Dep't of*

*Justice*, No. 12 CIV. 7412 WHP, 2014 WL 956303, at *7 (S.D.N.Y. Mar. 11, 2014) (ordering disclosure of "sensitive" GPS tracking techniques because they had been disclosed in litigation by the DEA, and thus became available to the public.)

Further, the information available to the public is more than general. First, the number, type, and schedule of detention staff are readily observable to individuals in detention and visitors to the facilities. Second, corrections agencies – which arguably have stronger security concerns than civil immigration detention facilities  – have revealed full staffing plans, including staffing per shift, for CCA-operated facilities, listing not only medical staff, chaplains, and recreation supervisors, but also security and transport staff. Schwarz Reply Decl. Exhs. 13-15. Yet the security collapses imagined by the Government have not transpired. There is no real-world evidence that disclosure of staffing levels of security or transportation staff, much less medical, food service, or chaplain services, would compromise the facility's underlying security strategy, much less provide information about law enforcement techniques or procedures.

In sum, the Government cannot show that Exemption 7(E) applies to staffing plans or that the numbers of staff reflected in those plans constitute "techniques and procedures for investigations and prosecutions." But even if the Court were to find that Exemption 7(E) protects security and transportation staffing levels from disclosure, there is no basis to do so for non-security, non-transportation services such as medical, food, and social services.  ICE and its contractors may well prefer to conceal the staffing levels of its medical clinic or recreational staff for their own purposes; Exemption 7(E), however, provides no justification for them to do so.

## CONCLUSION

For all these reasons, the Court should grant summary judgment to the Plaintiffs and order disclosure of unit prices, bed-day rates and staffing plans.

Dated: January 19, 2016

Respectfully submitted,

_____

GHITA SCHWARZ
OMAR FARAH
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel.: (212) 614-6445
Fax:  (212) 614-6422
gschwarz@ccrjustice.org


JENNY-BROOKE CONDON
Center for Social Justice
Seton Hall Law School
833 McCarter Highway
Newark, New Jersey 07102
(973) 642-8700
Jenny-Brooke.Condon@shu.edu