UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DETENTION WATCH NETWORK and CENTER FOR CONSTITUTIONAL RIGHTS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | 14 Civ. 583 (LGS) <br><br> **DECLARATION OF STEVEN CONRY** |

I, Steven Conry, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am employed by Corrections Corporation of America ("CCA") as Vice President, Facility Operations, Business Unit 3, which is comprised of Divisions V and VI and includes oversight of 7 ICE detention facilities. I submit this declaration based on my personal knowledge to protect the redactions of certain information from CCA's contracts with U.S. Immigration and Customs Enforcement ("ICE"), including bed-day rates and staffing plans, and to supplement the information provided in the Declaration of Bart Verhulst of CCA.

2. I have worked in the corrections field for 33 years, including 23 years with the New York City Department of Corrections, serving the last four years as Chief of Facility Operations. I started my career as a correctional officer and served in many other leadership roles, including Warden, Assistant Divisional Chief, Chief of Management and Planning, and Chief of Security. I have a Bachelor's Degree in Public Management

and a Master's Degree in Public Administration from John Jay College of Criminal Justice. Throughout my experience in the corrections and detentions industry, I have toured and inspected more than 100 correctional facilities throughout the United States.

3. I have extensive experience in both the immediate and overall supervision and operation of secure detention and correctional facilities on all shifts and in managing populations from a variety of jurisdictions (including state and federal), including management of a range of general population and segregation security classifications as well as oversight detention facilities housing ICE detainees. In addition, I am also familiar with CCA's process for procuring and maintaining government contracts as well as development of facility staffing plans, including the safety and security concerns resulting from public disclosure of CCA Staffing Plans.

4. The safety and security of detention facility personnel, facility detainee/inmate population, and the public (including members of the public who may visit the facility, law enforcement and emergency responders, and the public at large should a detainee/inmate escape from the facility) is of paramount concern when dealing with these types of facilities.

5. Inherent in the reality of operating safe and secure detention and correctional facilities is the required constant monitoring of detainee/inmate behavior to prevent misconduct; disorder/disruption to facility operations; threats to detainees/ inmates and facility personnel physical wellbeing; actual injury to detainees/inmates, facility personnel and the public; hostage taking; introduction of contraband; and escape.

6. Operating detention facilities that house immigration detainees is no different than managing incarcerated populations when it comes to operating a secure facility to maintain safety and security. A significant percentage of immigration detainee populations are comprised of detainees who have completed criminal sentences and are awaiting possible deportation. Thus, the same safety and security challenges inherent in operating prison facilities are faced in operating immigration detention facilities. Most of CCA's ICE facilities hold detainees whom the federal government classifies as Level 3 or "high" custody, meaning that the detainees, because of, for example, their criminal history and/or institutional behavior, present a high safety and security risk, including as substantial threat to the physical wellbeing of facility staff, the detainee/inmate population and/or the public (for example, escape risk).

7. CCA utilizes proprietary and confidential information to create Staffing Plans that set out the amount of personnel it understands are needed to provide a safe and secure facility for the public, staff and detainees/inmates. While each CCA facility has a somewhat different physical plant, programming and services mission, and set of custody classifications, all CCA Staffing Plans are based on certain core elements, which include, by shift designation, the number and location of posted security and medical staff that are necessary to the safe and secure operation of a detention/prison facility — general position, staffing numbers and locations that can be easily extrapolated by the public and the detainee/inmate population to determine when, where and how a facility may be staffed on any shift, at any location.

8. The public disclosure of any CCA Staffing Plan could reasonably be expected to risk the physical wellbeing and life of individuals, including detainees/inmates housed at CCA facilities, facility personnel, facility visitors, law enforcement and emergency responders to the facility, and the general public in the circumstance of escape.

9. Specifically, the Staffing Plan attached to Sample Contract Document 4 reveals how many management/support, security/operations, unit management, maintenance, services, programs, health services, and education personnel are on duty at the facility 24 hours a day, 7 days a week, broken down by shift. The Staffing Plan further reveals specific information indicating where personnel are posted at critical locations within the detention/correctional facility to include staffing by number of days per week and number of posts per shift for CCA facility entrances, administration buildings, administrative offices, visitation facilities, facility perimeters, armories, central control, housing unit control, housing pod control, detainee/inmate housing units/pods, recreation yards, vehicle sally ports, transportation services, dining halls, facility kitchens, medical departments, and programming buildings/offices. The Staffing Plan also discloses how many inmates are housed in each living unit and how many security personnel are assigned to the unit on a per-day and per-shift basis.

10. Disclosure of Staffing Plans would allow the public and detainee/inmate populations to determine how many days a week and on which shifts critical command and emergency response personnel will be present at the detention facility to include staffing for warden, assistant warden, chief of security, chief of unit management,

4

assistant chief of security, STG (Security Threat Groups) officer, shift supervisors, armory officers, k-9 officers, perimeter patrol officers, central control officers, search & escort officers, and unit manager positions — personnel most critical for coordinating response and management of critical incidents. The disclosure of the Staffing Plan would also allow persons to determine the specific schedule and staffing of nurses, physician's assistants and physicians, and thus determine the facility's overall capacity to respond (or not respond) to medical emergencies in cases of staff assaults, inmate assaults or large scale facility disturbances.

11. Release of facility Staffing Plan information to the general public and thus to the detainee/inmate population poses a substantial and genuine risk to the safe and orderly operation of CCA's detention and correctional facilities.

12. For legitimate safety and security reasons that are obvious and widely accepted in the detention/corrections industry, neither the public nor the detainees/inmates are privy to written plans on facility staffing. While detainees/inmates may be able to personally observe and study staffing for the particular housing unit they live in, such information is discernable only for the area in which the specific detainee/inmate resides, and such observations would not provide them with access to the overall facility staffing levels and locations that include specified facility shifts, numbers of specified personnel posted per shift and coverage days for critical safety, security and medical staff to include facility command/management personnel, medical personnel, control personnel, perimeter personnel, etc.

13. Based upon my more than 30 years of experience in corrections, it is both my experience and my professional opinion that detainees/inmates may plan, orchestrate, and carry out any number of major incidents that pose a substantial risk of harm and injury to another person during times that staffing of a particular location may be most vulnerable.

14. Detainees/inmates may attempt — and succeed — to carry out major incidents undetected by facility personnel to include introduction of dangerous contraband (drugs, weapons, cell phones, escape materials) into a facility (or transferred within the facility) through visitation, materials deliveries, smuggling onto recreation yards or through facility perimeters, and detainee/inmate-to-detainee/inmate transfer if the detainee/inmate population (and the smuggling accomplices from the public) knew when, where, and how many facility personnel are on duty based upon public access to a Staffing Plan.

15. Additionally, public disclosure of Staffing Plans would allow the public and detainee/inmate populations to determine (and thus potentially successfully plan for) when a facility may be most vulnerable in its ability to respond to and quell any number of high-risk detainee/inmate-initiated incidents to include: introduction/transfer of contraband to include weapons and drugs, unauthorized entries into a facility, hostage taking, inmate assaults/homicides, staff assaults/homicides, group disturbances, riots, and escapes — thus seriously compromising the safe and secure operation of CCA detention and correctional facilities.

16.     The fact that the Tennessee Department of Corrections has apparently disclosed a few security-sensitive Staffing Patterns pertaining to only three facilities does not obviate the substantial threat to all CCA facilities if the public and detainees/inmates were to use Staffing Plans for certain facilities to plan, attempt or succeed in carrying out introduction/transfer of contraband to include weapons and drugs, unauthorized entries into a facility, hostage taking, inmate assaults/homicides, staff assaults/homicides, group disturbances, riots, and escapes at CCA facilities.

17.     In sum, providing the public and thus detainees/inmates with access to Staffing Plans would allow detainees/inmates detained/incarcerated at CCA facilities across the country to determine when it is least likely that they will encounter facility personnel in carrying out the above major incidents that pose a substantial risk of harm to the life and/or physical safety of the detainee/inmate population, facility personnel, responding outside law enforcement and emergency personnel and the public.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of February, 2016 in Nashville, Tennessee.

_____
Steven Conry
Vice President, Facility Operations, Business Unit 3,
Divisions V & VI
Corrections Corporation of America