```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
DETENTION WATCH NETWORK, et al.,                              :
                                        Plaintiffs,           :
                                                              :        14 Civ. 583 (LGS)
            -against-                                         :
                                                              :        OPINION AND ORDER
                                                              :
UNITED STATES IMMIGRATION AND                                 :
CUSTOMS ENFORCEMENT, et al.,                                  :
                                        Defendants.           :
                                                              :
------------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

      This Opinion address cross motions for partial summary judgment in a Freedom of Information Act ("FOIA") action, 5 U.S.C. § 552, *et seq*. Plaintiffs, the Detention Watch Network and the Center for Constitutional Rights, move for partial summary judgment seeking the release of documents and information showing unit prices, bed-day rates and staffing plans in government contracts with private detention facility contractors. Defendants, the United States Immigration and Customs Enforcement ("ICE") and the Department of Homeland Security ("DHS"), cross-move for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, asserting that the information is properly withheld under FOIA pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4") and 5 U.S.C. § 552(b)(7)(E) ("Exemption 7(E)"). For the reasons stated below, Plaintiffs' motion for partial summary judgment is granted. Exemptions 4 and 7(E) do not apply to unit prices, bed-day rates and staffing plans, and the information must be produced. Defendants' cross-motion is denied.

I.    **BACKGROUND**

      A.  **The FOIA Request and "Unit Prices," "Bed Day Rates" and "Staffing Plans"**

      Plaintiffs submitted a FOIA request to DHS and ICE on November 25, 2013, seeking a

range of records related to the "Detention Bed Mandate," which the Plaintiffs define as a policy, since 2007, of maintaining a certain numerical level of detention. The records sought include executed agreements and contract renewals between ICE or DHS and private companies regarding detention facilities or detention beds. Since at least 2009, Congress has appropriated money to ICE conditioned on maintaining 34,000 detention beds per day. The Detention Bed Mandate has been the subject of significant public attention, including legislative efforts to eliminate the mandate. Plaintiffs, a non-profit, public interest legal organization, and a national coalition of organizations and individuals working exclusively on detention and deportation issues, sought the records noting that the public concern about the Detention Bed Mandate has focused on the profits accruing to private prison corporations and the financial incentives that the Detention Bed Mandate creates for ICE to detain an increased number of non-citizens and suspected non-citizens.

The issue on these summary judgment motions is whether the Government may withhold information showing unit prices, "bed-day rates" and "staffing plans" in government contracts with private detention facility contractors. Contracts between private contractors and ICE contain the contractors' pricing and staffing information for the services to be provided. The pricing can be provided as a fixed monthly amount based on housing an anticipated number of detainees, or as a "bed-day rate," representing the contractor's full cost of operating the facility divided by an expected number of detainees to be housed and the number of days, to arrive at a per-detainee, per-day rate. Many contracts also include staffing plans, which detail the number of personnel working at a particular detention facility, the number of personnel assigned by shift, and how and where the personnel are posted within the facility. ICE has redacted the bed-day rates and fixed

monthly rates from the contracts under Exemption 4, and has redacted the staffing plans under Exemptions 4 and 7(E) of FOIA. Plaintiffs challenge those redactions.

### B. Relevant Procedural History

On January 30, 2014, Plaintiffs filed the Complaint in the instant action, and on February 11, 2014, a motion for preliminary injunction to compel DHS and ICE to search for and produce documents responsive to Plaintiffs' FOIA request. At the time the Complaint and motion were filed, DHS and ICE had not produced any documents. By Order dated May 16, 2014, ICE and DHS were directed to produce the requested documents on a rolling basis. By Order dated July 3, 2014, ICE and DHS were required to meet monthly quotas in their document production.

When ICE produced contracts that ICE had executed with local governments and private contractors for the operation of immigration detention facilities, some information -- including terms about unit prices, bed-day rates, and staffing plans -- was withheld pursuant to FOIA Exemption 4, which protects commercial information that is privileged or confidential and obtained from a person. After Plaintiffs objected to the redactions, ICE conceded that it had improperly applied Exemption 4 to unit prices in contracts with public entities. Regarding contracts with private entities, ICE stated that it would obtain input from private contractors pursuant to DHS FOIA regulation 6 C.F.R. § 5.8 in deciding whether to release similar information from contracts with private contractors. ICE later informed Plaintiffs, in June 2016, that it would continue to invoke Exemption 4 to withhold unit pricing, bed-day rates, and staffing plans for private contracts.

Plaintiffs challenged these redactions and the parties negotiated a representative sample of documents relating to six contracts to be used for the present motions for partial summary judgment. The Government prepared a *Vaughn* index describing the agency's rationale for the

assertion of FOIA exemptions regarding those contracts, with the understanding that a ruling would apply to similar redactions in contracts that ICE has produced or will produce in connection with this litigation and other documents containing the same information. *See Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973) (requiring the Government to produce an itemized and indexed document outlining the Government's justification for asserting FOIA exemptions).

## II. LEGAL STANDARD

FOIA was enacted in 1966 to ensure public access to information by creating a judicially enforceable public right to obtain information from government agencies. *See Milner v. Dep't of Navy*, 562 U.S. 562, 565 ("Congress enacted FOIA to overhaul the public-disclosure section of the Administrative procedures Act . . . [which had] gradually become more 'a withholding statue than a disclosure statute.'") (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973)). By granting access to such information, the Act sought to promote "an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency vs. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). "Congress enacted FOIA 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 173 (2d Cir. 2014) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

At the same time, "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information . . . ." *John Doe Agency*, 493 U.S. at 152. Therefore, while FOIA "strongly favors a policy of disclosure," an agency may withhold a record that falls into one or more of the statutorily enumerated exemptions. *Long v. Office of*

*Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012).  Congress established nine exemptions in order "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy."  *John Doe Agency*, 493 U.S. at 152.

In interpreting these exemptions, courts have advised that the exemptions should be "given a narrow compass."  *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)); *see also Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) ("The Supreme Court has counseled that these exceptions are to be interpreted narrowly in the face of the overriding legislative intention to make records public.").

Challenges to a government agency's response are usually resolved at summary judgment in FOIA actions.  *See, e.g.*, *Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).  Summary judgement is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In order to prevail on a motion for summary judgment in a FOIA case, "the defending agency has the burden of showing . . . that any withheld documents fall within an exemption to the FOIA."  *Carney,* 19 F.3d at 812.  "Affidavits or declarations … giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009) (quoting *Carney*, 19 F.3d at 812).

A district court reviewing the government's assertion of exemptions and decision to withhold documents reviews the decision *de novo*.  *Main Street Legal Services, Inc. v. National Sec. Council*, 811 F.3d 542, 544 (2d Cir. 2016).  "The agency's decision that the information is

exempt from disclosure receives no deference. . . ." *Bloomberg*, 601 F.3d at 147.

## III. DISCUSSION

The Government invokes FOIA Exemptions 4 and 7(E) in withholding information regarding unit pricing, bed-day rates, and staffing plans, and Exemption 7(E) as an additional ground to withhold staffing plans. Neither exemption applies.

### A. Exemption 4

For Exemption 4 to apply, "(1)[t]he information . . . must be a 'trade secret[]' or 'commercial or financial' in character; (2) it must be 'obtained from a person,' and (3) it must be 'privileged or confidential.'" *Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996); *accord Inner City Press/Cmty. on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006), 5 U.S.C. § 552(b)(4). Defendants have not met their burden of showing that bed-day rates, unit prices and staffing plans contained in ICE contracts with private companies (1) were "obtained from a person" and (2) are confidential.

#### 1. The Information is "Commercial or Financial"

For the first prong of the test, "[t]o qualify for the exemption, information itself must in some fashion be commercial or financial in nature or use." *Intellectual Property Watch v. U.S. Trade Representative*, No. 13 Civ. 8955, 2015 WL 5698015, at *13 (S.D.N.Y. Sept. 25, 2015). Although the terms "commercial" and financial" have not been precisely defined by the Second Circuit, *see Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (defining "commercial" as "pertaining or relating to or dealing with commerce"), commercial includes at least information that has "commercial value," that would "jeopardize [] commercial interests or reveal information about [] ongoing operations." *N.Y. Pub. Interest Research Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 334 (S.D.N.Y. 2003). The parties do not dispute that unit prices, bed-day

rates, and staffing plans are commercial or financial in nature.

### 2. The Information Was Not "Obtained from a Person"

Defendants have not met their burden of showing that the information at issue was "obtained from a person." The statute makes clear that a "'person' includes an individual, partnership, corporation, association, or public or private organization," 5 U.S.C. § 551(2); a person does not include a government agency. Exemption 4 protects information and data only if it was not "generated within the Government." *Bloomberg*, 601 F.3d at 148 (citing *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006) ("Unlike many other types of information subject to an agency's control, materials implicating Exemption 4 are generally not developed within the agency.")).

In *Bloomberg,* the Board of Governors of the Federal Reserve System, a federal government agency, sought to withhold information about loans that the Federal Reserve Banks made to private banks under Exemption 4. *Id*. The Second Circuit held that the agency could not withhold the information because "the fact of the loan (and its terms) cannot be said to be 'obtained from' the borrower . . . . [and] [t]he fact that information *about* an individual can sometimes be inferred from information *generated within an agency* does not mean that such information was *obtained from* that person within the meaning of FOIA." *Id*. (emphasis in original). The Second Circuit noted that while some courts "have extended the protection of Exemption 4 to information beyond the raw data gathered from persons by the government," these cases did not bear on cases "where what is requested is not merely the information collected and slightly reprocessed by the government, but disclosure of the *agency's own executive action*s." *Id*. at 148-49 (emphasis added). The *Bloomberg* court noted that while a completed loan *application* is "obtained" from an individual, the final loan terms, even where "disclosure of

loan terms allows one to back into information about the borrower," are not "obtained from" an individual. *Id*. at 148. The Second Circuit therefore held that certain terms of the loan agreements between the Federal Reserve and private banks contained in reports -- the identity of the borrower, the dollar amount of the loan, the loan origination and maturity dates, and the collateral securing the loan -- were not protected under Exemption 4.

Here, bed-day rates, unit pricing and staffing plans included in final government contracts are like the terms of the loan agreements that the Second Circuit held were not exempt from disclosure in *Bloomberg*. The Government is incorrect in asserting that, because the unit pricing was submitted in the contractor's initial bids, it is "obtained from a person." In *Bloomberg*, the borrowers presumably proposed the loan amount and collateral in their loan applications, just as the private contractors here proposed pricing and staffing parameters. Yet, that information was not protected. In *Bloomberg*, the Second Circuit distinguished between a FOIA request for the application (or bid) made by the Government's counterparty, which is information "obtained from a person," and other documents reflecting the ultimate contractual terms, which are not "obtained from a person." *Id*. (Plaintiff's "FOIA request does not seek loan applications; it seeks documents that show what loans the Federal Reserve Banks actually made . . . . [T]he fact of the loan (and its terms) cannot be said to be 'obtained from' the borrower . . . ."). Plaintiffs do not seek the initial bid documents, they seek documents that show the ultimate terms of the government contracts, including the contracts themselves. The terms of those contracts are not "obtained from" the contractors. *See id*.

Also, as a factual matter the Government is incorrect that pricing and staffing terms in the contracts were "obtained from" the private contractors and simply incorporated into the final contracts. Declarations in the record confirm that these rates were negotiated and agreed on by

the Government, as one would expect in an arms-length transaction.  James Adams, an Assistant Director in the Office of Acquisition Management at ICE, states, "The bed-day rates included in the contract are those submitted in the successful contractor's final offer and as agreed by the Government" and "staffing plans proposed in either case may be accepted by ICE as is or modified during negotiations."  Adams Decl. ¶¶ 18, 19.  David Venturella, a Senior Vice President at one of the private contractors states, "The bed-day rates and staffing plans contained in the contractor's proposal or bid are incorporated into the final contract, unless they are revised as a result of subsequent negotiations with ICE."  Venturella Decl. ¶ 13.  Russell Harper, the CEO of another private contractor states, "The bed day rate number . . . is based on a daily rate as negotiated between ICE and ICA [Immigration Centers of America] . . . . [t]he bed day rate is proposed by ICA each year, and then ICE and ICA enter into negotiations on the rate."  Harper Decl. ¶ 8.  Even if the bed-day rates and unit prices were not negotiated but merely adopted, akin to the Government's argument in *Bloomberg*, 601 F.3d at 149, that the loans were granted automatically, the contracts and their terms did not come into existence until each party to the contract -- the private party and the Government -- took "executive action" to enter into the contract.  Because the bed-day rates, unit pricing and staffing plans contained in the contracts were not "obtained from a person," Exemption 4 does not apply.

### 3. The Information is Not "Confidential"

The requested information fails to qualify for Exemption 4 for the independent reason that it is not "confidential" under the third prong of the test.  A two-part test applies in determining whether information is "confidential" for the purpose of Exemption 4:  disclosure must have the effect "(1) of impairing the government's ability to obtain information -- necessary information -- in the future, or (2) of causing substantial harm to the competitive position of the person from

whom the information was obtained." *Inner City Press/Community on the Move*, 463 F.3d at 244. "To meet that standard, it is not enough for a corporation to state that it 'would prefer that [its] information be kept confidential.'" *Natural Resources Def. Council v. U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 401 (S.D.N.Y. 2014) (internal citations omitted). "Conclusory and generalized allegations of substantial competitive harm, of course, are unacceptable and cannot support an agency's decision to withhold requested documents." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983). "[T]he government retains the burden of persuasion that information is not subject to disclosure under FOIA . . . ." *Inner City Press/Community on the Move,* 463 F.3d at 245.

Here, the Government does not argue that the disclosure will impair ICE's ability to obtain information in the future, but instead maintains that release of the bed-day rates, unit prices and staffing plans contained in contracts will cause substantial competitive harm to the contractors. According to the Government, disclosure of the bed-day rates and unit pricing will allow competitors to "reverse-engineer the contractor's pricing strategies . . . . [which] in turn would enable the competitors to underbid the contractor in future bids, causing clear competitive harm." Def. Br. at 14.

Merely showing that competition exists or that contractors may face greater competition is inadequate to show that the information is confidential. "To establish competitive harm, the Government must show that 'the person who submitted the information faces both (1) actual competition and (2) a likelihood of 'substantial' competitive injury if the information were released." *Nat'l Resources Def. Council*, 36 F. Supp. 3d at 402 (quoting *Inner City Press v. Bd. of Governors*, 380 F. Supp. 2d 211, 219 (S.D.N.Y. 2005), *aff'd* 463 F.3d 239 (2d Cir. 2006)).

Here, Defendants have not shown that disclosure of bed-day rates, unit prices, or staffing

10

plans would likely cause substantial competitive harm.  In support of their argument, Defendants submit declarations that offer speculative explanations and conclusory statements about the competitive nature of the industry and the ease with which competitors could reverse-engineer pricing information from bed-day rates and unit prices, leading to competitive harm as competitors underbid them on future bids.  Contrary to these assertions, the record shows a limited competitive market for detention services and does not show that prices, or more importantly, profit, could be derived with the specificity needed to meet Defendants' burden of showing competitive harm.

The Government divides its contracts with private companies into three kinds -- (a) contracts for Service Processing Centers ("SPCs"), facilities that are owned by ICE and usually operated by small business contractors; (b) contracts for Contract Detention Facilities, which are privately owned and operated currently by one of two large contractors; and (c) contracts through Intergovernmental Service Agreements ("IGSAs"), which are contracts with local governments to use state and local jails as detention facilities operated by private subcontractors.  The Government argues that the competitive considerations are different for each of the three contract types.  The first two are subject to a competitive bidding process; the IGSAs are not, although ICE does receive unsolicited proposals for IGSAs.  For all of the contract types, the Government asserts that disclosure of bed-day rates, unit prices and staffing plans would allow competitors to reverse engineer the contractor's pricing strategies with a fair amount of precision.

The Government's argument is not persuasive because, based on the record, a competitor could not reverse engineer pricing strategies without knowledge of a large number of unascertainable variables.  The bed-day rate, as Defendants and contractors admit, is a composite number, based on a number of facts, including "wages and associated costs, general and

administrative costs, and profits." Def. Br. at 13-14.  Pricing is complex and requires contractors to make multiple assumptions and calculations.  As one contractor described:

> When pricing these contracts, APSS must first develop a staffing plan based on all required security posts (from an "example" provided by the government).  Then we must pare down our staffing in order to be competitive by substituting technology where possible (such as additional remote surveillance cameras and electronic wrist bands).  Once staffing is determined, our pricing is based on anticipated 'productive' (i.e., working) hours based on the applicable collective bargaining agreements' listed hourly wages and benefits (e.g., health insurance and pension) and anticipated 'unproductive' hours such as vacation, sick leave, and training.  In addition to direct employee costs, we must take into account employer-paid employment taxes and insurance, General & Administrative (G&A) costs, and profit. (G&A costs include corporate expenses such as salaries, mortgages, utilities, legal fees, office supplies, general liability insurance, and other overhead expense not directly attributed to a contract . . . .)  These aggregate costs are then divided by the 'guaranteed' number of beds per year to derive a 'bed day rate'; or, in the current round, added together and divided by 12 months to get a monthly firm fixed rate.

Gates Decl. ¶ 12.  Similarly, another contractor explained:

> A contractor's . . . bed-day or per diem rate is an amount composed of several elements – (1) labor charges for non-exempt, hourly staff used to operate the facility, (2) labor charges for exempt, salaried staff in management and supervisory positions, (3) medical services and supplies, food service, inmate expenses, security expenses, utilities (based on local research on rates), program expenses, repairs and maintenance, leases, insurance, professional fees, personnel expenses, travel expenses, administration expenses and appropriate taxes, and (4) profit.

Venturella Suppl. Decl. ¶ 8.

Defendants provide one declaration that attempts to articulate in detail how a competitor could reverse-engineer per diem rates to undercut competitors, arguing that knowledge of per diem rates "would allow . . . competitors to determine [the contractor's] estimated per diem rate" and then "submit a rate lower than [the contractor's] expected rate."  Venturella Suppl. Decl. ¶¶ 9-21.  However, this complex, multi-step process relies on estimations and assumptions at every step of the analysis:  "The first step is to evaluate the labor portion of the incumbent's per diem

bed-day rate," "[n]ext, the competitor would develop its own staffing plan and expected labor costs," "[t]he next step involves estimated the annual salaries," "[t]he next steps involves estimating non-labor expenses including medical services and supplies, food service, inmate expenses, security expenses, utilities . . ., program expenses, travel expenses, administration expenses and appropriate taxes.".   Venturella Suppl. Decl. ¶¶ 12-19.

Even assuming that a competitor could reverse engineer a contractor's pricing structure with accuracy, Defendants have not shown that a competitor would be able to use that information to underbid a competitor.  As an ICE official stated, "Bed-day rates quoted by private contractors vary because they have different costs (overhead, general and administrative, salaries, staff) and profit margins."  Adams Decl. ¶ 17.  An individual contractor's costs and the profit margin it needs to earn may make underbidding an impossibility.  An ICE official explained in the context of SPCs, "the prices proposed by SPCs while competing against one another are dependent upon a multitude of factors, such as how well it understands the requirements and local working environment; balances risk and profit; innovates to save costs; has learned from past performance at other location, in particular past mistakes, and how eager it is for business."  Adams Decl. ¶ 13.

The record also shows that past contracts will not necessarily dictate an approach to a future contract.  Although it is possible that a company may have one overall algorithm structure that it adapts for bids around the country, the assumptions input into the algorithm would likely vary dramatically between a detention center in metropolitan New York and one in rural Texas.  For example, while a detailed staffing plan may aid in estimating past labor costs at one facility, it is unclear how helpful that information would be in bidding on a future contract, possibly in a different geographic location, in the midst of an ever-changing labor market.

13

Disclosure of pricing information, in particular, is consistent with the purposes of FOIA. The contract prices at issue

> [A]re not mere offer or bid prices; they are prices that the government agreed to pay, and that it did pay, for specified services that it purchased from the company. Disclosure of such information permits the public to evaluate whether the government is receiving value for taxpayer funds, or whether the contract is instead an instance of waste, fraud, or abuse of the public trust . . . . Such disclosure thus comes within the core purpose of FOIA: to inform citizens about 'what their government is up to.'

*McDonnell Douglas Corp. v. U.S. Dep't of Airforce*, 357 F.3d 1182, 1195 (D.C. Cir. 2004) (Garland, J., dissenting); *Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 43 (D.C. Cir. 2008) (Tatel, J., concurring) ("[G]iven that FOIA's primary purpose is to inform citizens about 'what their government is up to,' it seems quite unlikely that Congress intended to prevent the public from learning how much the government pays for goods and services.") (internal citations omitted). At issue in this case is the disclosure of financial information underlying government policy regarding immigration detention and incarceration, a controversial area of public debate where the public has the right to be informed. *See Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012) ("Consistent with its purpose to promote honest and open government, and to assure the existence of an informed citizenry in order to hold the governors accountable to the governed, FOIA strongly favors a policy of disclosure.") (internal quotation marks omitted)).

For these reasons, the unit prices, bed-day rates and staffing plans in government contracts with private detention facility contractors are neither "obtained from a person" nor confidential, and therefore are not protected from disclosure under Exemption 4.

### B. Exemption 7(E)

In its cross-motion, the Government asserts an additional ground for withholding staffing plans, arguing that they are compiled for law enforcement purposes and therefore protected under Exemption 7(E). This argument fails under a plain reading of the statute.

Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures *for law enforcement investigations or prosecutions*, or would disclose guidelines *for law enforcement investigations or prosecutions* if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7) (emphasis added).

The Government argues that the staffing plans were (1) "compiled by ICE for law enforcement purposes," Def. Br. at 25, and (2) reflect law enforcement techniques and procedures, "to wit, how ICE implements detention facility security standards for the use and allocation of personnel at detention facilities." Def. Reply Br. at 15 (quoting Supp. Pineiro Decl. ¶ 9). However, the Government does not even attempt to show what investigations or prosecutions are occurring within the detention centers or how a staffing plan constitutes a technique or procedure used for law enforcement investigations or prosecutions. As a result, Defendants cannot withhold information in staffing plans pursuant to Exemption 7(E).

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment is

GRANTED, and Defendant's cross-motion for partial summary judgment is DENIED. The Clerk of Court is respectfully directed to close Docket Nos. 74, 86, and 95.

    SO ORDERED.

Dated: July 14, 2016
       New York, New York

                            **LORNA G. SCHOFIELD**
                            **UNITED STATES DISTRICT JUDGE**